# EXHIBIT 8

MC-275

Name Guadalupe Fernandez

Address P.O. Box 705/ND-70-L

CTF North Facility

Soledad,CA.93960-0705

CDC or ID Number C-72642

SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA

(Court)

Guadalupe Fernandez
Petitioner

vs.

Ben Curry: et., al;
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. ______________________

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**
- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.
- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.
- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."
- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.
- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.
- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.
- Notify the Clerk of the Court in writing if you change your address after filing your petition.
- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the Judicial Council of California MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Page one of six

Penal Code, § 1473 et seq.; Cal. Rules of Court, rule 60(a)

American LegalNet, Inc. www.USCourtForms.com

**This petition concerns:**

[ ] A conviction
[XX] Parole
[ ] A sentence
[ ] Credits
[ ] Jail or prison conditions
[ ] Prison discipline
[ ] Other *(specify)*: ______

1. Your name: Guadalupe Fernandez

2. Where are you incarcerated? Correctional Training Facility, Soledad, California

3. Why are you in custody? [X] Criminal Conviction [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Murder 2nd / With use F'arm

b. Penal or other code sections: P.C. 187 (a) / 12022.5

c. Name and location of sentencing or committing court: Santa Clara County Superior Court 191 N. First Street., San Jose,CA.95113-1090

d. Case number: 89523

e. Date convicted or committed: September 8,1983

f. Date sentenced: September 8,1983

g. Length of sentence: 15 years to life

h. When do you expect to be released? Unknown

i. Were you represented by counsel in the trial court? [XX] Yes. [ ] No. If yes, state the attorney's name and address:

Mr. Nazario Gonzales Public Defender 70 W. Hedding St. San Jose,CA. 95110

4. What was the LAST plea you entered? *(check one)*

[ ] Not guilty [XX] Guilty [ ] Nolo Contendere [ ] Other: ______

5. If you pleaded not guilty, what kind of trial did you have?

[ ] Jury [XX] Judge without a jury [ ] Submitted on transcript [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PETITION

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PETITION

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PETITION

7. Ground 2 or Ground ______ (*if applicable*):

SEE ATTACHED PETITION

a. Supporting facts:

SEE ATTACHED PETITION

b. Supporting cases, rules, or other authority:

SEE ATTACHED PETITION

MC-275 [Rev. January 1, 1999] PETITION FOR WRIT OF HABEAS CORPUS Page four of six

8. Did you appeal from the conviction, sentence, or commitment? [ ] Yes. [XX] No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): ______

b. Result: ______ c. Date of decision: ______

d. Case number or citation of opinion, if known: ______

e. Issues raised: (1) ______

(2) ______

(3) ______

f. Were you represented by counsel on appeal? [ ] Yes. [ ] No. If yes, state the attorney's name and address, if known:

______

9. Did you seek review in the California Supreme Court? [ ] Yes. [XX] No. If yes, give the following information:

a. Result: ______ b. Date of decision: ______

c. Case number or citation of opinion, if known: ______

d. Issues raised: (1) ______

(2) ______

(3) ______

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

______

______

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

N/A

b. Did you seek the highest level of administrative review available? [ ] Yes. [XX] No.

*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: __________

(2) Nature of proceeding (for example, "habeas corpus petition"): __________

(3) Issues raised: (a) __________

(b) __________

(4) Result *(Attach order or explain why unavailable)*: __________

(5) Date of decision: __________

b. (1) Name of court: __________

(2) Nature of proceeding: __________

(3) Issues raised: (a) __________

(b) __________

(4) Result *(Attach order or explain why unavailable)*: __________

(5) Date of decision: __________

c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

__________

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

No Delays

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

__________

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

__________

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

This Court has original jurisdiction

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 1-5-07

Guadalupe Fernandez
(SIGNATURE OF PETITIONER)

Guadalupe Fernandez, C-72642
P.O. Box 705/ND-70-L
CTF North Facility
Soledad,CA.93960-0705

In Propria Persona

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

IN RE: GUADALUPE FERNANDEZ

PETITIONER

ON HABEAS CORPUS
_______________/

CASE NO. ____________

PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.

TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

Guadalupe Fernandez,C-72642
P.O. Box 705/ND-70-L
CTF North Facility
Soledad,CA.93960-0705

In propria Persona

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| IN RE: GUADALUPE FERNANDEZ<br><br>PETITIONER<br><br>ON HABEAS CORPUS | CASE NO. ________________<br><br>PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF. |

1.

PETITION FOR WRIT OF HABEAS CORPUS

TO: THE HONORABLE JUDGE OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA IN AND FOR THE COUNTY OF SANTA CLARA.

Comes Now Guadalupe Fernandez (hereafter petitioner) In Propria Persona. Petitioner is unlawfully restrained of his liberty. This petition is intended to give meaning to Guadalupe Fernandez's sentence of 15 years to life for second degree murder - by seeking to overturn the Board of Parole Hearings "Illegal And Unconstitutional" decision refusing to grant him parole for the (6th) time since becoming eligible for parole on December 9, 1993.

Under the parole ststute (penal code section 3041, amended 1976,c. 1139), parole is now the norm rather than the exception. (penal code section 3041 (a), the board "shall" normally set a parole release date at the initial hearing". A life prisoner must have a release date set when his release would not pose a danger to the public. (penal code section 3041 (b). That determination must be based on criteria set forth in the Penal Code. The Board is given latitude to formulate criteria implementing the statutory mandate. (Penal Code Section 5076.2). However, this criteria is limited to the parameters established by statute and legislative intent. (Terhune v. Superior Court, 65 cal. App. 4th 864, 872-873 (1998).

In the case of this petitioner, there is "No Evidence" in the record to support the Board's denial of parole at his (6th) parole hearing. The court is asked to issue a formal "Order To Show Cause" and require the respondent to present to the court justification for the Board's decision in this case. The court is asked to find the decision violated due process of law and order the Board to set this petitioner's parole release date. The court is also asked to declare the rights of the parties under the Due Process and Equal Protection Clauses, in regards to the Board's interpretation of Section 3041, Penal Code, and to issue habeas relief accordingly.

Generally, Petitioner asserts that he is being subjected to an unconstitutional condition in the determination of his parole applications because the Board of Parole Hearings has been operating outside the law pursuant to a policy against granting paroles, such that the parole statute has been and currently is misinterpreted to the extent that petitioner has been deprived all substantive due process protections of the law including his federally protected liberty in-

terest to parole. Petitioner asserts, within this context, that the Board has been found to be operating pursuant to a "No" parole policy which reduces parole hearings to pro forma sham hearings where parole commissioners are precluded by this policy (and their own abiding animus) from being fair or impartial, which violates substantive due process of law.

11.

PARTIES

PETITIONER, Guadalupe Fernandez, CDC#C-72642 is a prisoner of the state of California, incarcerated at the Correctional Training Facility Soledad, California.

RESPONDENT, Ben Curry, is the Warden of the Correctional Training Facility, Soledad, California and is the legal custodian of petitioner.

111.

STATEMENT OF THE CASE

Preliminary formalities (HT 1). 1/ (Exhibit 1, transcript of parole hearing conducted on August 17, 2006).

Guadalupe Fernandez (hereafter petitioner) was received by the California Department of Corrections & Rehabilitations (CDCR) on September 13, 1983, from Santa Clara County for the offense of Murder 2nd with use of a firearm. He is sentenced to an indeterminate term of 17 years to life. Case number SCL-89523. His minimum eligible parole date (MEPD) is set for November 29th, 1993.

1. References to the parole hearing transcripts will be indicated by HT followed by page number, i.e., (HT 0).

COMMITMENT OFFENSE

The following are statements taken from the petitioner's September 8th, 1983 probation officer's report and provided to the court as petitioner's exhibit number 2 at p. 2.

On July 9, 1983, at approximately 8:55 p.m., Fernandez went to 236 North 20th Street, San Jose, where the victim Edwardo Fernandes was talking to a Mr. Winstead, got out of his car, walked up to Edwardo Fernandez and shot him several times with a .45 Caliber Automatic. The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead.

Witnesses identified the defendant Guadalupe Fernandez and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he killed the victim because victim killed the defendamt's brother in a bar in Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed that his blood alcohol content was 0.21%. The .45 Caliber Automatic weapon was located in the rear bedroom of 326 North 20-th Street where Jesus Frausto had placed the weapon after he had knocked it out of the defendant's hand.

BOARD FINDINGS

In the matter of Guadalupe Fernandez, CDC # C-72642. The panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prision.

The offense was carried out in an especially especially callous manner. The motive or the offense was carried out in a dispassionate manner. We find that there is a record of assaultive behavior. Specifically, firing into an inhabited dwelling and a criminal conduct which consist primarily of alcohol and firearms violations for which he received probation. With regard to institutional behavior, we find that he does have three 128 (A)s, the last of which was in october of 1995, and six serious 115 disciplinary reports, The last of which was in July of 1990.

Assessment of Dangerousness, he likely will be a low-risk for violence in the free community, This is dependent on his alcohol and drugs in the future. (HT 55-56).

## IV.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Petitioner filed this petition in the superior Court in the first instance in asmuch as the Board of Parole Hearings no longer provides for administrative appeals.

## V.

## VERIFICATION

I am the petitioner in this action. All facts in the above documents, not otherwise supported by citation to the record, exhibits, of other documents, are true of my own personal knowledge. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this date 1-5-07, at the Correctional Training Facility at Soledad, California.

Guadalupe Fernandez

Guadalupe Fernandez

VII.

CRITERIA FOR PAROLE

The "unreasonable risk" requirement is the standard required by statute (3041,subd,[b]), and by the Board regulations in order to justify a denial of parole. (CCR 15. 2402,subd [a]), Section 3041,(a), Penal Code requires, in pertinent part:

> One year prior to the inmates minimum eligible parole date a panel consisting of at least two commissioners of the Board Of Parole Hearings shall again meet with the inmate and normally set a parole release date as provided in section 3041.5. The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to public.... Subd. [b] of section 3041 provides in pertinent part, that: the panel or board shall set a release date unless it dteermines that the gravity of the current convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration of this individual, and that a parole date, therefore, cannot be fixed at this meeting.

TITLE 15, DIVISION 2, BOARD REGULATIONS

2402. DETERMINATION OF SUITABILITY.

(a) General. The panel shall first determin whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. (emphasis added).

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before and after the crime; past and present attitude toward the crime; any conditions of treatment or controle, including the use of special conditions under which the prisoner may safely be releaseed to the community;

and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending To Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as guidelines; the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitabiliyt include:

(1) Commitment Offense: The prisoner committed the offense in an especially heinous, atrocious or cruel manner. the factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record Of Violence. The prisoner on previous occasions inflicted or attempted to inflect serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unsuitable Social History. The prisoner has a history of unsutable or tumultous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assualted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending To Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines;the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juenile Record. The prisoner does not have a record assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.The prisoner has experienced reasonably stable relationships with others.

(3) Signs Of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation For Crime. The prisoner commited his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Sydrome. (Not quoted here as inapplicable).

(6) Lack Of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be be put to use upon release.

(9) Institutional Behavior. Institutional activities and enhanced ability to function within the law upon release.

VIII.

PRAYER FOR RELIEF

Guadalupe Fernandez states that he has no other plain or speedy remedy save habeas corpus: therefore, he prays this Honorable Court:

1. Issue an order to show cause;
2. appoint counsel to represent petitioner in any and all proceedings in this matter.
3. Conduct an evidentiary hearing;
4. Order respondents to provide petitioner with reasonable discovery;
5. Declare the rights of the petitioner;
6. Grant any other further relief the court deems proper and just.

Date: 1-5-07

Respectfully, submitted

Guadalupe Fernandez

Guadalupe Fernandez

IX.

MEMORANDUM OF POINTS AND AUTHORITIES

THE LAW ON PAROLE

Penal Code section 3041, subdivision (a) requires that at a suitability hearing the board "shall normally set a parole release date...Subdivision (b) provides that a release date "shall" be set "unless" the Board determins that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this individual...See, e.g, In re Rosenkrantz, 29 Cal.App. 4th 616, at 653, (2002), citing to In re Ramirez, 94 Cal. App. 4th 549, at 565. The parole board regulations make this criterion more specific. The panel can deny only if the prisoner would pose an unreasonable risk of danger to society if released from prison. (Cal. Code Regs., tit 15, 2402, subd (a). The regulations set forth specific criteria to determine whether under the standard a prisoner is suitable for parole.

