# EXHIBIT 11

MC-275

Name   Guadalupe Fernandez

Address   P.O. Box 705/ND-70-L

   CTF North Facility

   Soledad,CA:93960-0705

CDC or ID Number   C-72642

## IN THE COURT OF APPELLATE

## SIXTH APPELLATE DISTRICT
(Court)

Guadalupe Fernandez
_____
Petitioner
                 vs.

Ben Curry: et.,al;
_____
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____
         *(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction                          ☒ Parole

☐ A sentence                            ☐ Credits

☐ Jail or prison conditions             ☐ Prison discipline

☐ Other (specify): _____

1. Your name: Guadalupe Fernandez

2. Where are you incarcerated? Correctional Training Facility, Soledad, California

3. Why are you in custody? ☒ Criminal Conviction    ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Murder 2nd / With Use F'arm

b. Penal or other code sections: P.C. 187 (a) / P.C. 12022.5

c. Name and location of sentencing or committing court: Santa Clara County Superior Court 191

N. First Street., San Jose, CA. 95113-1090

d. Case number: 89523

e. Date convicted or committed: September 8,1983

f. Date sentenced: September 8,1983

g. Length of sentence: 15 years to life

h. When do you expect to be released? Unknown

i. Were you represented by counsel in the trial court? ☒ Yes.    ☐ No.  If yes, state the attorney's name and address:

Mr. Nazario Gonzales Public Defender 70 W. Hedding St. San Jose,CA.95110

4. What was the LAST plea you entered? *(check one)*

☐ Not guilty   ☒ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6.  GROUNDS FOR RELIEF
   **Ground 1:**  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

   SEE ATTACHED PETITION
   _____
   _____
   _____
   _____

   a.  Supporting facts:
      Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

   SEE ATTACHED PETITION
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

   b.  Supporting cases, rules, or other authority (optional):
      *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

   SEE ATTACHED PETITION
   _____
   _____
   _____
   _____

7. **Ground 2 or Ground _____** *(if applicable):*

SEE ATTACHED PETITION

a. Supporting facts:

SEE ATTACHED PETITION

b. Supporting cases, rules, or other authority:

SEE ATTACHED PETITION

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes. ☒☒ No.   If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

                       (2) _____

                       (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☒ No.   If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

                       (2) _____

                       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    _____

    _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       N/A _____

       _____

       _____

       _____

       _____

       _____

    b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

MC 275 [Rev. January 1, 1999]        **PETITION FOR WRIT OF HABEAS CORPUS**        Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised:  (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised:  (a) _____

        (b) _____

    (4) Result *(Attach order or explain why unavailable)*: _____

    (5) Date of decision: _____

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
    No Delays

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3/15/07       ▶ *Guadalupe Fernandez*
                                  (SIGNATURE OF PETITIONER)

Guadalupe Fernandez, C-72642
P.O. Box 705/ND-70-L
CTF North Facility
Soledad,CA.93960-0705

In Propria Persona

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

IN RE: GUADALUPE FERNANDEZ

      PETITIONER

ON HABEAS CORPUS

CASE NO. _____

PETITION FOR WRIT OF HABEAS
CORPUS AND MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF.

ON APPEAL FROM THE SUPERIOR COURT OF SANTA CLARA

TO: THE HONORABLE PRESIDING JUSTICE OF THE COURT OF APPEALS, SIXTH
APPELLATE DISTRICT AND THE HONORABLE ASSOCIATE JUSTICE.

    Petitioner, Guadalupe Fernandez, In Propria Personia, hereby

petitions this honorable court for writ of habeas corpus following the

decision of the Superior Court of Santa Clara. (See petitioner's ex-

hibit #3 attached to this petition.

//
//
//

1.

Guadalupe Fernandez, C-72642
P.O. Box 705/ND-70-L
CTF North Facility
Soledad,CA.93960-0705

In Propria Persona

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

IN RE: GUADALUPE FERNANDEZ          CASE NO. _____

        PETITIONER                  PETITION FOR WRIT OF HABEAS
                                     CORPUS AND MEMORANDUM OF
                                     POINTS AND AUTHORITIES IN
                                     SUPPORT THEREOF.
ON HABEAS CORPUS
_____/

1.

PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE PRESIDING JUSTICE OF THE COURT OF APPEALS, SIXTH
APPELLATE DISTRICT AND THE HONORABLE ASSOCIATE JUSTICE.

Comes now Guadalupe Fernandez (hereafter petitioner) In Propria

Persona. Petitioner is unlawfully restrained of his liberty. This

petition is intended to give meaning to Guadalupe Fernandez's sentence

of 15 years to life for second degree murder - by seeking to overturn

the Board of Parole Hearings "Illegal And Unconstitutional" decision

refusing to grant him parole for the (6th) time since becoming eligible

for parole on December 9, 1993.

2.

1  Under the parole ststute (penal code section 3041, amended 1976,c.
2  1139), parole is now the norm rather than the exception. (penal code
3  section 3041 (a), the board "shall" normally set a parole release date
4  at the initial hearing". A life prisoner must have a release date set
5  when his release would not pose a danger to the public. (penal code
6  section 3041 (b). That determination must be based on criteria set
7  forth in the Penal Code. The Board is given latitude to formulate
8  criteria implementing the statutory mandate. (Penal Code Section
9  5076.2). However, this criteria is limited to the parameters estab-
10  lished by statute and legislative intent. (Terhune v. Superior Court,
11  65 cal. App. 4th 864, 872-873 (1998).

12      In the case of this petitioner, there is "No Evidence" in the
13  record to support the Board's denial of parole at his (6th) parole
14  hearing. The court is asked to issue a formal "Order To Show Cause"
15  and require the respondent to present to the court justification for
16  the Board's decision in this case. The court is asked to find the
17  decision violated due process of law and order the Board to set
18  this petitioner's parole release date. The court is also asked to
19  declare the rights of the parties under the Due Process and Equal
20  Protection Clauses, in regards to the Board's interpretation of
21  Section 3041, Penal Code, and to issue habeas relief accordingly.

22      Generally, Petitioner asserts that he is being subjected to an
23  unconstitutional condition in the determination of his parole appli-
24  cations because the Board of Parole Hearings has been operating out-
25  side the law pursuant to a policy against granting paroles, such that
26  the parole statute has been and currently is misinterpreted to the
27  extent that petitioner has been deprived all substantive due process
28  protections of the law including his federally protected liberty in-

3.

terest to parole. Petitioner asserts, within this context, that the Board has been found to be operating pursuant to a "No" parole policy which reduces parole hearings to pro forma sham hearings where parole commissioners are precluded by this policy (and their own abiding animus) from being fair or impartial, which violates substantive due process of law.

## ll.

### PARTIES

PETITIONER, Guadalupe Fernandez, CDC#C-72642 is a prisoner of the state of California, incarcerated at the Correctional Training Facility Soledad, California.

RESPONDENT, Ben Curry, is the Warden of the Correctional Training Facility, Soledad, California and is the legal custodian of petitioner.

## lll.

### STATEMENT OF THE CASE

Preliminary formalities (HT 1). 1/ (Exhibit 1, transcript of parole hearing conducted on August 17, 2006).

Guadalupe Fernandez (hereafter petitioner) was received by the California Department of Corrections & Rehabilitations (CDCR) on September 13, 1983, from Santa Clara County for the offense of Murder 2nd with use of a firearm. He is sentenced to an indeterminate term of 17 years to life. Case number SCL-89523. His minimum eligible parole date (MEPD) is set for November 29th, 1993.

1.  References to the parole hearing transcripts will be indicated by HT followed by page number, i.e., (HT 0).

4.

## COMMITMENT OFFENSE

The following are statements taken from the petitioner's September 8th, 1983 probation officer's report and provided to the court as petitioner's exhibit number 2 at p. 2.

On July 9, 1983, at approximately 8:55 p.m., Fernandez went to 236 North 20th Street, San Jose, where the victim Edwardo Fernandes was talking to a Mr. Winstead, got out of his car, walked up to Edwardo Fernandez and shot him several times with a .45 Caliber Automatic. The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead.

Witnesses identified the defendant Guadalupe Fernandez and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he killed the victim because victim killed the defendamt's brother in a bar in Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed that his blood alcohol content was 0.21%. The .45 Caliber Automatic weapon was located in the rear bedroom of 326 North 20-th Street where Jesus Frausto had placed the weapon after he had knocked it out of the defendant's hand.

## BOARD FINDINGS

In the matter of Guadalupe Fernandez, CDC # C-72642. The panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prision.

The offense was carried out in an especially especially callous manner. The motive or the offense was carried out in a dispassionate manner. We find that there is a record of assaultive behavior. Specifically, firing into an inhabited dwelling and a criminal conduct which consist primarily of alcohol and firearms violations for which he received probation. With regard to institutional behavior, we find that he does have three 128 (A)s, the last of which was in october of 1995, and six serious 115 disciplinary reports, The last of which was in July of 1990.

Assessment of Dangerousness, he likely will be a low-risk for violence in the free community, This is dependent on his alcohol and drugs in the future. (HT 55-56).

## IV.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

Petitioner filed this petition in the superior Court in the first instance in asmuch as the Board of Parole Hearings no longer provides for administrative appeals.

## V.

### VERIFICATION

I am the petitioner in this action. All facts in the above documents, not otherwise supported by citation to the record, exhibits, of other documents, are true of my own personal knowledge. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this date 3/15/07 , at the Correctional Training Facility at Soledad, California.