Under the rule created by the United States Supreme court in Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1,12, and Board of Pardons v. Allen (1987) 482 U.S. 369, 377-378, a state's statutory parole scheme which used mandatory language "creates a presumption that parole will be granted" when or unless certain designated findings are made, and therefore gives rise to a constitutional liberty interest. The California parole scheme uses mandatory language which is parallel to the parole scheme found in Greenholtz and Allen

to give rise to a protected liberty interest in parole. Accordingly, the California parole scheme gives rise to a cognizable liberty interest in release on parole. See also, McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. Cal.2002); and Biggs v. Terhune, 334 F.3d 910 (9th Cir. Cal. 2003), affirming these propositions in California's section 3041, penal code. Following on the heels of McQuillion, supra, the siminal case of In er Rosenkrantz held that the satutory parole scheme creats a liberty interest under California due process of law. Id., at 29 Cal. 4th at 668, fn.12. The court then applied the clearly established federal due process test to review a gubernatorial decision to deny parole. It recognized that a gubernatorial decision is subject to judicial review to determine whether there is "some evidence" to support the decision. In this case, the decision by the Board to find petitioner unsuitable for parole is also subject to review to determine if there is some evidence to support the decision, the evidence must bear some indicis of reliability, Cato v, Rushen, 824 F. 2d 703, 705 (9th Cir. Cal. 1987); also, Jancsek v. Oregon Board of Parole. 833 F. 2d 1389, 1390. (9th Cir. 1987). The evidence must be relevant and material to the decision. (Cal. Code Regs., 15. 2000 (b) (50) Good Cause; (63) Material Evidence, (90) Relevant Evidence (Ibid. (50) Good Cause: A finding by the board based upon a preponderance of the evidence that there is a factual basis and good reason for the decision made. Evidence which tends to prove or disprove an issue or facts in dispute.In re Caswell, 92 Cal. App. 4th 1017, 1030;McQuillion supra, 306F.3d at 906,910.

A. THE DECISION TO FIND PETITIONER UNSUITABLE FOR PAROLE IS AN ABUSE OF DISCRETION AND VIOLATES DUE PROCESS; PETITIONER MUST BE GRANTED A PAROLE DATE.

1. THE DECISION IS NOT SUPPORTED BY ANY RELEVANT OR MATERIAL EVIDENCE.

Proceeding under the presumption that the evidence must be relevant and material, there was no relevant or material evidence to base denial of parole to petitioner. Under federal due process analysis, after finding a liberty interest, it must be determined what process is due. Morrissey v. Brewer (1972) 408 U.S. 471,481. In this context, the United States Supreme Court has held that there must be "some evidence" Superintendent v. Hill (1985) 472 U.S. 445,456, where it states that "the fundamental fairness guarnteed by the due process clause does not require courts to set aside decisions of prison administrators that have some basic fact."

Additionally, the evidence underlying the Board's decision must have some indicia of reliability. Jancsek, supra 833 F. 2d at 1390. In this case, petitioner contends that the Board of Parole Hearings erroneously concluded there is some evidence to justify the finding that he is suitable for parole.

(a). THE COMMITMENT OFFENSE DOES NOT CONSTITUTE "SOME EVIDENCE" FOR DENIAL OF PAROLE IN THIS CASE.

In finding petitioner unsuitable for parole the panel stated that the commitment offense was carried out in an especially vicious and brutal manner. Additionally, the motive of this crime was inexplicable and trivial in relationship to the offense. Moreover, the offense was carried out in a manner which demonstrates exceptional insensitive disregard for human suffering.Such a finding is contrary to the facts of the case, where the record indicates petitioner would pose a

low degree of risk to society if he were released from prison at this time. It could be argued that any and all murders are carried out in a vicious, brutal manner without regard to human suffering. and in fact is what second degree murder is. But used as a regulation for unsuitability would have to denote something greater than an ordinary or typical killing. Nonetheless, as the psychological evaluation report clearly demonstrates, petitioner has made substantial and significant progress in growth and maturation while incarcerated. The record is replete with his achieving the correctional objectives of reforming his life, and it would be a disservice to the professionalism and programs of the Department to devalue petitioner's officially-recognized progress and deny him parole because he committed the offense. Despite this offense, he was sentenced to a parolable sentence. Certainly, his case falls within the meaning expressed in Ramirez, supra, that any murder is parolable under the statute. Yet, the panel made no effort to distinguish his offense as containing circumstances which are beyond the minimum necessary to sustain a conviction for the crime of second degree murder.

2. THE BOARD"S BOILERPLATE RELIANCE ON STATIC HISTORY FACOTORS VIOLATES FUNDAMENTAL DUE PROCESS.

The Ninth Circuit has expressed concern about the use of the commitment offense to repeatedly deny parole. As the circuit in Biggs v. Terhune (9th Cir. 2003) 334 F. 3d 910,916, recently acknowledge: "Due process is not a mechanical instrument. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the constitution has entrusted with the unfolding of the process. "Lankford v. Idaho 500 U.S. 110,121 (1991 (quoting

Joint Anti-Fascist Refugee Comm. v.McGrath,341 U.S. 123, 163 (1951) (Frankfuter, J., Concurring). A continued reliance in the future on an unchanging factor, the circumstances of the crime... runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. See also, In re Rosenkrantz, supra, 29 Cal. 4th at 689 (Moreno, J., concurring). (Emphasis added).Biggs was denied at his first initial parole hearing. The Circuit allowed that the commitment offense could be used at that initial hearing as a legitimate cause for denial of parole, but questioned whether it could be used as a factor to continue denying parole at subsequent hearings. At first blush, the use of the offense in the petitioner's case at his initial hearing might have been upheld as "some evidence". but the hearing challenged here is his (6th) subsequent hearing. The Biggs court gave clear indication that had it been Biggs subsequent hearing, the court may have found against the Board on using the offense to again base parole denial on.

When considering the offense as circumstances for unsuitability the Board must be and should be mindful that the circumstances of the offense are static and unchangeable. The most important aspect of this case is the dynamic changes that years of imprisonment and exposuer to positive, behavioral programs has made in this petitioner. The record shows that he has achieved the objective of corrections, i.e., to correct behavior, and the record shows official and professional recognition that he does not pose an unreasonable risk to public safety if paroled. Thus, since there is no evidence whatsoever of unreasonable risk, which is the standard by which the Board's decision legally hinges, the Board's decision denying petitioner parole must be reversed. The statutory default must be enforced in this case.

3. THE BOARD'S STATEMENT OF REASON WAS INADEQUATE.

The Board's statement of reasons were inadequate and inappropriate. In In re Strum (1974) 11 Cal. 3d 258, 113 Cal. Rptr. 361, 521. P. 2d 97. The California Supreme Court held that in order to comply with a prisoner's due process rights, the Board must "support all its denials of parole with a written definitive statement of its reasons therefore and to communicate such statements to the inmate concerned". (Id., at P. 273.) The Strum court articulated three rationales as to why the Board must provide a written statement of reasons granting parole: (1) to promote carefule decision making; (2) to allow inmates to make an informed application for relief if parole is denied; and (3) to permit meaningful judicial review. (Id., at P. 270.) Other courts have taken similar positions where judges have failed to adequately articulate their findings. See People v. Martin (1986) 42 Cal. 3d 905, 913-915, and cases cited. In Martin the court said, citing several cases, such as In re Podesto (1976) 15 Cal. 3d 921, that

> "we emphasized that a requirement of articulated reasons to support a given decision serves a number of interests; it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring that the judge himself analyzes the problem and recognizes the grounds for his decision-making process by helping to persuade the parties and the public that the decision-making is careful, reasoned and equitable". (Ibid.)

Here, the Board's statement of reasons is crtptic at best. It merely recites the commitment offense as the primary basis upon which it denied parole and list pro forma boilerplate terminology from its Parole Denial Worksheet/Fm. 1000A. It dose not explain what it is about the commitment offense and its inclusive aggravvting circumstances that make the petitioner an "unreasonable risk of danger to society if

released". (see section 2402, subd. (a).) or how the commitment offense was "particularly egergious". It did not explain how all the evidence supporting petitioner's suitability for parole, including all the psychological clearances, and lack of any violent criminal history did not outweigh under the ordinary rules of the "perponderance of evidence" standard employed by the Board's regulations (see section 2000 (b), (50) - the static history of the commitment offense. Therefore, the Board's abused its discretion in violation of procedural due process by failing to properly apply its own burden of proof.

The Court is not here asked to substitute its judgment for that of the Board, nor is ti asked to weigh or reweigh the evidence. Rather the court is asked to review de novo the pre-decisional process of the hearing, including the evidence submitted, determined the legal signicance of that evidence as relevant or irrelevant, and then determine if the Board met its own standard of proof in weighing and balancing process.

4. THE DECISION TO DENY PETITIONER PAROLE WAS ARBITRARY AND AN ABUSE OF DISCRETION, UNSUPPORTED BY "SOME EVIDENCE," VIOLATING HIS RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.

Although the Board of parole Hearings (hereafter Board) discretion in parole matters has been described as "broad", it is not "absolute" (In re Powell (1988) 45 Cal. 3d 894,940), as its discretion is "cabined" by criteria, in petitioner's case, listed in the California Code of Regulations, title 15 § 2402 McQuillion v. Duncan (9th Cir. 2003) 306 F.3d 895, 912). Petitioner has not only a "liberty interest" in parole (In re Rosencrantz (2002) 29 Cal. 4th 616,652) but

an "expectation that [he] will be granted parole unless the Board finds in the exercise of its discretion that [the prisoner is] unsuitable for parole in light of the circumstances specified by statute and by regulations" (Ibid. at 654, emphasis added). Petitioner's liberty interest in and "expectation" of parole, dose ← does not attach upon being found suitable for parole, but upon entrance of prison gates (Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915). A decision of unsuitability for parole must be supported by some evidence having some indicia of reliability (Ibid., citation). There must also be a rational connection between the evidence and the decision made; if not the decision is arbitrary and an abuse of discretion, violating the due process clause (Guidotti v. County of Yolo (1989) 214 Cal. App. 3d 1552, 1561; Oregon Resource Council v Lowe (9th Cir. 1997) 109 F.3d 521, 526).

As will be demonstrated, the decision to deny petitioner parole for the sixth time, is not supported by "some evidence" and is therefore an abuse of discretion, violating his right to due process. (Rosenkrantz v. Marshall, 444 F. Supp. 2d 1063. C.D. Cal. (2006) U.S. Dist. Lexis 79358; (Martin v. Marshall, 431 F. Supp. 2d 1038 (N.D. Cal. 2006).

## AEGUMENTS

a. THE COMMITMENT OFFENSE, FOR THE SIXTH TIME, IS NOT "SOME EVIDENCE" UPON WHICH PAROLE CAN BE DENIED.

Petitioner's sixth parole hearing was held on August 17, 2006. Presiding Commissioner, Mr. James Davis states: This hearing is being conducted pursuant to Penal Code Section 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing parole consideration hearings for life inmates. (HT 7).

In closing, the panel states: In the matter of Guadalupe Fernandez CDC number C-72642. The panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. For the sixth time the Board relied on the unchanging factors of petitioner's case to deny him parole. The Board finds the offense was carried out in an especially callous manner. The motive or the offense was carried out in a dispassionate manner. (HT 55).

The relevant evidence does not merely fail to support but refutes the conclusion that the petitioner committed his offense in a dispassionate manner (In re Scott 119 Cal. App. 4th 889). This is petitioner's sixth suitability hearing. It has been 22-years since petitioner committed his offense. Under these circumstances, the nature of the offense has lost any predictive value and the continued reliance on it to find petitioner unsuitable violated due process. (Bair v. Folsom State Prison 2005 U.S. Dist. Lexis 29952 (E.D. Cal. 2005). The Biggs court held, in relevant part:

> [The] parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by the state. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs offense and prior conduct would raise serious questions involving his liberty interest in parole. A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment runs contrary to the rehabilitative goals espoused by the prison system. (Biggs v. Terhune, supra, 334 F.3d at 916-917).

b. THE OFFENSE WAS NOT PARTICULARLY EGREGIOUS.