Guadalupe Fernandez

# VII.

## CRITERIA FOR PAROLE

The "unreasonable risk" requirement is the standard required by statute (3041,subd,[b]), and by the Board regulations in order to justify a denial of parole. (CCR 15. 2402,subd [a]), Section 3041,(a), Penal Code requires, in pertinent part:

> One year prior to the inmates minimum eligible parole date
> a panel consisting of at least two commissioners of the Board
> Of Parole Hearings shall again meet with the inmate and nor-
> mally set a parole release date as provided in section 3041.5.
> The release date shall be set in a manner that will provide
> uniform terms for offenses of similar gravity and magnitude
> in respect to their threat to public.... Subd. [b] of section
> 3041 provides in pertinent part, that: the panel or board
> shall set a release date unless it dteermines that the gravity
> of the current convicted offense or offenses, is such that
> consideration of public safety requires a more lengthy per-
> iod of incarceration of this individual, and that a parole
> date, therefore, cannot be fixed at this meeting.

## TITLE 15, DIVISION 2, BOARD REGULATIONS

## 2402. DETERMINATION OF SUITABILITY.

(a) General. The panel shall first determin whether the life
    prisoner is suitable for release on parole. Regardless
    of the length of time served, a life prisoner shall be
    found unsuitable for and denied parole if in the judgment
    of the panel the prisoner will pose an unreasonable risk
    of danger to society if released from prison. (emphasis
    added).

(b) Information Considered. All relevant, reliable informat-
    ion available to the panel shall be considered in deter-
    mining suitability for parole. Such information shall in-
    clude the circumstances of the prisoner's social history;
    past and present mental state; past criminal history, in-
    cluding involvement in other criminal misconduct which
    is reliably documented; the base and other commitment
    offenses, including behavior before and after the crime;
    past and present attitude toward the crime; any condit-
    ions of treatment or controle, including the use of spe-
    cial conditions under which the prisoner may safely be
    releaseed to the community;

7.

and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending To Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as guidelines; the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitabiliyt include:

(1) Commitment Offense: The prisoner committed the offense in an especially heinous, atrocious or cruel manner. the factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record Of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unsuitable Social History. The prisoner has a history of unsutable or tumultous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending To Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juenile Record. The prisoner does not have a record assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs Of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation For Crime. The prisoner commited his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Sydrome. (Not quoted here as inapplicable).

(6) Lack Of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be be put to use upon release.

(9) Institutional Behavior. Institutional activities and enhanced ability to function within the law upon release.

# VIII.

## PRAYER FOR RELIEF

Guadalupe Fernandez states that he has no other plain or speedy remedy save habeas corpus: therefore, he prays this Honorable Court:

1. Issue an order to show cause;

2. appoint counsel to represent petitioner in any and all proceedings in this matter.

3. Conduct an evidentiary hearing;

4. Order respondents to provide petitioner with reasonable discovery;

5. Declare the rights of the petitioner;

6. Grant any other further relief the court deems proper and just.

Date: 3/15/07                    Respectfully, submitted

Guadalupe Fernandez
Guadalupe Fernandez

10.

IX.

## MEMORANDUM OF POINTS AND AUTHORITIES

## THE LAW ON PAROLE

Penal Code section 3041, subdivision (a) requires that at a suitability hearing the board "shall normally set a parole release date...Subdivision (b) provides that a release date "shall" be set "unless" the Board determins that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this ind-ividual...See, e.g, In re Rosenkrantz, 29 Cal.App. 4th 616, at 653, (2002), citing to In re Ramirez, 94 Cal. App. 4th 549, at 565. The parole board regulations make this criterion more specific. The panel can deny only if the prisoner would pose an unreasonable risk of da-nger to society if released from prison. (Cal. Code Regs., tit 15, 2402, subd (a). The regulations set forth specific criteria to deter-mine whether under the standard a prisoner is suitable for parole.

Under the rule created by the United States Supreme court in Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1,12, and Board of Pardons v. Allen (1987) 482 U.S. 369, 377-378, a state's statutory parole scheme which used mandatory language "creates a pre-sumption that parole will be granted" when or unless certain designa-ted findings are made, and therefore gives rise to a constitutional liberty interest. The California parole scheme uses mandatory language which is parallel to the parole scheme found in Greenholtz and Allen

11.

1  to give rise to a protected liberty interest in parole. Accordingly,
2  the California parole scheme gives rise to a cognizable liberty in-
3  terest in release on parole. See also, McQuillion v. Duncan, 306 F.3d
4  895, 902 (9th Cir. Cal.2002); and Biggs v. Terhune, 334 F.3d 910
5  (9th Cir. Cal. 2003), affirming these propositions in California's
6  section 3041, penal code. Following on the heels of McQuillion, supra,
7  the siminal case of In er Rosenkrantz held that the satutory parole
8  scheme creats a liberty interest under California due process of law.
9  Id., at 29 Cal. 4th at 668, fn.12. The court then applied the clearly
10  established federal due process test to review a gubernatorial dec-
11  ision to deny parole. It recognized that a gubernatorial decision is
12  subject to judicial review to determine whether there is "some evid-
13  ence" to support the decision. In this case, the decision by the Board
14  to find petitioner unsuitable for parole is also subject to review to
15  determine if there is some evidence to support the decision, the ev-
16  idence must bear some indicis of reliability. Cato v, Rushen, 824 F.
17  2d 703, 705 (9th Cir. Cal. 1987); also, Jancsek v. Oregon Board of
18  Parole. 833 F. 2d 1389, 1390. (9th Cir. 1987). The evidence must be
19  relevant and material to the decision. (Cal. Code Regs., 15. 2000 (b)
20  (50) Good Cause; (63) Material Evidence, (90) Relevant Evidence (Ibid.
21  (50) Good Cause: A finding by the board based upon a preponderance of
22  the evidence that there is a factual basis and good reason for the
23  decision made. Evidence which tends to prove or disprove an issue or
24  facts in dispute.In re Caswell, 92 Cal. App. 4th 1017, 1030;McQuillion
25  supra, 306F.3d at 906,910.

26
27    A.  THE DECISION TO FIND PETITIONER UNSUITABLE FOR
         PAROLE IS AN ABUSE OF DISCRETION AND VIOLATES DUE
         PROCESS; PETITIONER MUST BE GRANTED A PAROLE DATE.
28

12.

1.    THE DECISION IS NOT SUPPORTED BY ANY RELEVANT OR
      MATERIAL EVIDENCE.

Proceeding under the presumption that the evidence must be rel-
evant and material, there was no relevant or material evidence to ba-
se denial of parole to petitioner. Under federal due process analysis,
after finding a liberty interest, it must be determined what process
is due. Morrissey v. Brewer (1972) 408 U.S. 471,481. In this context,
the United States Supreme Court has held that there must be "some ev-
idence" Superintendent v. Hill (1985) 472 U.S. 445,456, where it sta-
tes that "the fundamental fairness guarnteed by the due process clause
does not require courts to set aside decisions of prison administra-
tors that have some basic fact."

Additionally, the evidence underlying the Board's decision must
have some indicia of reliability. Jancsek, supra 833 F. 2d at 1390.
In this case, petitioner contends that the Board of Parole Hearings
erroneously concluded there is some evidence to justify the finding
that he is suitable for parole.

(a).    THE COMMITMENT OFFENSE DOES NOT CONSTITUTE "SOME
        EVIDENCE" FOR DENIAL OF PAROLE IN THIS CASE.

In finding petitioner unsuitable for parole the panel stated
that the commitment offense was carried out in an especially vicious
and brutal manner. Additionally, the motive of this crime was inexpl-
icable and trivial in relationship to the offense. Moreover, the off-
ense was carried out in a manner which demonstrates exceptional insen-
sitive disregard for human suffering. Such a finding is contrary to the
facts of the case, where the record indicates petitioner would pose a

13.

low degree of risk to society if he were released from prison at this time. It could be argued that any and all murders are carried out in a vicious, brutal manner without regard to human suffering. and in fact is what second degree murder is. But used as a regulation for unsuitability would have to denote something greater than an ordinary or typical killing. Nonetheless, as the psychological evaluation report clearly demonstrates, petitioner has made substantial and significant progress in growth and maturation while incarcerated. The record is replete with his achieving the correctional objectives of reforming his life, and it would be a disservice to the professionalism and programs of the Department to devalue petitioner's officially-recognized progress and deny him parole because he committed the offense. Despite this offense, he was sentenced to a parolable sentence. Certainly, his case falls within the meaning expressed in Ramirez,supra, that any murder is parolable under the statute. Yet, the panel made no effort to distinguish his offense as containing circumstances which are beyond the minimum necessary to sustain a conviction for the crime of second degree murder.

## 2. THE BOARD"S BOILERPLATE RELIANCE ON STATIC HISTORY FACOTORS VIOLATES FUNDAMENTAL DUE PROCESS.

The Ninth Circuit has expressed concern about the use of the commitment offense to repeatedly deny parole. As the circuit in Biggs v. Terhune (9th Cir. 2003) 334 F. 3d 910,916, recently acknowledge: "Due process is not a mechanical instrument. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the constitution has entrusted with the unfolding of the process."Lankford v. Idaho 500 U.S. 110,121 (1991 (quoting

14.

1  Joint Anti-Fascist Refugee Comm. v.McGrath,341 U.S. 123, 163 (1951).
2  (Frankfuter, J., Concurring).A continued reliance in the future on an
3  unchanging factor, the circumstances of the crime....runs contrary to
4  the rehabilitative goals espoused by the prison system and could re-
5  sult in a due process violation. See also, In re Rosenkrantz, supra,
6  29 Cal. 4th at 689 (Moreno, J., concurring). (Emphasis added).Biggs
7  was denied at his first initial parole hearing. The Circuit allowed
8  that the commitment offense could be used at that initial hearing as
9  a legitimate cause for denial of parole, but questioned whether it
10 could be used as a factor to continue denying parole at subsequent
11 hearings. At first blush, the use of the offense in the petitioner's
12 case at his initial hearing might have been upheld as "some evidence".
13 but the hearing challenged here is his (6th) subsequent hearing. The
14 Biggs court gave clear indication that had it been Biggs subsequent
15 hearing, the court may have found against the Board on using the off-
16 ense to again base parole denial on.