One year prior to a prisoner's minimum eligible parole release date, the Board "shall normaly set a parole release date" (penal Code§ 3041 (a)). The only statutory expecption to "shall normally set a parole release date" is the gravity of the current or past convicted offenses, or timing and gravity of the current or past convicted offense or offenses (penal code § 3041 (b)). This has been interpreted to mean : The character of the offense alone may justify a denial of parole if the offense involves "particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder" (In re Rosenkrantz, supra, 29 Cal. 4th at 683). However, we must be mindful that [t]he Board's authority to make a exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted (Ibid., quoting with approval In re Ramirez (2001) 94 Cal. App. 4th 549, at 570).

This was clearly a senseless and unjustified crime. It was not however, particularly egregious when compared to other murders. Indeed, the crime falls squarely within the middle of the Board's matrix given the nature and behavior of both the victim snd the petitioner. The facts of this case show that the petitioner shot a man to death in the heat of passion.

As held by Ramirez court:

> The circumstances of any past offense, even any murder, not necessarily a sufficient ground for the Board to refuse to set a parole date.... And the Legislature has clearly expressed its intent that when murders--who are the great majotity of inmates serving indeterminate sen-

> tences--approach their minimum eligible parole date, the Board shall normally set a parole release date (Pen. Code § 3041, subd. (a)). (In re Ramirez, 94 Cal. App. 4th at 569-570).

Petitioner could have been denied parole, at least at his initial parole hearing, if his offense was "particularly egregious."

> In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense....[P] Therefore, a life term offense or any other offense underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date (In re Rosenkrantz, supra, 29 Cal. 4th at 683, citation).

## CONCLUSION

When the court applies the some evidence standard as properly understood to the circumstances of Guadalupe Fernandez, the court will find that the Board's decision was not based on some relevant reliable evidence that reasonable suggest that he poses a current, unreasonable threat to public safety. For these reasons, the petitioner respectfully request that this court vacate the Board's determination of unsuitability and direct yhe Board to set a parole date for Guadalupe Fernandez.

Date: 1-5-07

Respectfully, submitted

s: Guadalupe Fernandez

DECLARATION OF GUADALUPE FERNANDEZ

I declare as follows:

I am the petitioner in this case. I am over the age of eighteen years. I am aparty to the attached action. I am a resident of the Correctional Training Facility in Soledad, California. My address is Post Office Box 705 / ND- 70-L, CTF North Facility, Soledad, California. 93960-0705. I served the attached document entitled "WRIT OF HABEAS CORPUS" on the persons/parties specified below by placing a true copy of said document into a sealed envelope with the appropriate postage affixed thereto and surrendering said envelope to the following:

OFFICE OF THE ATTORNEY GENERAL
300 S. SPRING STREET.
LOS ANGELES, CA.90013

I declare under penalty of purjury under the laws of the United States that the foregoing is true and correct. Executed this 5Th day of January, 2007 at the Correctional Training Facility in Soledad, California.

Guadalupe Fernandez
Declarant

# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

| In the matter of the Life Term Parole Consideration Hearing of:<br><br>GUADALUPE FERNANDEZ | ) ) ) ) ) ) | CDC Number C-72642 |
|---|---|---|

CALIFORNIA TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 17, 2006

PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Guadalupe Fernandez, Inmate
Mr. Patrick Sparks, Attorney for Inmate
Mr. David Ugalve, Interpreter
Mr. Ed Martinez, Commissioner/Observer
Mr. Ronald Rico, Deputy District Attorney (via videoconference)
Correctional Officers, Unidentified

INMATE COPY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes

See Review of Hearing Transcript Memorandum

Tracy Richardson

Vine, McKinnon & Hall

INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 18 |
| Post-Commitment Factors | 22 |
| Parole Plans | 30 |
| Closing Statements | 44 |
| Recess | 54 |
| Decision | 55 |
| Adjournment | 59 |
| Transcriber Certification | 60 |

--oOo--

P R O C E E D I N G S

DEPUTY COMMISSIONER BLONIEN: Okay. We're on record.

PRESIDING COMMISSIONER DAVIS: This is a Subsequent Parole Consideration Hearing for Guadalupe Fernandez, CDC number C-72642. Today's date is August 17th, 2006. We're located at the Correctional Training Facility in Soledad. The inmate was received on September 13th, 1983, from Santa Clara County. The life term began on September 13th, 1983, with a minimum eligible parole date of November 29th, 1993. The controlling offense for which the inmate's been committed is Murder Second with use of a Firearm. Case number SCL-89523, Count One, Penal Code section 187/12022.5. The inmate received a term of 15 years to Life, plus two. This hearing is being tape-recorded and, for the purposes of voice identification, we will each state our first and last name, spelling the last name. When it reaches you, Mr. Fernandez, if you will also give us your CDC number, please, sir. So I will start and move to my left. I'm James Davis, D-A-V-I-S, Commissioner.

DEPUTY COMMISSIONER BLONIEN: I'm Noreen Blonien, B-L-O-N-I-E-N. I'm a Deputy Commissioner.

ATTORNEY SPARKS: Patrick Sparks, S-P-A-R-K-S, attorney for Mr. Fernandez.

INMATE FERNANDEZ: Guadalupe Fernandez.

ATTORNEY SPARKS: You can spell it in Spanish if you

want.

**INMATE FERNANDEZ:** F-E-R-N-A-N-D-E-Z.

**PRESIDING COMMISSIONER DAVIS:** All right, and your CDC number, please, sir.

**INMATE FERNANDEZ:** C-72642.

**PRESIDING COMMISSIONER DAVIS:** Very well, thank you.

**INTERPRETER UGALVE:** David Ugalve, U-G-A-L-V-E, from Monterey County, Interpreter.

**COMMISSIONER MARTINEZ:** Ed Martinez, M-A-R-T-I-N-E-Z, Commissioner/Observer.

**DEPUTY DISTRICT ATTORNEY RICO:** Ronald Rico, R-I-C-O, Deputy District Attorney of Santa Clara County by video conference.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. And let the record also reflect we're joined by two correctional officers who are here today for security purposes only and will not be actively participating in this hearing. Before we actually do anything else, Mr. Ugalve, I'll go ahead and swear you in. Do you solemnly swear to interpret to the best of your ability accurately from English to Spanish and Spanish to English?

**INTERPRETER UGALVE:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Thank you. All right, if you will, in front of you is the Americans with Disabilities Act Statement. Would you please read that for Mr. Fernandez?

[Thereupon, the ADA Statement was read to the inmate

in Spanish.]

INTERPRETER UGALVE: Okay, it's fine.

PRESIDING COMMISSIONER DAVIS: All right, sir, and our records indicate that on April 10th of 2006, together with staff from the institution, that you reviewed and signed the BPT Form 1073 indicating that you do not have any disabilities that would qualify under the Americans with Disabilities Act, but that you do need language interpretation which is, of course, what our interpreter is here for today. So is all that accurate, sir?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: All right. Has anything changed since that time?

INMATE FERNANDEZ: No. Only my eyes. I cannot see very well.

PRESIDING COMMISSIONER DAVIS: All right, do you have glasses that you wear normally?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: All right, and you brought those with you today?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: And they work all right for you?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: Now, are you able to read in English?

INMATE FERNANDEZ: No.

**PRESIDING COMMISSIONER DAVIS:** Now, are you able to -- when you reviewed your -- you waived your -- your right to review your Central File. Is that correct, sir? We're getting a little -- excuse me just one second. We're getting a little feedback from your end. Not feed back, but just more of you on the phone.

**DEPUTY DISTRICT ATTORNEY RICO:** I'm -- I'm sorry about that. Perhaps we should state for the record that there's been a little bit of a glitch in the video conference hook-up, so we have both an audio line as well the video line, and my technician is trying to work on that.

**PRESIDING COMMISSIONER DAVIS:** Right, and -- and that is -- that is absolutely correct and we are -- we're trying to -- to bridge the technical difficulties here to make sure we proceed appropriately. But we do have -- we do have video, that there is some delay from the actual audio which is by telephone line and they are doing some work on -- on I think both of our ends trying to figure out exactly what the problems are and get those resolved. But until then we're -- we're making the best of it.

**DEPUTY DISTRICT ATTORNEY RICO:** I apologize for the oversight on my part for getting the -- the open line while I was trying to resolve that. But if you could step back and ask the inmate that question again so the audio picks up the answer.

**PRESIDING COMMISSIONER DAVIS:** You bet. We're --

we're discussing the -- the C-File review, that you reviewed your right to review your C-File? Did you decide you didn't want to -- to review your C-File?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Okay, and why was --

**INMATE FERNANDEZ:** I don't have nothing to review.

**PRESIDING COMMISSIONER DAVIS:** It wasn't for lack of interpreter or anything. It was just because you chose not to review it?

**INMATE FERNANDEZ:** Yeah, because I didn't want to.

**PRESIDING COMMISSIONER DAVIS:** All right, very well. So you have your glasses. You can hear me all right?

**INMATE FERNANDEZ:** Yes.

**DEPUTY COMMISSIONER BLONIEN:** We've lost the (inaudible).

**PRESIDING COMMISSIONER DAVIS:** Okay, hang on just a second. I -- I apologize for this. We're having some technical difficulties so just bear with us. It -- it has nothing to do with you. Are you with us?

**DEPUTY DISTRICT ATTORNEY RICO:** I'm still live on the line.

**PRESIDING COMMISSIONER DAVIS:** Okay.

**DEPUTY DISTRICT ATTORNEY RICO:** Did you lose the video connection?

**PRESIDING COMMISSIONER DAVIS:** Did we? I -- I didn't notice.

**DEPUTY COMMISSIONER BLONIEN:** Yeah, but it came

back. You went off for about 30 seconds and you came back.

**DEPUTY DISTRICT ATTORNEY RICO:** So I do have a live landline here. I can copy everything you're saying and for purposes of the hearing. I -- I see no difficulty with that. If we lose video connection, I can still hear you.

**PRESIDING COMMISSIONER DAVIS:** All right, and -- and if for some reason again that we've lost you and you can't hear us any longer, I don't know, waive or something and we'll -- it'll attract our attention.

**DEPUTY DISTRICT ATTORNEY RICO:** Thank you, Commissioner.

**PRESIDING COMMISSIONER DAVIS:** All right. All right, Mr. Fernandez, again I apologize for the interruptions here, but we'll -- we'll do our best to proceed forward. So --

**INMATE FERNANDEZ:** It's okay.

**PRESIDING COMMISSIONER DAVIS:** -- Counsel, you're satisfied that your client is -- is ready and -- and healthy and -- and able to proceed today?

**ATTORNEY SPARKS:** Yes.

**PRESIDING COMMISSIONER DAVIS:** And Mr. Fernandez, do you agree with that? Your -- nothing that you can see that would interfere with your ability to actively participate in this hearing today?

**INMATE FERNANDEZ:** Yes.

PRESIDING COMMISSIONER DAVIS: All right, very well. Now, this hearing is being conducted pursuant to Penal Code Sections 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing parole consideration hearings for life inmates. The purpose of today's hearing is to once again consider the number and nature of the crimes for which you were committed, your prior criminal and social history, and your behavior and programming since your commitment. We've had the opportunity to review your Central File and your prior transcripts, and you will be given the opportunity to correct or clarify the record as we proceed. Now, we will reach a decision today and inform you whether or not we find you suitable for parole and the reason for our decision. If you are found suitable for parole the length of your confinement will be explained to you. Nothing that happens in today's hearing will change the findings of the court. The Panel is not here to retry your case. The Panel is here for the sole purpose of determining your suitability for parole. You understand that, sir?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: This hearing will be conducted in two phases. First, I will discuss with you the crime for which you were committed, as well as your prior criminal and social history. Following that, Commissioner Blonien will discuss with you your

counselor's report, your progress since your commitment, and your psychological evaluation, as well as your parole plans and any letters of support or opposition as they may exist. Once that's concluded, the Commissioners, the District Attorney, and then your attorney will have an opportunity to ask you questions. Questions that come from the District Attorney will be asked through the Chair and you will respond back to the Panel with your answer. Following that, the District Attorney and then your attorney will make closing statements, followed by your closing statement, which should focus specifically on your suitability for parole. The California Code of Regulations states that regardless of time served an inmate shall be found unsuitable for and denied parole if, in the judgment of the panel, the inmate would pose an unreasonable risk of danger to society if released from prison. You have certain rights. Those rights include the right to a timely notice of this hearing, the right to review your Central File and the right to present relevant documents. Counselor, are you satisfied that your client's rights have been met to date?