17      When considering the offense as circumstances for unsuitability
18 the Board must be and should be mindful that the circumstances of the
19 offense are static and unchangeable. The most important aspect of this
20 case is the dynamic changes that years of imprisonment and exposuer to
21 positive, behavioral programs has made in this petitioner. The record
22 shows that he has achieved the objective of corrections, i.e., to co-
23 rrect behavior, and the record shows official and professional recog-
24 nition that he does not pose an unreasonable risk to public safety if
25 paroled. Thus, since there is no evidence whatsoever of unreasonable
26 risk, which is the standard by which the Board's decision legally hi-
27 nges, the Board's decision denying petitioner parole must be reversed.
28 The statutory default must be enforced in this case.

15.

3.  THE BOARD'S STATEMENT OF REASON WAS INADEQUATE.

The Board's statement of reasons were inadequate and inappropriate. In In re Strum (1974) 11 Cal. 3d 258, 113 Cal. Rptr. 361, 521. P. 2d 97. The California Supreme Court held that in order to comply with a prisoner's due process rights, the Board must "support all its denials of parole with a written definitive statement of its reasons therefore and to communicate such statements to the inmate concerned". (Id., at P. 273.) The Strum court articulated three rationales as to why the Board must provide a written statement of reasons granting parole: (1) to promote carefule decision making; (2) to allow inmates to make an informed application for relief if parole is denied; and (3) to permit meaningful judicial review. (Id., at P. 270.) Other courts have taken similar positions where judges have failed to adequately articulate their findings. See People v. Martin (1986) 42 Cal. 3d 905, 913-915, and cases cited. In Martin the court said, citing several cases, such as In re Podesto (1976) 15 Cal. 3d 921, that

> "we emphasized that a requirement of articulated reasons
> to support a given decision serves a number of interests;
> it is frequently essential to meaningful review; it acts
> as an inherent guard against careless decisions, insuring
> that the judge himself analyzes the problem and recognizes
> the grounds for his decision-making process by helping to
> persuade the parties and the public that the decision-mak-
> ing is careful, reasoned and equitable". (Ibid.)

Here, the Board's statement of reasons is crtptic at best. It merely recites the commitment offense as the primary basis upon which it denied parole and list pro forma boilerplate terminology from its Parole Denial Worksheet/Fm. 1000A. It dose not explain what it is about the commitment offense and its inclusive aggravating circumstances that make the petitioner an "unreasonable risk of danger to society if

16.

1   released". (see section 2402, subd. (a).) or how the commitment offe-

2   nse was "particularly egergious". It did not explain how all the evi-

3   dence supporting petitioner's suitability for parole, including all

4   the psychological clearances, and lack of any violent criminal history

5   did not outweigh under the ordinary rules of the "perponderance of

6   evidence" standard employed by the Board's regulations (see section

7   2000 (b), (50) - the static history of the commitment offense. There-

8   fore, the Board's abused its discretion in violation of procedural due

9   process by failing to properly apply its own burden of proof.

10      The Court is not here asked to substitute its judgment for that

11  of the Board, nor is ti asked to weigh or reweigh the evidence. Rather

12  the court is asked to review de novo the pre-decisional process of the

13  hearing, including the evidence submitted, determined the <u>legal sign-</u>

14  <u>icance</u> of that evidence as relevant or irrelevant, and then determine

15  if the Board met its own standard of proof in weighing and balancing

16  process.

17      4.   **THE DECISION TO DENY PETITIONER PAROLE WAS ARBITRARY
            AND AN ABUSE OF DISCRETION, UNSUPPORTED BY "SOME EVID-**
18          **ENCE," VIOLATING HIS RIGHT TO DUE PROCESS GUARANTEED
            BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTIT-**
19          **UTION OF THE UNITED STATES.**

20

21      Although the Board of parole Hearings (hereafter Board) dis-

22  cretion in parole matters has been described as "broad", it is not

23  "absolute" (<u>In re Powell</u> (1988) 45 Cal. 3d 894,940), as its discretion

24  is "cabined" by criteria, in petitioner's case, listed in the Calif-

25  ornia Code of Regulations, title 15 § 2402 <u>McQuillion v. Duncan</u> (9th

26  Cir. 2003) 306 F.3d 895, 912). Petitioner has not only a "liberty

27  interest" in parole (<u>In re Rosencrantz</u> (2002) 29 Cal. 4th 616,652) but

28

an "expectation that [he] will be granted parole unless the Board finds in the exercise of its discretion that [the prisoner is] unsuitable for parole in light of the circumstances specified by statute and by regulations" (Ibid. at 654, emphasis added). Petitioner's liberty interest in and "expectation" of parole, dose not attach upon being found suitable for parole, but upon entrance of prison gates (Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915). A decision of unsuitability for parole must be supported by some evidence having some indicia of reliability (Ibid., citation). There must also be a rational connection between the evidence and the decision made; if not the decision is arbitrary and an abuse of discretion, violating the due process clause (Guidotti v. County of Yolo (1989) 214 Cal. App. 3d 1552, 1561; Oregon Resource Council v Lowe (9th Cir. 1997) 109 F.3d 521, 526).

As will be demonstrated, the decision to deny petitioner parole for the sixth time, is not supported by "some evidence" and is therefore an abuse of discretion, violating his right to due process. (Rosenkrantz v. Marshall, 444 F. Supp. 2d 1063. C.D. Cal. (2006) U.S. Dist. Lexis 79358; (Martin v. Marshall, 431 F. Supp. 2d 1038 (N.D. Cal. 2006).

### AEGUMENTS

a.  **THE COMMITMENT OFFENSE, FOR THE SIXTH TIME, IS NOT "SOME EVIDENCE" UPON WHICH PAROLE CAN BE DENIED.**

Petitioner's sixth parole hearing was held on August 17, 2006. Presiding Commissioner, Mr. James Davis states: This hearing is being conducted pursuant to Penal Code Section 3041 and 3042 and the rules and regulations of the Board of Prison Terms governing parole consideration hearings for life inmates. (HT 7).

18.

1  In closing, the panel states: In the matter of Guadalupe Fernandez

2  CDC number C-72642. The panel reviewed all information received

3  from the public and relied on the following circumstances in con-

4  cluding that the prisoner is not suitable for parole and would

5  pose an unreasonable risk of danger to society or a threat to

6  public safety if released from prison. For the sixth time the

7  Board relied on the unchanging factors of petitioner's case to

8  deny him parole. The Board finds the offense was carried out in

9  an especially callous manner. The motive or the offense was car-

10 ried out in a dispassionate manner. (HT 55).

11       The relevant evidence does not merely fail to support but

12                      refutes the conclusion that the petitioner

13 committed his offense in a dispassionate manner (In re Scott 119

14 Cal. App. 4th 889). This is petitioner's sixth suitability hear-

15 ing. It has been 22-years since petitioner committed his offense.

16 Under these circumstances, the nature of the offense has lost any

17 predictive value and the continued reliance on it to find petitio-

18 ner unsuitable violated due process. (Bair v. Folsom State Prison

19 2005 U.S. Dist. Lexis 29952 (E.D. Cal. 2005). The Biggs court

20 held, in relevant part:

21       [The] parole board's sole supportable reliance on the
22       gravity of the offense and conduct prior to imprisonment
         to justify denial of parole can be initially justified
         as fulfilling the requirements set forth by the state.
23       Over time, however, should Biggs continue to demonstrate
         exemplary behavior and evidence of rehabilitation, deny-
24       ing him a parole date simply because of the nature of
         Biggs offense and prior conduct would raise serious qu-
25       estions involving his liberty interest in parole. A con-
         tinued reliance in the future on an unchanging factor,
26       the circumstances of the offense and conduct prior to im-
27       prisonment runs contrary to the rehabilitative goals es-
         poused by the prison system. (Biggs v. Terhune, supra, 334
28       F.3d at 916-917).

                              19.

b.   **THE OFFENSE WAS NOT PARTICULARLY EGREGIOUS.**

One year prior to a prisoner's minimum eligible parole re-
lease date, the Board "shall normaly set a parole release date"
(penal Code§ 3041 (a)). The only statutory expecption to "shall
normally set a parole release date" is the gravity of the current
or past convicted offenses, or timing and gravity of the current
or past convicted offense or offenses (penal code § 3041 (b)).
This has been interpreted to mean : The character of the offense
alone may justify a denial of parole if the offense involves
"particularly egregious acts beyond the minimum necessary to sus-
tain a conviction for second degree murder" (In re Rosenkrantz,
supra, 29 Cal. 4th at 683). However, we must be mindful that [t]
he Board's authority to make a exception based on the gravity of
a life term inmate's current or past offenses should not operate
so as to swallow the rule that parole is 'normally' to be granted
(Ibid., quoting with approval In re Ramirez (2001) 94 Cal. App.
4th 549, at 570).

This was clearly a senseless and unjustified crime. It was
not however, particularly egregious when compared to other murders.
Indeed, the crime falls squarely within the middle of the Board's
matrix given the nature and behavior of both the victim snd the
petitioner. The facts of this case show that the petitioner shot
a man to death in the heat of passion.

As held by Ramirez court:

The circumstances of any past offense, even any murder,
not necessarily a sufficient ground for the Board to
refuse to set a parole date.... And the Legislature has
clearly expressed its intent that when murders--who are
the great majority of inmates serving indeterminate sen-

tences--approach their minimum eligible parole date, the Board shall normally set a parole release date (Pen. Code § 3041, subd. (a)). (In re Ramirez, 94 Cal. App. 4th at 569-570).

Petitioner could have been denied parole, at least at his initial parole hearing, if his offense was "particularly egregious."

In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense....[P] Therefore, a life term offense or any other offense underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date (In re Rosenkrantz, supra, 29 Cal. 4th at 683, citation).

## CONCLUSION

When the court applies the some evidence standard as properly understood to the circumstances of Guadalupe Fernandez, the court will find that the Board's decision was not based on some relevant reliable evidence that reasonable suggest that he poses a current, unreasonable threat to public safety. For these reasons, the petitioner respectfully request that this court vacate the Board's determination of unsuitability and direct yhe Board to set a parole date for Guadalupe Fernandez.