**ATTORNEY SPARKS:** Yes.

**PRESIDING COMMISSIONER DAVIS:** You have an additional right and that is to be heard by an impartial panel. Now, you've heard your Commissioners introduce our -- ourselves today. Is there any reason to believe that you would -- that we would not be impartial?

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. You will receive a written copy of our tentative decision today. That decision becomes effective within 120 days. A copy of the decision and a copy of the transcript will be sent to you. The -- the Board has eliminated its appeal process. If you disagree with anything in today's hearing, you have the right to go directly to court with your complaint. You are not required to admit your offense or discuss your offense. However, the Panel does accept the findings of the court to be true. Do you understand that, sir?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** All right. Commissioner, are we going to be dealing with anything from a confidential file today?

**DEPUTY COMMISSIONER BLONIEN:** No, there's no confidential information.

**PRESIDING COMMISSIONER DAVIS:** All right. Thank you. I'm going to be passing a checklist of documents to defense counsel in the room. It's dated 7/26/06. And I'm assuming that you have a similar list on your -- on your end?

**DEPUTY DISTRICT ATTORNEY RICO:** Commissioner Davis, I have a checklist dated 7/26/06 lower right-hand corner. I have all of those documents and I'm prepared to proceed.

**PRESIDING COMMISSIONER DAVIS:** Very well, thank you.

**ATTORNEY SPARKS:** I have those documents, thank you.

**PRESIDING COMMISSIONER DAVIS:** Very well. We'll mark that Exhibit 1 then. Any additional documents you'd like to submit?

**ATTORNEY SPARKS:** No, thank you.

**PRESIDING COMMISSIONER DAVIS:** Any preliminary objections?

**ATTORNEY SPARKS:** No.

**PRESIDING COMMISSIONER DAVIS:** Okay.

**ATTORNEY SPARKS:** Oh, actually, I do. This report from San Jose Police Department just came in today. It's dated July 21st, 2006. We just object to it. We didn't receive it until today. The ten-day processing of these documents --

**PRESIDING COMMISSIONER DAVIS:** Are you able to hear Mr. Sparks all right on your end?

**DEPUTY DISTRICT ATTORNEY RICO:** Perhaps if he could speak up a little louder. I copied July 21st (inaudible) the San Jose Police Department letter in opposition.

**PRESIDING COMMISSIONER DAVIS:** Yes, it was just received in today's -- as -- as we all arrived today, we got this today. This is that continuing problem of trying to get documents appropriately distributed.

**DEPUTY DISTRICT ATTORNEY RICO:** The only thing I would ask is that it would appear San Jose Police Department sent it out in timely fashion and it seems to

be a problem within the institution distributions thereof. If -- if the Panel were to consider this -- this timeliness problem, perhaps the file could be reviewed to see if there's been prior opposition.

**PRESIDING COMMISSIONER DAVIS:** All right, we can -- well, we have -- we have two issues then on the table. The first one is the timeliness issue and that is that this letter was received -- although written in a timely manner not -- not received by defense counsel in a timely manner and, therefore, I'll sustain that objection. The other request is that we look and see if there are other letters of objection in the existing file perhaps from the last hearing and we can certainly do that.

**DEPUTY DISTRICT ATTORNEY RICO:** Thank you, and one other matter. I will just tell you my technician called and indicated that he has the telephone companies looking into the matter. They're calling back in about 30 minutes if you have any problem on the line.

**PRESIDING COMMISSIONER DAVIS:** Good. Well, perhaps we can get this resolved before our next hearing today then that will good news. All right, any other objections, Counsel?

**ATTORNEY SPARKS:** No, thank you.

**PRESIDING COMMISSIONER DAVIS:** And will your client be speaking with us today?

**ATTORNEY SPARKS:** Yes.

**PRESIDING COMMISSIONER DAVIS:** All right, then if

you'll raise your right hand then, Mr. Fernandez. Do you solemnly swear or affirm that the testimony you will give at this hearing will be the truth and nothing but the truth?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Thank you. All right, for a review of the crime I'm going to refer to the Court of Appeals document starting on Page 2 where it states,

"On July 9th, 1983, at approximately 8:55 p.m., Mr. Fernandez went to 236 North 20th Street, San Jose, where Eduardo Fernandez was talking to a Mr. Winstead, W-I-N-S-T-E-A-D. Got out of his car, walked up to Eduardo Fernandez, and shot him several times with a .45 caliber automatic. The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead. Witnesses identified the defendant and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he had killed the victim because the victim had killed the defendant's brother in a bar fight in Mexico seven years prior. Analysis of a blood sample obtained from defendant revealed that the blood alcohol

content was a .21. The .45 caliber automatic weapon was located in the rear bedroom of 326 North 20th Street where Jesus Frausto, F-R-A-U-S-T-O, had placed the weapon after he knocked it out of the defendant's hand."

So Mr. Fernandez, did you commit this crime?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Okay. And why did you do this?

**INMATE FERNANDEZ:** The reason is that because he had killed one of my brothers. And I was flat-out drunk.

**PRESIDING COMMISSIONER DAVIS:** And how did you know that he was the person responsible for killing your brother?

**INMATE FERNANDEZ:** How did I know?

**PRESIDING COMMISSIONER DAVIS:** Yes, how did you know that this -- that the victim was the one responsible for killing your brother?

**INMATE FERNANDEZ:** He was the one because he belonged to the same family.

**DEPUTY DISTRICT ATTORNEY RICO:** Commissioner Davis?

**PRESIDING COMMISSIONER DAVIS:** Yes?

**DEPUTY DISTRICT ATTORNEY RICO:** We may have lost the video connection, but we still have the audio. You may inadvertently refer to the Court of Appeal document as the (inaudible) the Statement of Facts. I think it's actually the probation report. It's just that --

PRESIDING COMMISSIONER DAVIS: Oh.

DEPUTY DISTRICT ATTORNEY RICO: -- clear. (inaudible) Court of Appeals.

PRESIDING COMMISSIONER DAVIS: No, you are right. There is -- I had looked at the title originally and thought it was Court of Appeal, but it is a probation document. Thank you for the correction. So getting back to -- how did -- how did you know that this was the man responsible?

INMATE FERNANDEZ: He was my brother-in-law.

PRESIDING COMMISSIONER DAVIS: But how did you know that he was responsible for the death?

INMATE FERNANDEZ: I was here. They call me on the phone that he was the one that killed my brother.

PRESIDING COMMISSIONER DAVIS: So someone called you and told you that?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: And how long -- how long before the -- the incident offense did that happen?

INMATE FERNANDEZ: When I killed him.

PRESIDING COMMISSIONER DAVIS: So it was that day that you learned that he had killed your brother?

INMATE FERNANDEZ: Yeah, the same moment.

PRESIDING COMMISSIONER DAVIS: So, as I understand your -- your testimony is that you got a phone call just prior to the murder?

INMATE FERNANDEZ: Yes.

**PRESIDING COMMISSIONER DAVIS:** And -- but this -- this -- the death of your brother had occurred some seven years prior. Is that correct?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** And -- and why -- why that day? How did -- how did -- what had happened that they learned or that you had just learned that the -- that this was the person responsible for your brother's death?

**INMATE FERNANDEZ:** That -- that day I was drinking, I was drunk and that is when I remembered the couple.

**PRESIDING COMMISSIONER DAVIS:** And so it wasn't a matter that you got a phone call that day. You just remembered that day. Is that accurate?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Okay. Do you -- as you sit here today, do you think you have a fairly good recollection of the events of that day?

**INMATE FERNANDEZ:** No, I don't remember all.

**PRESIDING COMMISSIONER DAVIS:** Okay. Just let me -- from that same report -- let me read your statements from that statement report. "The defendant does not speak English and at the defendant's request and with his approval, inmate interpreter Carlos Paniagua, P-A-N-I-A-G-U-A, was used as an interpreter." And from that same report on Page 2, it states that,

"In a verbal statement the defendant admitted

that he killed Eduardo Fernandez. Indicated that Eduardo had killed his brother seven years ago. He also indicated that he was very drunk at the time and believes that if he had not been so drunk he would not have killed Eduardo. He had purchased the .45 caliber automatic approximately five months earlier for the purpose of protecting his home."

And that's -- that's pretty much all you had to say on this particular topic. So the -- the gun was one that you had purchased?

**INMATE FERNANDEZ:** No, I had it. I didn't buy it.

**PRESIDING COMMISSIONER DAVIS:** Where did you get the gun?

**INMATE FERNANDEZ:** It belonged to a nephew of mine.

**PRESIDING COMMISSIONER DAVIS:** And when had you borrowed it?

**INMATE FERNANDEZ:** It was there at my home.

**PRESIDING COMMISSIONER DAVIS:** Okay. So how well did you know the victim in this case?

**INMATE FERNANDEZ:** From Mexico.

**PRESIDING COMMISSIONER DAVIS:** How many years?

**INMATE FERNANDEZ:** All the life.

**PRESIDING COMMISSIONER DAVIS:** All your life. Had you had any other arguments with him or any other disagreements?

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** You know why he was the one that was accused of killing your brother?

**INMATE FERNANDEZ:** Oh, because he was drunk and my brother wanted to drive him home.

**PRESIDING COMMISSIONER DAVIS:** Do you -- do you think -- because alcohol clearly seems to be a significant part of this and you said even in the original probation officer's statement that if you weren't drunk you might not have done this. Do you think it was more the anger over the death of your brother or the alcohol that caused this to happen?

**INMATE FERNANDEZ:** I was drunk. I never wanted to do to him anything.

**PRESIDING COMMISSIONER DAVIS:** So it was really more -- more the alcohol than the anger, do you think?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Okay. In that regard, it says that you, in the same probation officer's report, denied any illegal use of drugs or narcotics, but that you did at that time consume about ten beers a week on average.

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** So about -- that would be about an average amount of alcohol that you would consume on average? About ten beers a week?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** And would it be more

on weekends?

**INMATE FERNANDEZ:** Once in a while.

**PRESIDING COMMISSIONER DAVIS:** On the particular -- on the day of the -- of the murder was there a reason why you had been drinking perhaps more than you normally do?

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** Again, the same report it indicates that on September 16th -- and this is in terms of your prior record, September 16th, 1977, you were granted two years probation after being convicted of carrying a loaded firearm in a public place. And then on January 19th, 1978, you received another grant of two years probation for shooting in an occupied dwelling. What was the -- the association with firearms here? How come you were -- how come you were associated with so many firearm incidents?

**INMATE FERNANDEZ:** I liked firearms but not to damage anybody.

**PRESIDING COMMISSIONER DAVIS:** What was the shooting into the inhabited dwelling that you were arrested for?

**INMATE FERNANDEZ:** The same owner told me let's see if you can shoot up and we were all drunk.

**PRESIDING COMMISSIONER DAVIS:** So that -- that incidence also happened when you -- had a firearm and you were -- and you'd been drinking?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Had you ever received

any -- any treatment for your use of alcohol?

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** According to the somewhat limited information we have in terms of your personal history is that you received three years of formal education while living in Mexico.

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Not really much in here about your family except -- do you have brothers and sisters?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** How many?

**INMATE FERNANDEZ:** Six brothers and six -- two sisters.

**PRESIDING COMMISSIONER DAVIS:** Okay. And you keep in contact with them?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Are your parents still living?

**INMATE FERNANDEZ:** Only my mother.

**PRESIDING COMMISSIONER DAVIS:** And your contact with your siblings is that letters or cards or telephone calls or --

**INMATE FERNANDEZ:** Letters and phone.

**PRESIDING COMMISSIONER DAVIS:** Are they living in the United States or in Mexico?

**INMATE FERNANDEZ:** They're in Texas.

PRESIDING COMMISSIONER DAVIS: Texas.

INMATE FERNANDEZ: All my children are in San Jose.

PRESIDING COMMISSIONER DAVIS: So you were married?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: And how many children do you have?