Date: 3/15/07                    Respectfully, submitted

                                 Guadalupe Fernandez
                                 Guadalupe Fernandez

## DECLARATION OF GUADALUPE FERNANDEZ

I declare as follows:

I am the petitioner in this case. I am over the age of eighteen years. I am aparty to the attached action. I am a resident of the Correctional Training Facility in Soledad, California. My address is Post Office Box 705 / ND- 70-L, CTF North Facility, Soledad, California. 93960-0705. I served the attached document entitled "WRIT OF HABEAS CORPUS" on the persons/parties specified below by placing a true copy of said document into a sealed envelope with the appropriate postage affixed thereto and surrendering said envelope to the following:

OFFICE OF THE ATTORNEY GENERAL
455 GOLDEN AVE., SUITE 11000
SAN FRANCISCO,CA.94102

I declare under penalty of purjury under the laws of the United States that the foregoing is true and correct. Executed this *15TH* day of *March*, 2007 at the Correctional Training Facility in Soledad, California.

*Guadalupe Fernandez*
Declarant

22.

# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration ) CDC Number C-72642
Hearing of: )
 )
GUADALUPE FERNANDEZ )
_____ )

CALIFORNIA TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 17, 2006

PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Guadalupe Fernandez, Inmate
Mr. Patrick Sparks, Attorney for Inmate
Mr. David Ugalve, Interpreter
Mr. Ed Martinez, Commissioner/Observer
Mr. Ronald Rico, Deputy District Attorney (via videoconference)
Correctional Officers, Unidentified

INMATE
COPY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Tracy Richardson              Vine, McKinnon & Hall

ii

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 18 |
| Post-Commitment Factors | 22 |
| Parole Plans | 30 |
| Closing Statements | 44 |
| Recess | 54 |
| Decision | 55 |
| Adjournment | 59 |
| Transcriber Certification | 60 |

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're on

3     record.

4          **PRESIDING COMMISSIONER DAVIS:**  This is a Subsequent

5     Parole Consideration Hearing for Guadalupe Fernandez, CDC

6     number C-72642.  Today's date is August 17th, 2006.

7     We're located at the Correctional Training Facility in

8     Soledad.  The inmate was received on September 13th,

9     1983, from Santa Clara County.  The life term began on

10    September 13th, 1983, with a minimum eligible parole date

11    of November 29th, 1993.  The controlling offense for

12    which the inmate's been committed is Murder Second with

13    use of a Firearm.  Case number SCL-89523, Count One,

14    Penal Code section 187/12022.5.  The inmate received a

15    term of 15 years to Life, plus two.  This hearing is

16    being tape-recorded and, for the purposes of voice

17    identification, we will each state our first and last

18    name, spelling the last name.  When it reaches you, Mr.

19    Fernandez, if you will also give us your CDC number,

20    please, sir.  So I will start and move to my left.  I'm

21    James Davis, D-A-V-I-S, Commissioner.

22         **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen Blonien, B-

23    L-O-N-I-E-N.  I'm a Deputy Commissioner.

24         **ATTORNEY SPARKS:**  Patrick Sparks, S-P-A-R-K-S,

25    attorney for Mr. Fernandez.

26         **INMATE FERNANDEZ:**  Guadalupe Fernandez.

27         **ATTORNEY SPARKS:**  You can spell it in Spanish if you

2

1    want.

2.        **INMATE FERNANDEZ:**  F-E-R-N-A-N-D-E-Z.

3        **PRESIDING COMMISSIONER DAVIS:**  All right, and your

4    CDC number, please, sir.

5        **INMATE FERNANDEZ:**  C-72642.

6        **PRESIDING COMMISSIONER DAVIS:**  Very well, thank you.

7        **INTERPRETER UGALVE:**  David Ugalve, U-G-A-L-V-E, from

8    Monterey County, Interpreter.

9        **COMMISSIONER MARTINEZ:**  Ed Martinez, M-A-R-T-I-N-E-

10    Z, Commissioner/Observer.

11        **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico, R-I-C-

12    O, Deputy District Attorney of Santa Clara County by

13    video conference.

14        **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

15    And let the record also reflect we're joined by two

16    correctional officers who are here today for security

17    purposes only and will not be actively participating in

18    this hearing.  Before we actually do anything else, Mr.

19    Ugalve, I'll go ahead and swear you in.  Do you solemnly

20    swear to interpret to the best of your ability accurately

21    from English to Spanish and Spanish to English?

22        **INTERPRETER UGALVE:**  Yes.

23        **PRESIDING COMMISSIONER DAVIS:**  Thank you.  All

24    right, if you will, in front of you is the Americans with

25    Disabilities Act Statement.  Would you please read that

26    one for Mr. Fernandez?

27        [Thereupon, the ADA Statement was read to the inmate

3.

1    in Spanish.]

2        INTERPRETER UGALVE:  Okay, it's fine.

3        PRESIDING COMMISSIONER DAVIS:  All right, sir, and

4    our records indicate that on April 10th of 2006, together

5    with staff from the institution, that you reviewed and

6    signed the BPT Form 1073 indicating that you do not have

7    any disabilities that would qualify under the Americans

8    with Disabilities Act, but that you do need language

9    interpretation which is, of course, what our interpreter

10   is here for today.  So is all that accurate, sir?

11       INMATE FERNANDEZ:  Yes.

12       PRESIDING COMMISSIONER DAVIS:  All right.  Has

13   anything changed since that time?

14       INMATE FERNANDEZ:  No.  Only my eyes.  I cannot see

15   very well.

16       PRESIDING COMMISSIONER DAVIS:  All right, do you

17   have glasses that you wear normally?

18       INMATE FERNANDEZ:  Yes.

19       PRESIDING COMMISSIONER DAVIS:  All right, and you

20   brought those with you today?

21       INMATE FERNANDEZ:  Yes.

22       PRESIDING COMMISSIONER DAVIS:  And they work all

23   right for you?

24       INMATE FERNANDEZ:  Yes.

25       PRESIDING COMMISSIONER DAVIS:  Now, are you able to

26   read in English?

27       INMATE FERNANDEZ:  No.

4

1    PRESIDING COMMISSIONER DAVIS:  Now, are you able

2    to -- when you reviewed your -- you waived your -- your

3    right to review your Central File.  Is that correct, sir?

4    We're getting a little -- excuse me just one second.

5    We're getting a little feedback from your end.  Not feed

6    back, but just more of you on the phone.

7    DEPUTY DISTRICT ATTORNEY RICO:  I'm -- I'm sorry

8    about that.  Perhaps we should state for the record that

9    there's been a little bit of a glitch in the video

10   conference hook-up, so we have both an audio line as well

11   the video line, and my technician is trying to work on

12   that.

13   PRESIDING COMMISSIONER DAVIS:  Right, and -- and

14   that is -- that is absolutely correct and we are -- we're

15   trying to -- to bridge the technical difficulties here to

16   make sure we proceed appropriately.  But we do have -- we

17   do have video, that there is some delay from the actual

18   audio which is by telephone line and they are doing some

19   work on -- on I think both of our ends trying to figure

20   out exactly what the problems are and get those resolved.

21   But until then we're -- we're making the best of it.

22   DEPUTY DISTRICT ATTORNEY RICO:  I apologize for the

23   oversight on my part for getting the -- the open line

24   while I was trying to resolve that.  But if you could

25   step back and ask the inmate that question again so the

26   audio picks up the answer.

27   PRESIDING COMMISSIONER DAVIS:  You bet.  We're --

5

1   we're discussing the -- the C-File review, that you

2   reviewed your right to review your C-File?  Did you

3   decide you didn't want to -- to review your C-File?

4        INMATE FERNANDEZ:  Yes.

5        PRESIDING COMMISSIONER DAVIS:  Okay, and why was --

6        INMATE FERNANDEZ:  I don't have nothing to review.

7        PRESIDING COMMISSIONER DAVIS:  It wasn't for lack of

8   interpreter or anything.  It was just because you chose

9   not to review it?

10       INMATE FERNANDEZ:  Yeah, because I didn't want to.

11       PRESIDING COMMISSIONER DAVIS:  All right, very well.

12  So you have your glasses.  You can hear me all right?

13       INMATE FERNANDEZ:  Yes.

14       DEPUTY COMMISSIONER BLONIEN:  We've lost the

15  (inaudible).

16       PRESIDING COMMISSIONER DAVIS:  Okay, hang on just a

17  second.  I -- I apologize for this.  We're having some

18  technical difficulties so just bear with us.  It -- it

19  has nothing to do with you.  Are you with us?

20       DEPUTY DISTRICT ATTORNEY RICO:  I'm still live on

21  the line.

22       PRESIDING COMMISSIONER DAVIS:  Okay.

23       DEPUTY DISTRICT ATTORNEY RICO:  Did you lose the

24  video connection?

25       PRESIDING COMMISSIONER DAVIS:  Did we?  I -- I

26  didn't notice.

27       DEPUTY COMMISSIONER BLONIEN:  Yeah, but it came

6

1    back.  You went off for about 30 seconds and you came

2    back.

3        **DEPUTY DISTRICT ATTORNEY RICO:**  So I do have a live

4    landline here.  I can copy everything you're saying and

5    for purposes of the hearing.  I -- I see no difficulty

6    with that.  If we lose video connection, I can still hear

7    you.

8        **PRESIDING COMMISSIONER DAVIS:**  All right, and -- and

9    if for some reason again that we've lost you and you

10   can't hear us any longer, I don't know, waive or

11   something and we'll -- it'll attract our attention.

12       **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

13   Commissioner.

14       **PRESIDING COMMISSIONER DAVIS:**  All right.  All

15   right, Mr. Fernandez, again I apologize for the

16   interruptions here, but we'll -- we'll do our best to

17   proceed forward.  So --

18       **INMATE FERNANDEZ:**  It's okay.