INMATE FERNANDEZ: Three.

PRESIDING COMMISSIONER DAVIS: And you keep in contact with them?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: What kind of work did you do before the -- before the incident offense?

INMATE FERNANDEZ: Oh, I was at (inaudible) Electronics.

PRESIDING COMMISSIONER DAVIS: As an assembler I think I recall?

INMATE FERNANDEZ: Assembler.

PRESIDING COMMISSIONER DAVIS: And you -- you received your citizenship in 1975, but -- and it also indicates that you -

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: -- did graduate or you completed the 11th grade?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: In the United States?

INMATE FERNANDEZ: No.

PRESIDING COMMISSIONER DAVIS: No? Okay. Did you

receive any more education than the three years of education that you got in Mexico?

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** You were in the -- were you in the Mexican Army?

**INMATE FERNANDEZ:** I did my military service.

**PRESIDING COMMISSIONER DAVIS:** And you were -- received an honorable discharge?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** And what did you do in the Army?

**INMATE FERNANDEZ:** Just do the exercises and the (inaudible).

**PRESIDING COMMISSIONER DAVIS:** No particular skills or trades that you learned in the Army?

**INMATE FERNANDEZ:** No. Oh, just to get my education.

**PRESIDING COMMISSIONER DAVIS:** Just to get -- okay, but no skills? No --

**INMATE FERNANDEZ:** No.

**PRESIDING COMMISSIONER DAVIS:** All right, is there anything that we haven't talked about or covered in your -- your family history, your -- the crime itself, any details that you would like the Panel to know more about? Your education? Anything that -- prior to the incident offense that you feel it's important for the Panel to understand today before we make any decisions?

**INMATE FERNANDEZ:** No, it's fine.

**PRESIDING COMMISSIONER DAVIS:** All right. Do you have any questions, Commissioner?

**DEPUTY COMMISSIONER BLONIEN:** I do. How many people were there when you shot your brother-in-law?

**INMATE FERNANDEZ:** There were like six but they were running inside.

**DEPUTY COMMISSIONER BLONIEN:** And what did you do after you shot him?

**INMATE FERNANDEZ:** I left from there.

**DEPUTY COMMISSIONER BLONIEN:** Who called for help?

**INMATE FERNANDEZ:** I don't know.

**DEPUTY COMMISSIONER BLONIEN:** You never asked?

**INMATE FERNANDEZ:** No.

**DEPUTY COMMISSIONER BLONIEN:** That's all I have.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. I'll ask you to turn your attention to Commissioner Blonien for her part in this.

**DEPUTY COMMISSIONER BLONIEN:** Mr. Fernandez, this is your fifth subsequent hearing and your last appearance before the Board was August 18th, of '04 and the panel on a two-year denial. And they were very specific when they talked to you about what they wanted you to do before the next hearing. And -- and I'm just going to read that into the -- into the record because they took a lot of time talking to you.

"First, that you remain disciplinary-free and

you have. That when available to you, you participate in self-help, specifically alcohol-abuse-related programs such as AA, which you do. But you've got to do more than just attend. You've got to -- you don't have to pass a test here. You don't have to tell us the 12 Steps. But we need to believe that you are able to understand what AA is all about and that you make it part of your daily operation. And in your own words you'll be able to tell the Panel how you will keep sober if released into the community. We recommend that you continue to upgrade educationally and vocationally and that your parole plans -- it would be very helpful if you could get something official indicating that you do have property or residence in Mexico and when your wife writes her next letter, she should also be able to say that she's willing to go to Mexico with you. And if you have anyone in Mexico who will give you a job, that would be helpful as well. You have to assume that you're going to be deported based on that INS hold."

So your custody level is Medium-A. Your classification score is 19. I have that.

**ATTORNEY SPARKS:** Okay. And then we have two

others.

DEPUTY COMMISSIONER BLONIEN: Okay, that's good.

ATTORNEY SPARKS: Then in Spanish.

DEPUTY COMMISSIONER BLONIEN: The psych report by Dr. Talbot is dated November 24th of '03 and I've read that. I've read your current counselor's report by Counselor Studebaker, S-T-U-D-E-B-A-K-E-R, dated May 24th, '06. I've read your whole C-File, the whole Board report. And you've already talked to the Commissioner about declining to review your C-File. So in your history you've had six 115s. The last one was in 1990. You've only had three 128s and the last one was in 1995. You work in the Kitchen and you're very dependable. And you get -- your supervisor says you're satisfactory to excellent. You've worked in Waste Management in the Recycling in '02. You've had other jobs in Culinary and Yard Crew. You were in Vocational Auto Body Fender, but I don't think you got a certificate, did you?

INMATE FERNANDEZ: Yeah, they gave it but I didn't finish it.

DEPUTY COMMISSIONER BLONIEN: Right. You weren't able to complete the course. Were -- were you transferred before you could complete it?

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: You've worked a long time in the -- in the area of English as a Second Language and I think the highest TABE test I saw was a

6.0 with a 2.0 overall. Is the education very difficult for you?

INMATE FERNANDEZ: Yes. Yeah, they took me off because I wasn't able to learn.

DEPUTY COMMISSIONER BLONIEN: You -- there's a chrono in there that you reached a plateau on March 12th, 1998, and they felt –

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: -- and in the chrono, I wasn't sure if it was because of lack of motivation on your part or you were trying really hard and that was the best you could do.

INMATE FERNANDEZ: I wasn't able to learn more.

DEPUTY COMMISSIONER BLONIEN: You -- and were you trying really hard?

INMATE FERNANDEZ: Yes. My head hurt.

DEPUTY COMMISSIONER BLONIEN: You have been in AA '89, '91, '94, '96, '97, '98, '99, 2000, 2003, -4 and -5. So a long time.

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: And the -- and the last Panel asked you if you've worked through all the Steps.

INMATE FERNANDEZ: Yes, but I have -- we have almost a year that we don't go to AA. But I study from my book.

DEPUTY COMMISSIONER BLONIEN: And when you study -- from your book, have you worked through the Steps?

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: And how do you plan to use those Steps to help you not to drink if you're released?

INMATE FERNANDEZ: If they ever granted me freedom to Mexico continue with AA.

DEPUTY COMMISSIONER BLONIEN: And -- and does he use the Steps not to drink?

INMATE FERNANDEZ: Studying all the time, going to AA.

DEPUTY COMMISSIONER BLONIEN: Have you made a list of people that you need to make amends to?

INMATE FERNANDEZ: Yes. I wrote something. I have something.

ATTORNEY SPARKS: He wrote out the Steps and applied them accordingly to what he understands. He could probably just read you something off of here.

DEPUTY COMMISSIONER BLONIEN: Yeah, if he -- if he could give me -- tell me an example. Well, it's good that the wrote it down. He can look at it.

ATTORNEY SPARKS: Yeah, this is Step 9. Right? So you want to tell that or use the interpreter for that purpose?

INMATE FERNANDEZ: Which Step do you want?

DEPUTY COMMISSIONER BLONIEN: I want the one that's most important to him.

INMATE FERNANDEZ: Number 12. The number 12 says

gaining a spiritual awakening -- awakening as a result of the Steps to try to take the message to the alcoholics and practice these principles in all our dealings. After gaining all these 12 Steps, our happiness and willingness of (inaudible) the last Step. To share with another alcoholic our experience in our lives for the rest of our lives.

**DEPUTY COMMISSIONER BLONIEN:** And did you write that?

**INMATE FERNANDEZ:** Yes. Right here are the 12.

**DEPUTY COMMISSIONER BLONIEN:** When I finish our discussion, I'd like to see that cause -- because I can read Spanish.

**INMATE FERNANDEZ:** Yes.

**DEPUTY COMMISSIONER BLONIEN:** Okay?

**INMATE FERNANDEZ:** Okay.

**DEPUTY COMMISSIONER BLONIEN:** You've also completed the Impact Program.

**INMATE FERNANDEZ:** Oh, yeah.

**DEPUTY COMMISSIONER BLONIEN:** How did -- how did -- was it in Spanish?

**INMATE FERNANDEZ:** Yes.

**DEPUTY COMMISSIONER BLONIEN:** And what did you think about that program?

**INMATE FERNANDEZ:** Very well for me.

**DEPUTY COMMISSIONER BLONIEN:** Tell me -- tell me about it.

INMATE FERNANDEZ: I can't explain. I forget. But really good.

DEPUTY COMMISSIONER BLONIEN: In the program they talk about the impact your action had on the victim's family and the victim's family --

INMATE FERNANDEZ: Yeah.

DEPUTY COMMISSIONER BLONIEN: -- is your family. How did -- how did that feel?

INMATE FERNANDEZ: Very bad. I was -- I felt very bad.

DEPUTY COMMISSIONER BLONIEN: Do you think about your brother-in-law?

INMATE FERNANDEZ: Of course, yes.

DEPUTY COMMISSIONER BLONIEN: Tell me about your feelings.

INMATE FERNANDEZ: Very bad because he was my brother. I don't want to talk about that. I feel bad.

DEPUTY COMMISSIONER BLONIEN: Well, tell Mr. Fernandez that this is a good time to talk about that.

INMATE FERNANDEZ: He was my brother. I didn't want to do that.

DEPUTY COMMISSIONER BLONIEN: So in the institution he goes to work in the Kitchen.

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: AA on lockdown. So what does he do all day?

INMATE FERNANDEZ: When?

DEPUTY COMMISSIONER BLONIEN: All day. After -- you go to work --

INMATE FERNANDEZ: After work, I -- I study the book about alcoholics. I go to church.

DEPUTY COMMISSIONER BLONIEN: What church do you go to?

INMATE FERNANDEZ: The brothers of -- Jehovah's Witnesses.

DEPUTY COMMISSIONER BLONIEN: So you go to church.

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: You study your AA Steps.

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: What else?

INMATE FERNANDEZ: Not much.

DEPUTY COMMISSIONER BLONIEN: Watch TV?

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: Read books?

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: What -- what -- what do -- what are you read?

INMATE FERNANDEZ: Stories in Spanish.

DEPUTY COMMISSIONER BLONIEN: Like things that help him with his life or novels?

INMATE FERNANDEZ: Yes. Things that you learn -- things that you learn more.

DEPUTY COMMISSIONER BLONIEN: So what is he learning

more?

**INMATE FERNANDEZ:** Every book that you read you learn something out of it. You learn a lot when you read.

**DEPUTY COMMISSIONER BLONIEN:** Are you a different person, Mr. Fernandez, than the person who did --

**INMATE FERNANDEZ:** Of course. I have changed a lot.

**DEPUTY COMMISSIONER BLONIEN:** I saw, just looking back over past reports, that when you first came in your counselor said that "his relationship with staff and other inmates is barely mentioned in progress reports. He is reported as shy, self-conscious individual who demonstrates a lack of self-confidence." And that was 1992. Then in 1994, two years later, comments were that "Fernandez took an active role and had an excellent attitude toward staff." So you found yourself changing as a person.

**INMATE FERNANDEZ:** I have noticed that I have changed. I'm not the same person. Many years passed by.

**DEPUTY COMMISSIONER BLONIEN:** And when your family comes to visit you, have they told you that you've made big changes?

**INMATE FERNANDEZ:** Yes.

**DEPUTY COMMISSIONER BLONIEN:** And your parole plans, I know you have two letters there. I don't who they're from. Says you plan to live with your wife.

**INMATE FERNANDEZ:** Yes.

DEPUTY COMMISSIONER BLONIEN: In San Jose?

INMATE FERNANDEZ: She's going to go with me to Mexico.

DEPUTY COMMISSIONER BLONIEN: And that you have property in Mexico.

INMATE FERNANDEZ: Not myself. But my brothers do.

DEPUTY COMMISSIONER BLONIEN: And where in Mexico?

INMATE FERNANDEZ: Vera Cruz.

DEPUTY COMMISSIONER BLONIEN: All right. And so -- and -- and I see the confusion here because you -- you do have citizenship papers, but you do also have a U.S. INS hold. So if you live in San Jose, your wife will stay in San Jose and she has an address and an apartment. And if not, you will go to your brother's in Vera Cruz and your wife will go with you.

INMATE FERNANDEZ: My wife goes with me.

DEPUTY COMMISSIONER BLONIEN: And then I have a letter dated 6/26 from Guadalupe Fernandez who is your son?