19       **PRESIDING COMMISSIONER DAVIS:**  -- Counsel, you're

20   satisfied that your client is -- is ready and -- and

21   healthy and -- and able to proceed today?

22       **ATTORNEY SPARKS:**  Yes.

23       **PRESIDING COMMISSIONER DAVIS:**  And Mr. Fernandez, do

24   you agree with that?  Your -- nothing that you can see

25   that would interfere with your ability to actively

26   participate in this hearing today?

27       **INMATE FERNANDEZ:**  Yes.

7

1　　　**PRESIDING COMMISSIONER DAVIS:**  All right, very well.

2　　Now, this hearing is being conducted pursuant to Penal

3　　Code Sections 3041 and 3042 and the rules and regulations

4　　of the Board of Prison Terms governing parole

5　　consideration hearings for life inmates.  The purpose of

6　　today's hearing is to once again consider the number and

7　　nature of the crimes for which you were committed, your

8　　prior criminal and social history, and your behavior and

9　　programming since your commitment.  We've had the

10　　opportunity to review your Central File and your prior

11　　transcripts, and you will be given the opportunity to

12　　correct or clarify the record as we proceed.  Now, we

13　　will reach a decision today and inform you whether or not

14　　we find you suitable for parole and the reason for our

15　　decision.  If you are found suitable for parole the

16　　length of your confinement will be explained to you.

17　　Nothing that happens in today's hearing will change the

18　　findings of the court.  The Panel is not here to retry

19　　your case.  The Panel is here for the sole purpose of

20　　determining your suitability for parole.  You understand

21　　that, sir?

22　　　　**INMATE FERNANDEZ:**  Yes.

23　　　　**PRESIDING COMMISSIONER DAVIS:**  This hearing will be

24　　conducted in two phases.  First, I will discuss with you

25　　the crime for which you were committed, as well as your

26　　prior criminal and social history.  Following that,

27　　Commissioner Blonien will discuss with you your

8

 1    counselor's report, your progress since your commitment,

 2    and your psychological evaluation, as well as your parole

 3    plans and any letters of support or opposition as they

 4    may exist.  Once that's concluded, the Commissioners, the

 5    District Attorney, and then your attorney will have an

 6    opportunity to ask you questions.  Questions that come

 7    from the District Attorney will be asked through the

 8    Chair and you will respond back to the Panel with your

 9    answer.  Following that, the District Attorney and then

10    your attorney will make closing statements, followed by

11    your closing statement, which should focus specifically

12    on your suitability for parole.  The California Code of

13    Regulations states that regardless of time served an

14    inmate shall be found unsuitable for and denied parole

15    if, in the judgment of the panel, the inmate would pose

16    an unreasonable risk of danger to society if released

17    from prison.  You have certain rights.  Those rights

18    include the right to a timely notice of this hearing, the

19    right to review your Central File and the right to

20    present relevant documents.  Counselor, are you satisfied

21    that your client's rights have been met to date?

22         **ATTORNEY SPARKS:**  Yes.

23         **PRESIDING COMMISSIONER DAVIS:**  You have an

24    additional right and that is to be heard by an impartial

25    panel.  Now, you've heard your Commissioners introduce

26    our ourselves today.  Is there any reason to believe

27    that you would -- that we would not be impartial?

9

1       INMATE FERNANDEZ:  No.

2       PRESIDING COMMISSIONER DAVIS:  All right, thank you.

3   You will receive a written copy of our tentative decision

4   today.  That decision becomes effective within 120 days.

5   A copy of the decision and a copy of the transcript will

6   be sent to you.  The -- the Board has eliminated its

7   appeal process.  If you disagree with anything in today's

8   hearing, you have the right to go directly to court with

9   your complaint.  You are not required to admit your

10  offense or discuss your offense.  However, the Panel does

11  accept the findings of the court to be true.  Do you

12  understand that, sir?

13      INMATE FERNANDEZ:  Yes.

14      PRESIDING COMMISSIONER DAVIS:  All right.

15  Commissioner, are we going to be dealing with anything

16  from a confidential file today?

17      DEPUTY COMMISSIONER BLONIEN:  No, there's no

18  confidential information.

19      PRESIDING COMMISSIONER DAVIS:  All right.  Thank

20  you.  I'm going to be passing a checklist of documents to

21  defense counsel in the room.  It's dated 7/26/06.  And

22  I'm assuming that you have a similar list on your -- on

23  your end?

24      DEPUTY DISTRICT ATTORNEY RICO:  Commissioner Davis,

25  I have a checklist dated 7/26/06 lower right-hand corner.

26  I have all of those documents and I'm prepared to

27  proceed.

10

1       **PRESIDING COMMISSIONER DAVIS:**  Very well, thank you.

2       **ATTORNEY SPARKS:**  I have those documents, thank you.

3       **PRESIDING COMMISSIONER DAVIS:**  Very well.  We'll

4    mark that Exhibit 1 then.  Any additional documents you'd

5    like to submit?

6       **ATTORNEY SPARKS:**  No, thank you.

7       **PRESIDING COMMISSIONER DAVIS:**  Any preliminary

8    objections?

9       **ATTORNEY SPARKS:**  No.

10      **PRESIDING COMMISSIONER DAVIS:**  Okay.

11      **ATTORNEY SPARKS:**  Oh, actually, I do.  This report

12   from San Jose Police Department just came in today.  It's

13   dated July 21st, 2006.  We just object to it.  We didn't

14   receive it until today.  The ten-day processing of these

15   documents --

16      **PRESIDING COMMISSIONER DAVIS:**  Are you able to hear

17   Mr. Sparks all right on your end?

18      **DEPUTY DISTRICT ATTORNEY RICO:**  Perhaps if he could

19   speak up a little louder.  I copied July 21st (inaudible)

20   the San Jose Police Department letter in opposition.

21      **PRESIDING COMMISSIONER DAVIS:**  Yes, it was just

22   received in today's -- as -- as we all arrived today, we

23   got this today.  This is that continuing problem of

24   trying to get documents appropriately distributed.

25      **DEPUTY DISTRICT ATTORNEY RICO:**  The only thing I

26   would ask is that it would appear San Jose Police

27   Department sent it out in timely fashion and it seems to

11

1    be a problem within the institution distributions

2    thereof. If -- if the Panel were to consider this --

3    this timeliness problem, perhaps the file could be

4    reviewed to see if there's been prior opposition.

5        PRESIDING COMMISSIONER DAVIS:  All right, we can --

6    well, we have -- we have two issues then on the table.

7    The first one is the timeliness issue and that is that

8    this letter was received -- although written in a timely

9    manner not -- not received by defense counsel in a timely

10    manner and, therefore, I'll sustain that objection.  The

11    other request is that we look and see if there are other

12    letters of objection in the existing file perhaps from

13    the last hearing and we can certainly do that.

14        DEPUTY DISTRICT ATTORNEY RICO:  Thank you, and one

15    other matter.  I will just tell you my technician called

16    and indicated that he has the telephone companies looking

17    into the matter.  They're calling back in about 30

18    minutes if you have any problem on the line.

19        PRESIDING COMMISSIONER DAVIS:  Good.  Well, perhaps

20    we can get this resolved before our next hearing today

21    then that will good news.  All right, any other

22    objections, Counsel?

23        ATTORNEY SPARKS:  No, thank you.

24        PRESIDING COMMISSIONER DAVIS:  And will your client

25    be speaking with us today?

26        ATTORNEY SPARKS:  Yes.

27        PRESIDING COMMISSIONER DAVIS:  All right, then if

12

1   you'll raise your right hand then, Mr. Fernandez.   Do you

2   solemnly swear or affirm that the testimony you will give

3   at this hearing will be the truth and nothing but the

4   truth?

5        **INMATE FERNANDEZ:**   Yes.

6        **PRESIDING COMMISSIONER DAVIS:**   Thank you.   All

7   right, for a review of the crime I'm going to refer to

8   the Court of Appeals document starting on Page 2 where it

9   states,

10       "On July 9[th], 1983, at approximately 8:55

11       p.m., Mr. Fernandez went to 236 North 20th

12       Street, San Jose, where Eduardo Fernandez was

13       talking to a Mr. Winstead, W-I-N-S-T-E-A-D.

14       Got out of his car, walked up to Eduardo

15       Fernandez, and shot him several times with a

16       .45 caliber automatic.   The defendant left the

17       area after the shooting.   Police arrived and

18       the victim was taken to the San Jose Hospital

19       where he was pronounced dead.   Witnesses

20       identified the defendant and most knew him as

21       he was related to the victim.   The defendant

22       was arrested on the same date and it was

23       learned that he had killed the victim because

24       the victim had killed the defendant's brother

25       in a bar fight in Mexico seven years prior.

26       Analysis of a blood sample obtained from the

27       defendant revealed that the blood alcohol

13

```
 1        content was a .21.  The .45 caliber automatic

 2        weapon was located in the rear bedroom of 326

 3        North 20th Street where Jesus Frausto, F-R-A-

 4        U-S-T-O, had placed the weapon after he

 5        knocked it out of the defendant's hand."

 6   So Mr. Fernandez, did you commit this crime?

 7        INMATE FERNANDEZ:  Yes.

 8        PRESIDING COMMISSIONER DAVIS:  Okay.  And why did

 9   you do this?

10        INMATE FERNANDEZ:  The reason is that because he had

11   killed one of my brothers.  And I was flat-out drunk.

12        PRESIDING COMMISSIONER DAVIS:  And how did you know

13   that he was the person responsible for killing your

14   brother?

15        INMATE FERNANDEZ:  How did I know?

16        PRESIDING COMMISSIONER DAVIS:  Yes, how did you know

17   that this -- that the victim was the one responsible for

18   killing your brother?

19        INMATE FERNANDEZ:  He was the one because he

20   belonged to the same family.

21        DEPUTY DISTRICT ATTORNEY RICO:  Commissioner Davis?

22        PRESIDING COMMISSIONER DAVIS:  Yes?

23        DEPUTY DISTRICT ATTORNEY RICO:  We may have lost the

24   video connection, but we still have the audio.  You may

25   inadvertently refer to the Court of Appeal document as

26   the (inaudible) the Statement of Facts.  I think it's

27   actually the probation report.  It's just that --
```

14

1    PRESIDING COMMISSIONER DAVIS:  Oh.

2    DEPUTY DISTRICT ATTORNEY RICO:  -- clear.

3    (inaudible) Court of Appeals.