INMATE FERNANDEZ: Yes.

DEPUTY COMMISSIONER BLONIEN: Who says that -- that he will have a job -- that you will have a job waiting for you the day of your release. The name of the company is V & A Painting. "We will always need help in some area. Example, touch-up, prepare, clean-up." And then it gives the telephone number of V & A Painting. Does your son own the -- own V & A Painting?

**INMATE FERNANDEZ:** No, no. It's another (inaudible).

**DEPUTY COMMISSIONER BLONIEN:** Okay. Oh, another.

**INMATE FERNANDEZ:** He's not my son.

**DEPUTY COMMISSIONER BLONIEN:** Not your son. And it's notarized. He had the letter notarized. And Mr. Ugalve, if you could summarize the -- the letters that he has in -- in Spanish and then when you're done, if you could pass them to me along with his AA --

**INTERPRETER UGALVE:** Okay, sounds good.

"I am Mrs. Glafida Fernandez, wife of Guadalupe Fernandez, write this letter to let you know how much I need my husband. I'm a person -- sick, sick person. I suffer from cholesterol and diabetes, depression, arthritis. I have many years that I'm suffering this sickness and to this point I cannot even walk for -- by directions of the doctor. I am disabled. My feet get swollen. My hands get swollen. I cannot even walk. They found me a tumor in my brain and the doctors don't know yet what to do with this problem. I need the help of my husband since I live by myself and I cannot do very much by -- for myself. He knows my (inaudible) my condition. He wants to help me and I don't want to be alone. I need him very much."

And that's -- this is from Glafida (phonetic) Fernandez, my wife.

**DEPUTY COMMISSIONER BLONIEN:** Who's the first one from?

**INTERPRETER UGALVE:** That was Glafida Fernandez.

**DEPUTY COMMISSIONER BLONIEN:** His wife.

**INTERPRETER UGALVE:** His wife.

**DEPUTY COMMISSIONER BLONIEN:** Okay.

**INTERPRETER UGALVE:** And the next is from Mrs. Guadalupe -- oh, Mr. Guadalupe Fernandez.

"Through this letter me, Jorge Fernandez (inaudible), let you know that I know Mr. Guadalupe Fernandez for a long -- from a long time ago and he's a hard-working person for whom I promise to provide work in my company with the address, Jose Maria Morales (phonetic) number 197 between the 2nd and the 3rd (inaudible) Ensenada, Baja, California. At this moment, Mr. Guadalupe Fernandez -- oh, the moment that he resides in this city of Ensenada, Baja, California."

**DEPUTY COMMISSIONER BLONIEN:** How far is Vera Cruz from Ensenada?

**INMATE FERNANDEZ:** About eight hours.

**DEPUTY COMMISSIONER BLONIEN:** That's what I thought. It'd be a long commute. Living in Vera Cruz and --

**INMATE FERNANDEZ:** Oh, I'm going to live in Ensenada

because I have a brother who lives there.

**DEPUTY COMMISSIONER BLONIEN:** Do you see how this can be confusing for the Panel when you don't have letters saying I'm going to live here, work here? And -- and I'll note that you passed me the work that you're doing on your AA and he's written down every Step and then he has written down how that Step is important to him and how it applies to him and how it -- how he's going to use it to remain sober. Are you ever going to drink again?

**INMATE FERNANDEZ:** No, never.

**DEPUTY COMMISSIONER BLONIEN:** And he's gone through and explains that in Spanish. We also sent out 3042 notices and the District Attorney of Santa Clara is here today, audio and sometimes video, and at the appropriate time he'll be given the opportunity to speak. So I'm going to return to the Chair.

**PRESIDING COMMISSIONER DAVIS:** Thank you. Mr. Fernandez, have you made some plans in your parole preparation for continuing with AA?

**INMATE FERNANDEZ:** I haven't done yet, but if I go to Mexico down there.

**PRESIDING COMMISSIONER DAVIS:** Do you consider this a life-long commitment?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** How would you go about finding an AA sponsor? Have you -- have you

written anyone or done anything in preparation for that?

INMATE FERNANDEZ: That's easy because in Mexico there's a lot of them.

PRESIDING COMMISSIONER DAVIS: What about San Jose? Is there any preparation for your potential parole to San Jose?

INMATE FERNANDEZ: No, I haven't done anything because I have -- going to be deported to Mexico.

PRESIDING COMMISSIONER DAVIS: What would be your preference? I mean, given the best of all words, would you rather go to Mexico or stay in the United States? Where do you think you can be most successful?

INMATE FERNANDEZ: In Mexico.

PRESIDING COMMISSIONER DAVIS: Mexico. Do you have any other questions?

DEPUTY COMMISSIONER BLONIEN: I don't.

PRESIDING COMMISSIONER DAVIS: District Attorney have questions?

DEPUTY DISTRICT ATTORNEY RICO: Just very briefly, Commissioner. The prior conviction for shooting into an occupied dwelling. Did Mr. Fernandez indicate whose dwelling that was or why he did that?

PRESIDING COMMISSIONER DAVIS: Can you give us some additional details, Mr. Fernandez, on whose dwelling you were shooting at and why that was occurring?

INMATE FERNANDEZ: It was -- I was with some friends of the owner of the residence.

PRESIDING COMMISSIONER DAVIS: And why were they -- they were shooting at the owner's residence? Who's residence were they shooting at?

INMATE FERNANDEZ: The apartment.

PRESIDING COMMISSIONER DAVIS: And why were they shooting at the apartment?

INMATE FERNANDEZ: They were -- we were all drunk drinking.

PRESIDING COMMISSIONER DAVIS: Was there anyone inside the apartment?

INMATE FERNANDEZ: Oh, the owner's wife.

PRESIDING COMMISSIONER DAVIS: Was inside the apartment?

INMATE FERNANDEZ: Yes. She was there.

PRESIDING COMMISSIONER DAVIS: Was the owner actively participating in the shooting?

INMATE FERNANDEZ: Yes.

PRESIDING COMMISSIONER DAVIS: And why was that?

INMATE FERNANDEZ: Cause he was drunk also.

DEPUTY DISTRICT ATTORNEY RICO: Did Mr. Fernandez do any of the shooting himself?

INMATE FERNANDEZ: Yes.

DEPUTY DISTRICT ATTORNEY RICO: And why did he do that?

INMATE FERNANDEZ: I didn't know what I was doing. I was drunk.

DEPUTY DISTRICT ATTORNEY RICO: I -- I understand to

some extent what Mr. Fernandez has said about why he shot the victim, but what I don't understand -- did Mr. Fernandez know it to be true that the victim had killed his brother or did Mr. Fernandez do this just because someone said the victim had killed his brother? Does he understand that?

**INMATE FERNANDEZ:** I was sure of that.

**DEPUTY DISTRICT ATTORNEY RICO:** And how was he so sure of that?

**INMATE FERNANDEZ:** Because they called me from Mexico saying that he had killed my brother.

**DEPUTY DISTRICT ATTORNEY RICO:** And why did Mr. Fernandez think it was necessary -- let -- let me withdraw that. As I understand it the victim in this case, Eduardo Fernandez, was married to the inmate's sister. Is that correct?

**INMATE FERNANDEZ:** I was marred to his sister. He was married to my sister.

**DEPUTY DISTRICT ATTORNEY RICO:** So the victim's wife is Anna Maria and that's the inmate's sister? Is that correct?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** Do we -- do we have a connection?

**PRESIDING COMMISSIONER DAVIS:** Oh, yeah. The answer was yes.

**DEPUTY DISTRICT ATTORNEY RICO:** I'm sorry, okay.

And the victim and the inmate's sister had some children at the time, did they not?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** There was a Jorge, J-O-R-G-E, who was the victim's son. Is that correct?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** And he would be the inmate's nephew?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** And there was a Maria who was the victim's daughter?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** And Alesia is maybe A-L-E-S-I-A, who was the victim's daughter. Is that right?

**INMATE FERNANDEZ:** Yes.

**PRESIDING COMMISSIONER DAVIS:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** So those would've been the inmate's nieces?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** Did Mr. Fernandez give any thought to his own sister and his nephew and his nieces in pulling the trigger on the victim?

**INMATE FERNANDEZ:** No, at that moment. I was bad. Feeling bad.

**DEPUTY DISTRICT ATTORNEY RICO:** Does Mr. Fernandez's sister, who's the widow, as well as his nephew and his

nieces, do they live in Mexico or the United States?

**INMATE FERNANDEZ:** Here in San Jose.

**DEPUTY DISTRICT ATTORNEY RICO:** And what is Mr. Fernandez's current relationship to that part of his family?

**INMATE FERNANDEZ:** Haven't spoke to them, but with my sister, yes.

**DEPUTY DISTRICT ATTORNEY RICO:** Now, I know there's been some discussion about Mr. Fernandez's involvement in AA. Has Mr. Fernandez taken any steps or made any effort to contact any of the family members who have been harmed by his actions to make amends with them?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** Would that include his sister, his nephew and his nieces?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** I thought he said a moment ago he hadn't spoken to his sister about this.

**INMATE FERNANDEZ:** She's not upset.

**DEPUTY DISTRICT ATTORNEY RICO:** She is upset, is that what he said?

**INTERPRETER UGALVE:** She's not upset.

**DEPUTY DISTRICT ATTORNEY RICO:** She's not upset. Now, this a little harder question to ask. I will try to -- to do it. If Mr. Fernandez was upset at the victim for killing his -- Mr. Fernandez's brother, if Mr. [illegible] Fernandez killed his brother-in-law, are there any

hostilities on the part of the widow and nephew or the nieces that Mr. Fernandez should be concerned about here? Does he understand that?

**INMATE FERNANDEZ:** Yes.

**DEPUTY DISTRICT ATTORNEY RICO:** Could he comment on that?

**INMATE FERNANDEZ:** I cannot say. I feel very bad for all this had happened.

**DEPUTY DISTRICT ATTORNEY RICO:** Does Mr. Fernandez think that he needs to do anything else while he is incarcerated to prepare himself for a life on the outside where there may be stresses awaiting him?

**INMATE FERNANDEZ:** Yes, I'm a different person. I have changed a lot.

**DEPUTY DISTRICT ATTORNEY RICO:** That -- that wasn't really my question. Perhaps, Commissioner?

**PRESIDING COMMISSIONER DAVIS:** Yeah, I -- is there anything else that you think that you need to do to prepare yourself to get -- other than what you've already done, is there anything else that you think that you need to prepare yourself for the outside world?

**INMATE FERNANDEZ:** I think I'm fine to get out.

**DEPUTY DISTRICT ATTORNEY RICO:** And the last thing I have, did I understand that one of those letters was from Mr. Fernandez's wife who appears to have some serious medical issues. Is that accurate?

**INMATE FERNANDEZ:** Yes.

DEPUTY DISTRICT ATTORNEY RICO: Does Mr. Fernandez think that if he goes back into that situation caring for his wife that there are going to be significant stress factors there that may tempt him to take a drink?

INMATE FERNANDEZ: No. Never.

DEPUTY DISTRICT ATTORNEY RICO: I really have nothing further.

PRESIDING COMMISSIONER DAVIS: All right, thank you. Mr. Sparks?

ATTORNEY SPARKS: Is there anybody out there that wants to kill you from your family or the other side's family because of the crime that you did?

INMATE FERNANDEZ: No.

ATTORNEY SPARKS: Do you think that if something happened to one of your family members that you would take the law into your own hands again?

INMATE FERNANDEZ: No, never. No.

ATTORNEY SPARKS: Do you think that the philosophy that you had at the time, that you could take the law into your hands, was an appropriate philosophy?

INTERPRETER UGALVE: Can you repeat that, please?

ATTORNEY SPARKS: Do you think that the philosophy that you had at the time, that you could take the law into your own hands, was an appropriate philosophy?

INMATE FERNANDEZ: No.

ATTORNEY SPARKS: What was it about the way that you lived that made you believe that you could take the law

into your own hands?