4    PRESIDING COMMISSIONER DAVIS:  No, you are right.

5    There is -- I had looked at the title originally and

6    thought it was Court of Appeal, but it is a probation

7    document.  Thank you for the correction.  So getting back

8    to -- how did -- how did you know that this was the man

9    responsible?

10    INMATE FERNANDEZ:  He was my brother-in-law.

11    PRESIDING COMMISSIONER DAVIS:  But how did you know

12    that he was responsible for the death?

13    INMATE FERNANDEZ:  I was here.  They call me on the

14    phone that he was the one that killed my brother.

15    PRESIDING COMMISSIONER DAVIS:  So someone called you

16    and told you that?

17    INMATE FERNANDEZ:  Yes.

18    PRESIDING COMMISSIONER DAVIS:  And how long -- how

19    long before the -- the incident offense did that happen?

20    INMATE FERNANDEZ:  When I killed him.

21    PRESIDING COMMISSIONER DAVIS:  So it was that day

22    that you learned that he had killed your brother?

23    INMATE FERNANDEZ:  Yeah, the same moment.

24    PRESIDING COMMISSIONER DAVIS:  So, as I understand

25    your -- your testimony is that you got a phone call just

26    prior to the murder?

27    INMATE FERNANDEZ:  Yes.

15

1          PRESIDING COMMISSIONER DAVIS:  And -- but this --

2     this -- the death of your brother had occurred some seven

3     years prior.  Is that correct?

4          INMATE FERNANDEZ:  Yes.

5          PRESIDING COMMISSIONER DAVIS:  And -- and why -- why

6     that day?  How did -- how did -- what had happened that

7     they learned or that you had just learned that the --

8     that this was the person responsible for your brother's

9     death?

10          INMATE FERNANDEZ:  That -- that day I was drinking,

11     I was drunk and that is when I remembered the couple.

12          PRESIDING COMMISSIONER DAVIS:  And so it wasn't a

13     matter that you got a phone call that day.  You just

14     remembered that day.  Is that accurate?

15          INMATE FERNANDEZ:  Yes.

16          PRESIDING COMMISSIONER DAVIS:  Okay.  Do you -- as

17     you sit here today, do you think you have a fairly good

18     recollection of the events of that day?

19          INMATE FERNANDEZ:  No, I don't remember all.

20          PRESIDING COMMISSIONER DAVIS:  Okay.  Just let me --

21     from that same report -- let me read your statements from

22     that statement report.  "The defendant does not speak

23     English and at the defendant's request and with his

24     approval, inmate interpreter Carlos Paniagua, P-A-N-I-A-

25     G-U-A, was used as an interpreter."  And from that same

26     report on Page 2, it states that

27          "In a verbal statement the defendant admitted

16

1       that he killed Eduardo Fernandez.  Indicated

2       that Eduardo had killed his brother seven

3       years ago.  He also indicated that he was very

4       drunk at the time and believes that if he had

5       not been so drunk he would not have killed

6       Eduardo.  He had purchased the .45 caliber

7       automatic approximately five months earlier

8       for the purpose of protecting his home."

9  And that's -- that's pretty much all you had to say on

10  this particular topic.  So the -- the gun was one that

11  you had purchased?

12       INMATE FERNANDEZ:  No, I had it.  I didn't buy it.

13       PRESIDING COMMISSIONER DAVIS:  Where did you get the

14  gun?

15       INMATE FERNANDEZ:  It belonged to a nephew of mine.

16       PRESIDING COMMISSIONER DAVIS:  And when had you

17  borrowed it?

18       INMATE FERNANDEZ:  It was there at my home.

19       PRESIDING COMMISSIONER DAVIS:  Okay.  So how well

20  did you know the victim in this case?

21       INMATE FERNANDEZ:  From Mexico.

22       PRESIDING COMMISSIONER DAVIS:  How many years?

23       INMATE FERNANDEZ:  All the life.

24       PRESIDING COMMISSIONER DAVIS:  All your life.  Had

25  you had any other arguments with him or any other

26  disagreements?

27       INMATE FERNANDEZ:  No.

17

1    PRESIDING COMMISSIONER DAVIS:  You know why he was

2    the one that was accused of killing your brother?

3    INMATE FERNANDEZ:  Oh, because he was drunk and my

4    brother wanted to drive him home.

5    PRESIDING COMMISSIONER DAVIS:  Do you -- do you

6    think -- because alcohol clearly seems to be a

7    significant part of this and you said even in the

8    original probation officer's statement that if you

9    weren't drunk you might not have done this.  Do you think

10   it was more the anger over the death of your brother or

11   the alcohol that caused this to happen?

12   INMATE FERNANDEZ:  I was drunk.  I never wanted to

13   do to him anything.

14   PRESIDING COMMISSIONER DAVIS:  So it was really more

15   -- more the alcohol than the anger, do you think?

16   INMATE FERNANDEZ:  Yes.

17   PRESIDING COMMISSIONER DAVIS:  Okay.  In that

18   regard, it says that you, in the same probation officer's

19   report, denied any illegal use of drugs or narcotics, but

20   that you did at that time consume about ten beers a week

21   on average.

22   INMATE FERNANDEZ:  Yes.

23   PRESIDING COMMISSIONER DAVIS:  So about -- that

24   would be about an average amount of alcohol that you

25   would consume on average?  About ten beers a week?

26   INMATE FERNANDEZ:  Yes sir.

27   PRESIDING COMMISSIONER DAVIS:  And would it be more

18

1    on weekends?

2        INMATE FERNANDEZ:  Once in a while.

3        PRESIDING COMMISSIONER DAVIS:  On the particular --

4    on the day of the -- of the murder was there a reason why

5    you had been drinking perhaps more than you normally do?

6        INMATE FERNANDEZ:  No.

7        PRESIDING COMMISSIONER DAVIS:  Again, the same

8    report it indicates that on September 16th -- and this is

9    in terms of your prior record, September 16th, 1977, you

10   were granted two years probation after being convicted of

11   carrying a loaded firearm in a public place.  And then on

12   January 19th, 1978, you received another grant of two

13   years probation for shooting in an occupied dwelling.

14   What was the -- the association with firearms here?  How

15   come you were -- how come you were associated with so

16   many firearm incidents?

17       INMATE FERNANDEZ:  I liked firearms but not to

18   damage anybody.

19       PRESIDING COMMISSIONER DAVIS:  What was the shooting

20   into the inhabited dwelling that you were arrested for?

21       INMATE FERNANDEZ:  The same owner told me let's see

22   if you can shoot up and we were all drunk.

23       PRESIDING COMMISSIONER DAVIS:  So that -- that

24   incidence also happened when you -- had a firearm and you

25   were -- and you'd been drinking?

26       INMATE FERNANDEZ:  Yes.

27       PRESIDING COMMISSIONER DAVIS:  Had you ever received

19

1    any -- any treatment for your use of alcohol?

2        INMATE FERNANDEZ:  No.

3        PRESIDING COMMISSIONER DAVIS:  According to the

4    somewhat limited information we have in terms of your

5    personal history is that you received three years of

6    formal education while living in Mexico.

7        INMATE FERNANDEZ:  Yes.

8        PRESIDING COMMISSIONER DAVIS:  Not really much in

9    here about your family except -- do you have brothers and

10   sisters?

11       INMATE FERNANDEZ:  Yes.

12       PRESIDING COMMISSIONER DAVIS:  How many?

13       INMATE FERNANDEZ:  Six brothers and six -- two

14   sisters.

15       PRESIDING COMMISSIONER DAVIS:  Okay.  And you keep

16   in contact with them?

17       INMATE FERNANDEZ:  Yes.

18       PRESIDING COMMISSIONER DAVIS:  Are your parents

19   still living?

20       INMATE FERNANDEZ:  Only my mother.

21       PRESIDING COMMISSIONER DAVIS:  And your contact with

22   your siblings is that letters or cards or telephone calls

23   or --

24       INMATE FERNANDEZ:  Letters and phone.

25       PRESIDING COMMISSIONER DAVIS:  Are they living in

26   the United States or in Mexico?

27       INMATE FERNANDEZ:  They're in Texas.

20

1      PRESIDING COMMISSIONER DAVIS:  Texas.

2      INMATE FERNANDEZ:  All my children are in San Jose.

3      PRESIDING COMMISSIONER DAVIS:  So you were married?

4      INMATE FERNANDEZ:  Yes.

5      PRESIDING COMMISSIONER DAVIS:  And how many children

6  do you have?

7      INMATE FERNANDEZ:  Three.

8      PRESIDING COMMISSIONER DAVIS:  And you keep in

9  contact with them?

10     INMATE FERNANDEZ:  Yes.

11     PRESIDING COMMISSIONER DAVIS:  What kind of work did

12  you do before the -- before the incident offense?

13     INMATE FERNANDEZ:  Oh, I was at (inaudible)

14  Electronics.

15     PRESIDING COMMISSIONER DAVIS:  As an assembler I

16  think I recall?

17     INMATE FERNANDEZ:  Assembler.

18     PRESIDING COMMISSIONER DAVIS:  And you -- you

19  received your citizenship in 1975, but -- and it also

20  indicates that you -

21     INMATE FERNANDEZ:  Yes.

22     PRESIDING COMMISSIONER DAVIS:  -- did graduate or

23  you completed the 11th grade?

24     INMATE FERNANDEZ:  Yes.

25     PRESIDING COMMISSIONER DAVIS:  In the United States?

26     INMATE FERNANDEZ:  No.

27     PRESIDING COMMISSIONER DAVIS:  No?  Okay.  Did you

21

1    receive any more education than the three years of

2    education that you got in Mexico?