**INMATE FERNANDEZ:** I don't know what happened to me that moment. I never thought it (inaudible).

**ATTORNEY SPARKS:** What (inaudible) that you took the law into your own hands?

**INMATE FERNANDEZ:** Yes, but I don't know why I -- how I did it.

**ATTORNEY SPARKS:** But it was revenge, right?

**INMATE FERNANDEZ:** Yes.

**ATTORNEY SPARKS:** An eye for an eye, a tooth for a tooth?

**INMATE FERNANDEZ:** I feel for them very much that that happened.

**ATTORNEY SPARKS:** But that was pretty much the reality, right?

**INMATE FERNANDEZ:** Yes.

**ATTORNEY SPARKS:** All right. So what makes you think that you would handle things differently now? Who's responsible for enforcing the law then?

**INMATE FERNANDEZ:** I feel that I'm a different person.

**ATTORNEY SPARKS:** Okay, but who's responsible for enforcing the law if, in fact, somebody gets killed for your family members, who's the responsible authority for taking care of that then?

**INMATE FERNANDEZ:** God.

**ATTORNEY SPARKS:** Okay. But if there was some kind

of enforcement of the law, who would that be besides God?

INMATE FERNANDEZ: The government.

ATTORNEY SPARKS: Do you see how you took the responsibility that would otherwise be the police's authority?

INMATE FERNANDEZ: Yes, but as I told you, I didn't know what I was doing.

ATTORNEY SPARKS: No, it doesn't matter. You still did it. It's not whether you didn't know what you were doing; you did it. I mean, today you have to agree that you did it and you're responsible for it, right?

INMATE FERNANDEZ: I realize that I was not (inaudible).

ATTORNEY SPARKS: Nobody said you premeditated it. That would be first degree murder. But you intentionally did it because that was second degree murder. Okay. I'm just trying to understand whether or not you understand the severity of the crime. Not -- not in the sense that you took his life. But in the sense that you -- you understand that you're attempting to held -- you're -- you're held responsible for this as a second degree murder. And that there was some other authority that should've taken care of the situation rather than you.

INMATE FERNANDEZ: Yes.

ATTORNEY SPARKS: As long as you understand all that.

INMATE FERNANDEZ: I know I recognize all that.

**ATTORNEY SPARKS:** Okay. And the question is slightly different in the sense that even if you don't remember because your memory's clouded by alcohol that, in fact, somebody else should've stepped up to take care of this if -- if your brother-in-law had killed your brother that should've been left up to other authorities to take care of it. Not just you.

**INMATE FERNANDEZ:** You.

**ATTORNEY SPARKS:** Would you agree with all that?

**INMATE FERNANDEZ:** Yes, I'm agreeing with that.

**ATTORNEY SPARKS:** So revenge isn't something that you get to do? That's God or other authorities to take care of that, right?

**INMATE FERNANDEZ:** Yeah, that's very correct.

**ATTORNEY SPARKS:** Can't lead you through it any more than that, Mr. Fernandez. That's enough questions for me.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. Closing?

**DEPUTY DISTRICT ATTORNEY RICO:** Thank you, Commissioner. Well, this -- I find a little bit difficult to put these in the proper perspective. But we have a situation where Mr. Fernandez, when he was 35 years of age, and -- and I think that's an important factor. That's not -- this is some type of a -- an impulse or an indiscretion of youth. He was 35 at the time that this crime took place. And I believe that his

record involved four misdemeanors and one felony which included carrying a loaded firearm in a public place and shooting into an occupied dwelling. Alcohol has been a problem for him, historically. I'm troubled by the circumstances of the discharge of the firearm into the occupied dwelling. There seems to be -- there was no true motive to do that. He was he says drunk at the time and others were doing it, so he just kind of went along with and -- and fired into the dwelling where a woman was inside. It was an extreme risk potential for loss of life. Then there's this circumstance where he shoots his brother-in-law. The husband of own sister. The father of his nephew and nieces. Because he believes that the victim killed his own brother some seven years before. I think it's still equivocal as to when he got that information. He seems to indicate on the day of, but then seems to be somewhat inconsistent with what's in the packet. Again, alcohol is involved and he says he knew for sure that the victim had done it because they told him that he had. Now, today he indicates -- and today he's 59-years-old of age at this time. He's been in for a significant period of time. He has taken AA. Been involved in AA. I think there are some unresolved issues. The family situation, I would feel more comfortable if there were some letters documenting certain things in terms of support letters from members of the family. I hope that this is not a Hatfield and

McCoy situation where we have the inmate killing his brother-in-law, who he believes to have killed his own brother, leaving alive a nephew and nieces and his own sister in a situation that may still involve possibility (inaudible) in the family. I -- I don't know. And I don't know -- I don't have in my packet significant letters of support. I -- I heard what I thought was an inconsistency when he indicated first of all that he hadn't talked to his sister about this and then he said that he had made amends and that she wasn't upset. It would be nice to have some letter documenting that. The parole plans, he wants to go back and live with his wife who has serious medical issues. And I submit that it's a matter of common sense that's going to be a very difficult situation for him to step back into. The question is whether his wife can even physically relocate to Mexico, whether or not she would want to because of the medical conditions. I think there's unresolved issues there that -- that need to clarified. I'm a bit troubled by the fact and -- and it may be difficult to do for Mr. Fernandez to find out what resources there are to keep him on the straight and narrow if he is really deported to Mexico. But I thought I heard him say that he hadn't inquired into the resources there, but if he were paroled and went to Mexico he would look into it, and I think that's kind of putting the cart well back of the horse so to speak and I think that's something that

he needs to explore before he's given a release date, because the most current psych assessment, which I have some issues with, does state that attendance in Alcohol -- Alcoholic's Anonymous has been a benefit to him. The author of that report indicates that he appears to be a low-risk for violence in the free community and that goes on the condition that saying that,

> "however, this statement is dependent on his avoiding alcohol and drug use in the future to ensure this state of affairs, that it's important that he continue to Alcoholic's Anonymous if he is to be released. This is an important source of understanding and support for the alcoholic. Moreover, he must be monitored regularly to ensure he is not using."

And, quite frankly, I'm at a loss as to how that could be done if he were to be deported to Mexico without there being some inquiry on his part or inquiry on someone's part, maybe family members, who could look into that and see what resources are available and how to ensure that he's not released and, in spite of his good intentions, in spite of his word that he's a different person, that he would never drink again. I think there needs to be a little bit more solidification of that rather than just the good intentions, because I'm not hearing sufficient indication that Mr. Fernandez is strong enough in that

area to be able to do that without some assist. Now, the part of what makes this problematic is the language issue where Mr. Fernandez's English is not his -- his native tongue and I would hope that these inferences that seem to be raising troublesome concern are not just because of the language. I would feel much more comfortable if there were a stronger psych assessment and somehow I could hear a little bit more (inaudible) as to what's going on in Mr. Fernandez's head, because what I've heard today, I'm hearing the word, I'm hearing him say I'm a different person now, I'll never drink again, but I'm not seeing the independent verification on the outside that there is a support network in place that would allow him to function within a non-controlled environment in a safe fashion that would not -- that would not allow him to be a risk to others. And with those comments, I have to say that based on everything that I see here, he is not ready for release. There are other issues that need to be addressed in terms of the parole plans and in terms of perhaps some insight. I heard him say today quite often that he didn't really remember too much about the crime. It was the alcohol. And he seems to blaming the alcohol. And I'm not sure that this is entirely alcohol-related because of his history with not only alcohol, but his history with some fascination of guns that in spite of him running afoul of law and carrying a loaded firearm in a public place and then picking up the felony conviction

of carrying a gun and shooting it through an occupied dwelling. Then on the date of the life crime, he's back to carrying a gun again. He doesn't seem to learn from society's efforts to correct his behavior and I think that goes beyond just a problem with alcohol. It's got to do something with a willingness, inability to conform to the law and the fascination with firearms that doesn't seem to be addressed, at least that aspect, in the -- the most current psych eval. So with all those comments, I have to submit that I believe that the evidence before the Panel shows that he still constitutes a significant risk and an unacceptable -- an unacceptable risk if he were to be released at this time and there is still work that he needs to do, although he should be commended for the efforts that he has been making in that direction. Thank you.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. Mr. Sparks?

**ATTORNEY SPARKS:** This is where I think the Deputy DA's not served by appearing personally at these hearings to be able to make observations in a direct way about who Mr. Fernandez is. Not that Rico doesn't have experience in witnessing in where life prisoners and their progress. I certainly think that Mr. Rico understands well where potential falls -- faults are of some unsuitability for parole as he does have that kind of experience he's not aware. It's not that in this

particular situation, if he'd seen Mr. Fernandez in person, he would be able to see that the changes that he's made are genuine and that concerns that he has are more of the nature of whether or not -- well, I mean if you're a -- a pro-baseball player and you hit 365, you're going into the whole thing. But if you're an inmate and you hit 365, you're not getting out of prison. You know, that's just kind of the way it is. And so the question is where is the standard for an inmate to be found suitable for parole. In the Board parole hearings it's -- it's clearly concern about the citizens in the community being harmed by someone like Mr. Fernandez again and that's an appropriate concern. I don't disagree with that. And I don't even necessarily disagree with the notion that someone like Mr. Fernandez has to change from his inner core to somebody that took into his own hands revenge. Which was totally inappropriate and he has to understand that as a basic realization about why he came into prison. I certainly think that that's appropriate and that alcohol was a precipitating factor. That this attitude that he had about the wild west and begin able to do things his way by retaliation for his brother's death is inappropriate and he grasped that although it took a lot of leading questions on my part to actually get him to realize that this is really what the issue as to why he's incarcerated. It would be much easier if Mr. Fernandez

just came in and told the Parole Board, you know, what I did was clearly inappropriate. I took matters into my own hands. And that -- the question that -- that Mr. Rico's ask -- asking in the sense is will this revenge be an ongoing -- be in his family. Whether or not the bygones be bygones and the resolution has been made in his family. Does anybody have any bitterness towards him and doesn't he have to be fearful in the community or is he still causing fear in the community. It's sort of an issue. You know. So yeah, it would be nice to know, I mean, 1,000 percent it would be nice to have a perfect hitting record relative to this sort of hearing, but 23 years later, I mean, if things aren't resolved you would think that the victim's next of kin or somebody would be writing, you know, we're just not comfortable with Mr. Fernandez being returned to the community. You would think somebody would say something. And so to say well, we're going to speculate that somebody's still uncomfortable with Mr. Fernandez, I don't think that that's necessarily fair. Somebody would show up and say that if they were feeling that. The DA's office has affirmative duty to continue to let the victim's next of kin know that these hearings are -- are taking place and Mr. Fernandez himself is connected with the family so they're aware of when he's coming up for these parole consideration hearings. The fact that his family continues to support him and that he's provided

opportunities here today for his return to the community is some evidence that bygones are bygones. It's not 1,000 percent, but it's some evidence. The psychological report reports a low risk of violence if released to the community and that's, again, some evidence that he's suitable for parole and that he's changed, that he's matured and grown. I really think Mr. (inaudible)'s own subjective analysis here today in terms of what the Panel sees is the necessary statement to show that he's no longer dangerous to the community. That he's done his 12 Steps work and written it out shows that he has in place the AA program of living and that finding that in the community won't be that difficult. In fact, in Mexico, it's my understanding that Alcoholics Anonymous is -- is something rather than a stigma the way oftentimes it's perceived in the United States, that the people in Mexico look at it more as heroes in a sense that they're taking care of themselves now rather than pariahs in their community. And then I know that in the United States that's ultimately changing. You wouldn't look at somebody that has leukemia as a pariah. You would look at him as somebody that has a disease and -- and, accordingly, if they're taking care of it by chemotherapy or whatever you would think, well, they're taking care of themselves. Whereas in alcohol the same; you would look at them as a sick person. If you saw them as a sick person, you wouldn't necessarily say well, you know,

they're not taking care of themselves. So to Mr. Fernandez's credit, he hasn't shown that he's willing relapse in the institutional setting and that -- I think that's a certainly good indication of his return to good citizenship and that he's willing to live a day at a time without alcohol in his life in the institution somehow will reflect that same commitment in the community since he does have a 12 Step methodology in place and knows that he needs to return to that same methodology in the community to abstain from alcohol use. I would like to see, as has been pointed out by the Panel, that where his parole plans you're going to live here and you're going to work here be somehow syncopated, but I'm not willing to say that since he has a job offer and he's purporting that he has family members in Mexico that they could be a simple confirmation by way of during the gap if the Parole Board gave him a release date, it's pretty obvious it -- whoever's investigating where he's going to go and where he's going to live is going to check those things anyways and that that's not necessarily something that we should deny him parole here for today as he didn't hit 1,000 again, you know, I think it's sufficient. Not perfect, but it's sufficient. I'll submit on that.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you. Mr. Fernandez, now is your opportunity to address the Panel directly and tell us why you believe that you're suitable for parole.