3        INMATE FERNANDEZ:  No.

4        PRESIDING COMMISSIONER DAVIS:  You were in the --

5    were you in the Mexican Army?

6        INMATE FERNANDEZ:  I did my military service.

7        PRESIDING COMMISSIONER DAVIS:  And you were --

8    received an honorable discharge?

9        INMATE FERNANDEZ:  Yes.

10       PRESIDING COMMISSIONER DAVIS:  And what did you do

11   in the Army?

12       INMATE FERNANDEZ:  Just do the exercises and the

13   (inaudible).

14       PRESIDING COMMISSIONER DAVIS:  No particular skills

15   or trades that you learned in the Army?

16       INMATE FERNANDEZ:  No.  Oh, just to get my

17   education.

18       PRESIDING COMMISSIONER DAVIS:  Just to get -- okay,

19   but no skills?  No --

20       INMATE FERNANDEZ:  No.

21       PRESIDING COMMISSIONER DAVIS:  All right, is there

22   anything that we haven't talked about or covered in

23   your -- your family history, your -- the crime itself,

24   any details that you would like the Panel to know more

25   about?  Your education?  Anything that -- prior to the

26   incident offense that you feel it's important for the

27   Panel to understand today before we make any decisions?

22

1     **INMATE FERNANDEZ:**  No, it's fine.

2     **PRESIDING COMMISSIONER DAVIS:**  All right.  Do you

3  have any questions, Commissioner?

4     **DEPUTY COMMISSIONER BLONIEN:**  I do.  How many people

5  were there when you shot your brother-in-law?

6     **INMATE FERNANDEZ:**  There were like six but they were

7  running inside.

8     **DEPUTY COMMISSIONER BLONIEN:**  And what did you do

9  after you shot him?

10     **INMATE FERNANDEZ:**  I left from there.

11     **DEPUTY COMMISSIONER BLONIEN:**  Who called for help?

12     **INMATE FERNANDEZ:**  I don't know.

13     **DEPUTY COMMISSIONER BLONIEN:**  You never asked?

14     **INMATE FERNANDEZ:**  No.

15     **DEPUTY COMMISSIONER BLONIEN:**  That's all I have.

16     **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

17  I'll ask you to turn your attention to Commissioner

18  Blonien for her part in this.

19     **DEPUTY COMMISSIONER BLONIEN:**  Mr. Fernandez, this is

20  your fifth subsequent hearing and your last appearance

21  before the Board was August 18th, of '04 and the panel on

22  a two-year denial.  And they were very specific when they

23  talked to you about what they wanted you to do before the

24  next hearing.  And -- and I'm just going to read that

25  into the -- into the record because they took a lot of

26  time talking to you.

27     "First, that you remain disciplinary-free and

23

1    you have.  That when available to you, you

2    participate in self-help, specifically

3    alcohol-abuse-related programs such as AA,

4    which you do.  But you've got to do more than

5    just attend.  You've got to -- you don't have

6    to pass a test here.  You don't have to tell

7    us the 12 Steps.  But we need to believe that

8    you are able to understand what AA is all

9    about and that you make it part of your daily

10   operation.  And in your own words you'll be

11   able to tell the Panel how you will keep sober

12   if released into the community.  We recommend

13   that you continue to upgrade educationally and

14   vocationally and that your parole plans -- it

15   would be very helpful if you could get

16   something official indicating that you do have

17   property or residence in Mexico and when your

18   wife writes her next letter, she should also

19   be able to say that she's willing to go to

20   Mexico with you.  And if you have anyone in

21   Mexico who will give you a job, that would be

22   helpful as well.  You have to assume that

23   you're going to be deported based on that INS

24   hold."

25   So your custody level is Medium-A.  Your classification

26   score is 19.  We have that

27   **ATTORNEY SPARKS**:  Okay.  And then we have two

24

1    others.

2         **DEPUTY COMMISSIONER BLONIEN:**  Okay, that's good.

3         **ATTORNEY SPARKS:**  Then in Spanish.

4         **DEPUTY COMMISSIONER BLONIEN:**  The psych report by

5    Dr. Talbot is dated November 24th of '03 and I've read

6    that.  I've read your current counselor's report by

7    Counselor Studebaker, S-T-U-D-E-B-A-K-E-R, dated May 24th,

8    '06.  I've read your whole C-File, the whole Board

9    report.  And you've already talked to the Commissioner

10   about declining to review your C-File.  So in your

11   history you've had six 115s.  The last one was in 1990.

12   You've only had three 128s and the last one was in 1995.

13   You work in the Kitchen and you're very dependable.  And

14   you get -- your supervisor says you're satisfactory to

15   excellent.  You've worked in Waste Management in the

16   Recycling in '02.  You've had other jobs in Culinary and

17   Yard Crew.  You were in Vocational Auto Body Fender, but

18   I don't think you got a certificate, did you?

19        **INMATE FERNANDEZ:**  Yeah, they gave it but I didn't

20   finish it.

21        **DEPUTY COMMISSIONER BLONIEN:**  Right.  You weren't

22   able to complete the course.  Were -- were you

23   transferred before you could complete it?

24        **INMATE FERNANDEZ:**  Yes.

25        **DEPUTY COMMISSIONER BLONIEN:**  You've worked a long

26   time in the -- in the area of English as a Second

27   Language and I think the highest TABE test I saw was a

25

1    6.0 with a 2.0 overall.  Is the education very difficult

2    for you?

3        **INMATE FERNANDEZ:**  Yes.  Yeah, they took me off

4    because I wasn't able to learn.

5        **DEPUTY COMMISSIONER BLONIEN:**  You -- there's a

6    chrono in there that you reached a plateau on March 12th,

7    1998, and they felt —

8        **INMATE FERNANDEZ:**  Yes.

9        **DEPUTY COMMISSIONER BLONIEN:**  -- and in the chrono,

10   I wasn't sure if it was because of lack of motivation on

11   your part or you were trying really hard and that was the

12   best you could do.

13       **INMATE FERNANDEZ:**  I wasn't able to learn more.

14       **DEPUTY COMMISSIONER BLONIEN:**  You -- and were you

15   trying really hard?

16       **INMATE FERNANDEZ:**  Yes.  My head hurt.

17       **DEPUTY COMMISSIONER BLONIEN:**  You have been in AA

18   '89, '91, '94, '96, '97, '98, '99, 2000, 2003, -4 and -5.

19   So a long time.

20       **INMATE FERNANDEZ:**  Yes.

21       **DEPUTY COMMISSIONER BLONIEN:**  And the -- and the

22   last Panel asked you if you've worked through all the

23   Steps.

24       **INMATE FERNANDEZ:**  Yes, but I have -- we have almost

25   a year that we don't go to AA.  But I study from my book.

26       **DEPUTY COMMISSIONER BLONIEN:**  And when you study

27   from your book, have you worked through the Steps?

26

1      INMATE FERNANDEZ:  Yes.

2      DEPUTY COMMISSIONER BLONIEN:  And how do you plan to

3   use those Steps to help you not to drink if you're

4   released?

5      INMATE FERNANDEZ:  If they ever granted me freedom

6   to Mexico continue with AA.

7      DEPUTY COMMISSIONER BLONIEN:  And -- and does he use

8   the Steps not to drink?

9      INMATE FERNANDEZ:  Studying all the time, going to

10   AA.

11      DEPUTY COMMISSIONER BLONIEN:  Have you made a list

12   of people that you need to make amends to?

13      INMATE FERNANDEZ:  Yes.  I wrote something.  I have

14   something.

15      ATTORNEY SPARKS:  He wrote out the Steps and applied

16   them accordingly to what he understands.  He could

17   probably just read you something off of here.

18      DEPUTY COMMISSIONER BLONIEN:  Yeah, if he -- if he

19   could give me -- tell me an example.  Well, it's good

20   that the wrote it down.  He can look at it.

21      ATTORNEY SPARKS:  Yeah, this is Step 9.  Right?  So

22   you want to tell that or use the interpreter for that

23   purpose?

24      INMATE FERNANDEZ:  Which Step do you want?

25      DEPUTY COMMISSIONER BLONIEN:  I want the one that's

26   most important to him.

27      INMATE FERNANDEZ:  Number 12.  The number 12 says

27

1   gaining a spiritual awakening -- awakening as a result of

2   the Steps to try to take the message to the alcoholics

3   and practice these principles in all our dealings.  After

4   gaining all these 12 Steps, our happiness and willingness

5   of (inaudible) the last Step.  To share with another

6   alcoholic our experience in our lives for the rest of our

7   lives.

8        DEPUTY COMMISSIONER BLONIEN:  And did you write

9   that?

10       INMATE FERNANDEZ:  Yes.  Right here are the 12.

11       DEPUTY COMMISSIONER BLONIEN:  When I finish our

12  discussion, I'd like to see that cause -- because I can

13  read Spanish.

14       INMATE FERNANDEZ:  Yes.

15       DEPUTY COMMISSIONER BLONIEN:  Okay?

16       INMATE FERNANDEZ:  Okay.

17       DEPUTY COMMISSIONER BLONIEN:  You've also completed

18  the Impact Program.

19       INMATE FERNANDEZ:  Oh, yeah.

20       DEPUTY COMMISSIONER BLONIEN:  How did -- how did --

21  was it in Spanish?

22       INMATE FERNANDEZ:  Yes.

23       DEPUTY COMMISSIONER BLONIEN:  And what did you think

24  about that program?

25       INMATE FERNANDEZ:  Very well for me.

26       DEPUTY COMMISSIONER BLONIEN:  Impact -- tell me

27  about it.

28

1      **INMATE FERNANDEZ:**  I can't explain.  I forget.  But

2   really good.

3      **DEPUTY COMMISSIONER BLONIEN:**  In the program they

4   talk about the impact your action had on the victim's

5   family and the victim's family --

6      **INMATE FERNANDEZ:**  Yeah.