**INMATE FERNANDEZ:** We all have a second opportunity. My family needs me. The family is very important and they need me outside.

**PRESIDING COMMISSIONER DAVIS:** Anything else, sir?

**INMATE FERNANDEZ:** That's all.

**PRESIDING COMMISSIONER DAVIS:** All right, thank you very much. We'll now recess for deliberation.

**R E C E S S**

--o0o--

CALIFORNIA BOARD OF PAROLE HEARINGS

D E C I S I O N

**DEPUTY COMMISSIONER BLONIEN:** We're on record.

**PRESIDING COMMISSIONER DAVIS:** All right, let the record reflect that all those previously identified as being in the room have returned including -- by actually just instead of video conference, now we just have a phone connection of Mr. Rico. So -- but everyone has returned and this is in the matter of Guadalupe Fernandez CDC number C-72642. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. We come to this conclusion first by the commitment itself. It -- the offense was carried out in an especially callous manner. The motive or the offense was carried out in a dispassionate manner. These conclusions are drawn from the statement of facts wherein the prisoner after years of reflection believes he killed the victim more because of alcohol intoxication than out of anger over the death of his brother. He chose to shoot the victim several times and left him to die. With regard to a previous record, we find that there is a record of assaultive behaviors. Specifically, firing into an inhabited dwelling and a criminal conduct which

consists primarily of alcohol and firearms violations for which he received probation. We find that he has failed a previous grant of probation and failed to profit from society's previous attempts to correct criminality. Specifically, adult probation. With regard to institutional behavior, we find that he does have three 128(a)s, the last of which was in 10 of '95, and six serious 115 disciplinary reports, the last of which was in July of 1990. So, effectively, since 1990 you have been free of -- of discipline so that is a record to be -- to be proud of and something that you could certainly -- that you guard jealously and continue to build upon. The psychological report dated November 2003 by Dr. Talbot is not supportive of release. And I'll quote from the report itself where it states under Assessment of Dangerousness,

"He likely will be a -- a low-risk for violence in the free community, as well. However, this last statement is dependent on his alcohol and drugs in the future. To ensure this state of affairs, it is important that he continue to attend Alcoholic's Anonymous if he is to be released since this is an important source of understanding and support for the alcoholic. Moreover, he must be monitored regularly to ensure he is not using alcohol."

So I think that goes, Mr. Fernandez, to our original suggestions that you work on identifying locations where you can continue your AA work should you -- should you -- when you -- when you receive a date. We note that in response to -- I'm sorry, with regard to parole plans, your parole plans are taking shape, but they need to be refined. Job offers would be best on the company letterhead and signed by the person who has the authority to hire you. Also, residential plans need to be clear and with some relation to the place of employment. We note that in response to the 3042 notices, the District Attorney from Santa Clara County is -- has joined us by video conferencing and telephone and does oppose parole. The San Jose Police Department had sent previous letters of opposition in all of the prior hearings. However, the last letter for this hearing was not able to be introduced due to the -- the -- the time in which it was received by defense counsel. Nevertheless, we do want to commend you for several things. First of all, your consistent history of -- of AA, as well as your independent work in AA during the lockdowns because that's often something or reason or excuse we hear is that well, we -- I haven't been able to participate in AA because of a lockdown. But you chose the more assertive route and did some independent study and, in fact, produced that -- that very good document that you allowed

the Panel to read not only identifying the Steps, but also writing an explanation of what the Steps meant to you personally. So I think that was a good thing that you did on your part. You have participated in the Impact program and your -- you consistently work. Your most current work in the Kitchen, you received excellent work reports. This is a -- however, these aspects of behavior or positive behavior do not outweigh the factors of unsuitability. This is a one-year denial. The Panel recommends that you remain disciplinary-free, that you continue to participate in -- in self-help, that you earn positive chrono's, and that you continue to refine your parole plans. And I would even go so far as to say that you want to encourage family support letters. I think given the illness that your wife is facing that should you receive a date and you're out there trying to help her, you -- you're going to find that you're going to need a lot of help to help her. Probably in the way of transportation. Many, many things. So the more that you can begin to rally the family around you and identify some of the -- their willingness to -- to help and -- and, as your counsel said, let bygones be bygones, I think that will bode well for you also. Commissioner, do you have anything else you'd like to add?

**DEPUTY COMMISSIONER BLONIEN:** No. Good luck to you.

PRESIDING COMMISSIONER DAVIS: All right, Mr. Fernandez, we wish you the best of luck. You have a lot of work to do in -- in -- in one year. It's a very short period of time, so start today. All right, good luck to you, sir. We are adjourned.

--oOo--

PAROLE DENIED ONE YEAR

THIS DECISION WILL BE FINAL ON: DEC 15 2006

YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE DECISION IS MODIFIED.

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, Tracy Richardson, a duly designated transcriber, VINE MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 59, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GUADALUPE FERNANDEZ, CDC No. C-72642, on AUGUST 17, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated NOVEMBER 7, 2006, at Sacramento County, California.

TRACY RICHARDSON
Transcriber
**VINE MCKINNON & HALL**

# EXHIBIT 2

IN THE SUPERIOR [illegible]T OF THE

STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA, PLAINTIFF,

vs.

GUADALUPE FERNANDEZ DEFENDANT,

REPORT OF PROBATION OFFICER
No. 89523
September 8, 1983
D. Shearer, D.A.
N. Gonzales, P.D.

COURT DATA

MICROFILMED AT CDC

SENTENCING COURT: Honorable John R. Kennedy

COURT OF CONVICTION: Honorable John R. Kennedy

CHARGE: Section 187 of the Penal Code (Murder), Second Degree With Use of a Firearm Allegation, Admitted within the meaning of Section 12022.5 and Section 1203.06 of the Penal Code

DATE OF OFFENSE: July 9, 1983

DATE OF ARREST: July 9, 1983 (SJPD)

CONVICTION: Pled guilty on August 11, 1983 pursuant to Sec. 859(a) PC.

CONDITIONS: Sec. 187 PC stipulated to be in the Second Degree.

REMAINING CHARGES: None

DAYS IN CUSTODY: 62 actual days, 31 days - 4019 PC, 93 total days; presently in custody.

AGE & DATE OF BIRTH: 36; August 22, 1947; Mexico

CODEFENDANTS & STATUS: None

SUMMARY OF OFFENSE:

The source of this summary is an Investigation Report prepared by the San Jose Police Department, #83-190-1208.

In the Case of: GUADALUPE FERNANDEZ
Charge: 187 PC
Info. No.: 89523

September 8, 1983

On July 9, 1983, at approximately 8:55 p.m., ~~the~~ FERNANDEZ defendant went to 236 North 20th Street, San Jose, where Edwardo Fernandez was talking to a Mr. Winstead, got out of his car, walked up to Edwardo Fernandez and shot him several times with a .45 Caliber Automatic. pistol The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead.

Witnesses identified the defendant and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he had killed the victim because the victim had killed the defendant's brother in a bar fight in Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed that his blood alcohol content was 0.21%. The .45 Caliber Automatic weapon was located in the rear bedroom of 326 North 20th Street where Jesus Frausto had placed the weapon after he had knocked it out of the defendant's hand.

The defendant was booked into the County Jail.

VICTIM'S STATEMENT:

Contact was made with the victim's daughter Anna Fernandez, 20 years old. She indicated that her mother, the victim's wife does not speak English. Total funeral expenses came to $2,400.80. Anna believes that the defendant should be sentenced to a lot of years in Prison and indicated that if he gets out to soon that her brother will be after him.

The victim's daughter was advised of her right to be present at this Hearing and to be heard and she indicated that she, her sister, Alicia, and her brother will be present.

DEFENDANT'S STATEMENT:

The defendant does not speak English. At the defendant's request and his approval inmate interpreter, Carlos Paniagua was used as an interpreter.

In a verbal statement, the defendant admitted that he killed Edwardo Fernandez. He indicated that Edwardo had killed his brother seven years ago. He also indicated he was very drunk at the time and believes that if he had not been so drunk he would not have killed Edwardo. He had purchased the .45 Caliber Automatic approximately five months earlier for the purpose of protecting his home.

In the Case of: GUADALUPE FERNANDEZ
Charge: 187 PC
Info. No.: 89523

September 8, 1983

As to disposition, the defendant does not believe 17 years of State Prison is fair. He believes this is too many years for this particular type of situation.

The defendant was last employed for Atari in Sunnyvale from 1980 until 1983 until he was laid off. He was working as an assembler making $7 an hour.

The defendant denies any use of illegal drugs or narcotics. As to alcohol usage, the defendant indicates he consumes approximately 10 beers per week on the average.

INTERESTED PARTIES:

The defendant's probation file indicates that he has been supervised by the Probation Department on two separate grants. On September 16, 1977, he was granted two years probation by the San Jose Municipal Court after being convicted of Carrying a Loaded Firearm in a Public Place. On January 19, 1978, he was granted two years probation by the Superior Court for Section 246 of the Penal Code (Shooting in an Occupied Dwelling). The probation file indicates that the defendant successfully completed probation on January 19, 1980.

Priors

Notes in the probation file prepared by the defendant's past supervising officer Lorenzo Arroyo, indicate that the defendant did comply with all conditions of probation.

DISCUSSION:

Judicial Council Rules 414, 421 & 423: (Attached)

Enhancements: (None)

Case Evaluation:

Appearing before the Court is 36-year-old Guadalupe Fernandez, who has pled guilty to Murder in the Second Degree.

The defendant's criminal record consists of four misdemeanor convictions and one felony conviction. The defendant has been granted probation on two previous occasions, once for Carrying a Loaded Firearm in a Public Place and another for Shooting into an Occupied Dwelling. His misdemeanor convictions were mostly alcohol related.

In the present offense, the defendant shot and killed Edwardo Fernandez, a relative of the defendant, who allegedly seven years

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523                                    September 8, 1983

prior had killed the defendant's brother in a bar fight in
Mexico.  The defendant was highly intoxicated at the time as
indicated by an analysis of his blood which indicated a 0.21%
blood alcohol content.  The defendant indicates that if he had
not been drunk, he does not believe he would have shot Edwardo
Fernandez.  However, it is noted that witnesses indicated that he
had drove by the victim's location earlier prior to coming back
and shooting the victim, indicating possible premeditation.  The
defendant demonstrates absolutely no remorse for this offense and
believes that a 17 year State Prison sentence would not be fair
considering this situation.

Reviewing the defendant's criminal record, two facts are
outstanding:  One, the defendant has an obsession with firearms;
Two, he has an alcohol problem.  Perhaps the California
Department of Corrections can assist him with these two problems.
It is recommended the defendant be committed to State Prison for
17 years to life.  The defendant is absolutely ineligible for
probation pursuant to Section 1203.06 of the Penal Code.

SUGGESTED TERM:

| CRIME | MIT | AGG | RANGE | ENHANCEMENT | TOTAL TERM |
|---|---|---|---|---|---|
| 187 PC, Second Degree | No | No | 15 Yrs to Life | 2 Years (12022.5 PC) | 17 Yrs to Life |

In the Case of: GUADALUPE FERNANDEZ
Charge: 187 PC
Info. No.: 89523

September 8, 1983

RECOMMENDATION:

1. Probation be denied.
2. State Prison for 17 years to Life.
3. Five years parole.

Respectfully submitted,

ROBERT M. WEIGLE
Chief Probation Officer

Lee R. Casey, Deputy
Probation Officer

LRC/lms
Attachments

Reviewed by:

C. John Wardle
Supervising Probation
Officer - Ext. 3621

The above report has been read and considered by the Court.

JOHN R. KENNEDY
Judge of the Superior Court
Santa Clara County, California

RECEIVED
2007 JAN 10 AM 9:26
ATTORNEY GENERAL
LOS ANGELES

RECEIVED
DOCKETING
2007 JAN 10 AM 11:30
ATTORNEY GENERAL
LOS ANGELES