7      **DEPUTY COMMISSIONER BLONIEN:**  -- is your family.

8   How did -- how did that feel?

9      **INMATE FERNANDEZ:**  Very bad.  I was -- I felt very

10   bad.

11      **DEPUTY COMMISSIONER BLONIEN:**  Do you think about

12   your brother-in-law?

13      **INMATE FERNANDEZ:**  Of course, yes.

14      **DEPUTY COMMISSIONER BLONIEN:**  Tell me about your

15   feelings.

16      **INMATE FERNANDEZ:**  Very bad because he was my

17   brother.  I don't want to talk about that.  I feel bad.

18      **DEPUTY COMMISSIONER BLONIEN:**  Well, tell Mr.

19   Fernandez that this is a good time to talk about that.

20      **INMATE FERNANDEZ:**  He was my brother.  I didn't want

21   to do that.

22      **DEPUTY COMMISSIONER BLONIEN:**  So in the institution

23   he goes to work in the Kitchen.

24      **INMATE FERNANDEZ:**  Yes.

25      **DEPUTY COMMISSIONER BLONIEN:**  AA on lockdown.  So

26   what does the do all day?

27      **INMATE FERNANDEZ:**  When?

29

1    **DEPUTY COMMISSIONER BLONIEN:**  All day.  After -- you

2    go to work --

3    **INMATE FERNANDEZ:**  After work, I -- I study the book

4    about alcoholics.  I go to church.

5    **DEPUTY COMMISSIONER BLONIEN:**  What church do you go

6    to?

7    **INMATE FERNANDEZ:**  The brothers of -- Jehovah's

8    Witnesses.

9    **DEPUTY COMMISSIONER BLONIEN:**  So you go to church.

10    **INMATE FERNANDEZ:**  Yes.

11    **DEPUTY COMMISSIONER BLONIEN:**  You study your AA

12    Steps.

13    **INMATE FERNANDEZ:**  Yes.

14    **DEPUTY COMMISSIONER BLONIEN:**  What else?

15    **INMATE FERNANDEZ:**  Not much.

16    **DEPUTY COMMISSIONER BLONIEN:**  Watch TV?

17    **INMATE FERNANDEZ:**  Yes.

18    **DEPUTY COMMISSIONER BLONIEN:**  Read books?

19    **INMATE FERNANDEZ:**  Yes.

20    **DEPUTY COMMISSIONER BLONIEN:**  What -- what -- what

21    do -- what are you read?

22    **INMATE FERNANDEZ:**  Stories in Spanish.

23    **DEPUTY COMMISSIONER BLONIEN:**  Like things that help

24    him with his life or novels?

25    **INMATE FERNANDEZ:**  Yes.  Things that you learn --

26    things that you learn more in Spanish, the -- all the --

27    **DEPUTY COMMISSIONER BLONIEN:**  So what is he learning

30

1    more?

2        INMATE FERNANDEZ:  Every book that you read you

3    learn something out of it.  You learn a lot when you

4    read.

5        DEPUTY COMMISSIONER BLONIEN:  Are you a different

6    person, Mr. Fernandez, than the person who did --

7        INMATE FERNANDEZ:  Of course.  I have changed a lot.

8        DEPUTY COMMISSIONER BLONIEN:  I saw, just looking

9    back over past reports, that when you first came in your

10   counselor said that "his relationship with staff and

11   other inmates is barely mentioned in progress reports.

12   He is reported as shy, self-conscious individual who

13   demonstrates a lack of self-confidence." And that was

14   1992.  Then in 1994, two years later, comments were that

15   "Fernandez took an active role and had an excellent

16   attitude toward staff."  So you found yourself changing

17   as a person.

18       INMATE FERNANDEZ:  I have noticed that I have

19   changed.  I'm not the same person.  Many years passed by.

20       DEPUTY COMMISSIONER BLONIEN:  And when your family

21   comes to visit you, have they told you that you've made

22   big changes?

23       INMATE FERNANDEZ:  Yes.

24       DEPUTY COMMISSIONER BLONIEN:  And your parole plans,

25   I know you have two letters there.  I don't who they're

26   from.  Says you plan to live with your wife.

27       INMATE FERNANDEZ:  Yes.

31

1      **DEPUTY COMMISSIONER BLONIEN:**  In San Jose?

2      **INMATE FERNANDEZ:**  She's going to go with me to

3    Mexico.

4      **DEPUTY COMMISSIONER BLONIEN:**  And that you have

5    property in Mexico.

6      **INMATE FERNANDEZ:**  Not myself.  But my brothers do.

7      **DEPUTY COMMISSIONER BLONIEN:**  And where in Mexico?

8      **INMATE FERNANDEZ:**  Vera Cruz.

9      **DEPUTY COMMISSIONER BLONIEN:**  All right.  And so --

10    and -- and I see the confusion here because you -- you do

11    have citizenship papers, but you do also have a U.S. INS

12    hold.  So if you live in San Jose, your wife will stay in

13    San Jose and she has an address and an apartment.  And if

14    not, you will go to your brother's in Vera Cruz and your

15    wife will go with you.

16      **INMATE FERNANDEZ:**  My wife goes with me.

17      **DEPUTY COMMISSIONER BLONIEN:**  And then I have a

18    letter dated 6/26 from Guadalupe Fernandez who is your

19    son?

20      **INMATE FERNANDEZ:**  Yes.

21      **DEPUTY COMMISSIONER BLONIEN:**  Who says that -- that

22    he will have a job -- that you will have a job waiting

23    for you the day of your release.  The name of the company

24    is V & A Painting.  "We will always need help in some

25    area.  Example, touch-up, prepare, clean-up."  And then

26    it gives the telephone number of V & A Painting.  Does

27    your son own the -- own V & A Painting?

32

1      **INMATE FERNANDEZ:**  No, no.  It's another

2  (inaudible).

3      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  Oh, another.

4      **INMATE FERNANDEZ:**  He's not my son.

5      **DEPUTY COMMISSIONER BLONIEN:**  Not your son.  And

6  it's notarized.  He had the letter notarized.  And Mr.

7  Ugalve, if you could summarize the -- the letters that he

8  has in -- in Spanish and then when you're done, if you

9  could pass them to me along with his AA --

10      **INTERPRETER UGALVE:**  Okay, sounds good.

11  "I am Mrs. Glafida Fernandez, wife of

12  Guadalupe Fernandez, write this letter to let

13  you know how much I need my husband.  I'm a

14  person -- sick, sick person.  I suffer from

15  cholesterol and diabetes, depression,

16  arthritis.  I have many years that I'm

17  suffering this sickness and to this point I

18  cannot even walk for -- by directions of the

19  doctor.  I am disabled.  My feet get swollen.

20  My hands get swollen.  I cannot even walk.

21  They found me a tumor in my brain and the

22  doctors don't know yet what to do with this

23  problem.  I need the help of my husband since

24  I live by myself and I cannot do very much by

25  -- for myself.  He knows my (inaudible) my

26  condition.  He wants to help me and I don't

27  want to be alone.  I need him very much."

33

1      And that's -- this is from Glafida (phonetic) Fernandez,

2      my wife.

3          DEPUTY COMMISSIONER BLONIEN:  Who's the first one

4      from?

5          INTERPRETER UGALVE:  That was Glafida Fernandez.

6          DEPUTY COMMISSIONER BLONIEN:  His wife.

7          INTERPRETER UGALVE:  His wife.

8          DEPUTY COMMISSIONER BLONIEN:  Okay.

9          INTERPRETER UGALVE:  And the next is from Mrs.

10     Guadalupe -- oh, Mr. Guadalupe Fernandez.

11             "Through this letter me, Jorge Fernandez

12             (inaudible), let you know that I know Mr.

13             Guadalupe Fernandez for a long -- from a long

14             time ago and he's a hard-working person for

15             whom I promise to provide work in my company

16             with the address, Jose Maria Morales

17             (phonetic) number 197 between the 2nd and the

18             3rd (inaudible) Ensenada, Baja, California.

19             At this moment, Mr. Guadalupe Fernandez -- oh,

20             the moment that he resides in this city of

21             Ensenada, Baja, California."

22         DEPUTY COMMISSIONER BLONIEN:  How far is Vera Cruz

23     from Ensenada?

24         INMATE FERNANDEZ:  About eight hours.

25         DEPUTY COMMISSIONER BLONIEN:  That's what I thought.

26     And it'd be a long commute living in Vera Cruz and

27         INMATE FERNANDEZ:  Oh, I'm going to live in Ensenada

34

1    because I have a brother who lives there.

2        DEPUTY COMMISSIONER BLONIEN:  Do you see how this

3    can be confusing for the Panel when you don't have

4    letters saying I'm going to live here, work here?  And --

5    and I'll note that you passed me the work that you're

6    doing on your AA and he's written down every Step and

7    then he has written down how that Step is important to

8    him and how it applies to him and how it -- how he's

9    going to use it to remain sober.  Are you ever going to

10   drink again?

11       INMATE FERNANDEZ:  No, never.

12       DEPUTY COMMISSIONER BLONIEN:  And he's gone through

13   and explains that in Spanish.  We also sent out 3042

14   notices and the District Attorney of Santa Clara is here

15   today, audio and sometimes video, and at the appropriate

16   time he'll be given the opportunity to speak.  So I'm

17   going to return to the Chair.

18       PRESIDING COMMISSIONER DAVIS:  Thank you.  Mr.

19   Fernandez, have you made some plans in your parole

20   preparation for continuing with AA?

21       INMATE FERNANDEZ:  I haven't done yet, but if I go

22   to Mexico down there.

23       PRESIDING COMMISSIONER DAVIS:  Do you consider this

24   a life-long commitment?

25       INMATE FERNANDEZ:  Yes.

26       PRESIDING COMMISSIONER DAVIS:  How would you go

27   about finding an AA sponsor?  Have you -- have you