35

1  written anyone or done anything in preparation for that?

2      INMATE FERNANDEZ:  That's easy because in Mexico

3  there's a lot of them.

4      PRESIDING COMMISSIONER DAVIS:  What about San Jose?

5  Is there any preparation for your potential parole to San

6  Jose?

7      INMATE FERNANDEZ:  No, I haven't done anything

8  because I have -- going to be deported to Mexico.

9      PRESIDING COMMISSIONER DAVIS:  What would be your

10  preference?  I mean, given the best of all words, would

11  you rather go to Mexico or stay in the United States?

12  Where do you think you can be most successful?

13      INMATE FERNANDEZ:  In Mexico.

14      PRESIDING COMMISSIONER DAVIS:  Mexico.  Do you have

15  any other questions?

16      DEPUTY COMMISSIONER BLONIEN:  I don't.

17      PRESIDING COMMISSIONER DAVIS:  District Attorney

18  have questions?

19      DEPUTY DISTRICT ATTORNEY RICO:  Just very briefly,

20  Commissioner.  The prior conviction for shooting into an

21  occupied dwelling.  Did Mr. Fernandez indicate whose

22  dwelling that was or why he did that?

23      PRESIDING COMMISSIONER DAVIS:  Can you give us some

24  additional details, Mr. Fernandez, on whose dwelling you

25  were shooting at and why that was occurring?

26      INMATE FERNANDEZ:  I was -- I was with some friends

27  of the owner of the residence.

36

1          PRESIDING COMMISSIONER DAVIS:  And why were they --

2     they were shooting at the owner's residence?  Who's

3     residence were they shooting at?

4          INMATE FERNANDEZ:  The apartment.

5          PRESIDING COMMISSIONER DAVIS:  And why were they

6     shooting at the apartment?

7          INMATE FERNANDEZ:  They were -- we were all drunk

8     drinking.

9          PRESIDING COMMISSIONER DAVIS:  Was there anyone

10    inside the apartment?

11         INMATE FERNANDEZ:  Oh, the owner's wife.

12         PRESIDING COMMISSIONER DAVIS:  Was inside the

13    apartment?

14         INMATE FERNANDEZ:  Yes.  She was there.

15         PRESIDING COMMISSIONER DAVIS:  Was the owner

16    actively participating in the shooting?

17         INMATE FERNANDEZ:  Yes.

18         PRESIDING COMMISSIONER DAVIS:  And why was that?

19         INMATE FERNANDEZ:  Cause he was drunk also.

20         DEPUTY DISTRICT ATTORNEY RICO:  Did Mr. Fernandez do

21    any of the shooting himself?

22         INMATE FERNANDEZ:  Yes.

23         DEPUTY DISTRICT ATTORNEY RICO:  And why did he do

24    that?

25         INMATE FERNANDEZ:  I didn't know what I was doing.

26    I was drunk.

27         DEPUTY DISTRICT ATTORNEY RICO:  I -- I understand to

37

1    some extent what Mr. Fernandez has said about why he shot

2    the victim, but what I don't understand -- did Mr.

3    Fernandez know it to be true that the victim had killed

4    his brother or did Mr. Fernandez do this just because

5    someone said the victim had killed his brother?  Does he

6    understand that?

7         **INMATE FERNANDEZ:**  I was sure of that.

8         **DEPUTY DISTRICT ATTORNEY RICO:**  And how was he so

9    sure of that?

10        **INMATE FERNANDEZ:**  Because they called me from

11   Mexico saying that he had killed my brother.

12        **DEPUTY DISTRICT ATTORNEY RICO:**  And why did Mr.

13   Fernandez think it was necessary -- let -- let me

14   withdraw that.  As I understand it the victim in this

15   case, Eduardo Fernandez, was married to the inmate's

16   sister.  Is that correct?

17        **INMATE FERNANDEZ:**  I was marred to his sister.  He

18   was married to my sister.

19        **DEPUTY DISTRICT ATTORNEY RICO:**  So the victim's wife

20   is Anna Maria and that's the inmate's sister?  Is that

21   correct?

22        **INMATE FERNANDEZ:**  Yes.

23        **DEPUTY DISTRICT ATTORNEY RICO:**  Do we -- do we have

24   a connection?

25        **PRESIDING COMMISSIONER DAVIS:**  Oh, yeah.  The answer

26   was yes.

27        **DEPUTY DISTRICT ATTORNEY RICO:**  I'm sorry, okay.

38

1   'And the victim and the inmate's sister had some children

2   at the time, did they not?

3       INMATE FERNANDEZ:   Yes.

4       DEPUTY DISTRICT ATTORNEY RICO:   There was a Jorge,

5   J-O-R-G-E, who was the victim's son.   Is that correct?

6       INMATE FERNANDEZ:   Yes.

7       DEPUTY DISTRICT ATTORNEY RICO:   And he would  be the

8   inmate's nephew?

9       INMATE FERNANDEZ:   Yes.

10      DEPUTY DISTRICT ATTORNEY RICO:   And there was a

11  Maria who was the victim's daughter?

12      INMATE FERNANDEZ:   Yes.

13      DEPUTY DISTRICT ATTORNEY RICO:   And Alesia is maybe

14  A-L-E-S-I-A, who was the victim's daughter.   Is that

15  right?

16      INMATE FERNANDEZ:   Yes.

17      PRESIDING COMMISSIONER DAVIS:   Yes.

18      DEPUTY DISTRICT ATTORNEY RICO:   So those would've

19  been the inmate's nieces?

20      INMATE FERNANDEZ:   Yes.

21      DEPUTY DISTRICT ATTORNEY RICO:   Did Mr. Fernandez

22  give any thought to his own sister and his nephew and his

23  nieces in pulling the trigger on the victim?

24      INMATE FERNANDEZ:   No, at that moment.  I was bad.

25  Feeling bad.

26      DEPUTY DISTRICT ATTORNEY RICO:   Does Mr. Fernandez's

27  sister, who's the widow, as well as his nephew and his

39

1    nieces, do they live in Mexico or the United States?

2        **INMATE FERNANDEZ:**  Here in San Jose.

3        **DEPUTY DISTRICT ATTORNEY RICO:**  And what is Mr.

4    Fernandez's current relationship to that part of his

5    family?

6        **INMATE FERNANDEZ:**  Haven't spoke to them, but with

7    my sister, yes.

8        **DEPUTY DISTRICT ATTORNEY RICO:**  Now, I know there's

9    been some discussion about Mr. Fernandez's involvement in

10   AA.  Has Mr. Fernandez taken any steps or made any effort

11   to contact any of the family members who have been harmed

12   by his actions to make amends with them?

13       **INMATE FERNANDEZ:**  Yes.

14       **DEPUTY DISTRICT ATTORNEY RICO:**  Would that include

15   his sister, his nephew and his nieces?

16       **INMATE FERNANDEZ:**  Yes.

17       **DEPUTY DISTRICT ATTORNEY RICO:**  I thought he said a

18   moment ago he hadn't spoken to his sister about this.

19       **INMATE FERNANDEZ:**  She's not upset.

20       **DEPUTY DISTRICT ATTORNEY RICO:**  She is upset, is

21   that what he said?

22       **INTERPRETER UGALVE:**  She's not upset.

23       **DEPUTY DISTRICT ATTORNEY RICO:**  She's not upset.

24   Now, this a little harder question to ask.  I will try

25   to -- to do it.  If Mr. Fernandez was upset at the victim

26   for killing his -- Mr. Fernandez's brother.  If Mr.

27   Fernandez killed his brother-in-law, are there any

40

1    hostilities on the part of the widow and nephew or the

2    nieces that Mr. Fernandez should be concerned about here?

3    Does he understand that?

4        **INMATE FERNANDEZ:**  Yes.

5        **DEPUTY DISTRICT ATTORNEY RICO:**  Could he comment on

6    that?

7        **INMATE FERNANDEZ:**  I cannot say.  I feel very bad

8    for all this had happened.

9        **DEPUTY DISTRICT ATTORNEY RICO:**  Does Mr. Fernandez

10   think that he needs to do anything else while he is

11   incarcerated to prepare himself for a life on the outside

12   where there may be stresses awaiting him?

13       **INMATE FERNANDEZ:**  Yes, I'm a different person.  I

14   have changed a lot.

15       **DEPUTY DISTRICT ATTORNEY RICO:**  That -- that wasn't

16   really my question.  Perhaps, Commissioner?

17       **PRESIDING COMMISSIONER DAVIS:**  Yeah, I -- is there

18   anything else that you think that you need to do to

19   prepare yourself to get -- other than what you've already

20   done, is there anything else that you think that you need

21   to prepare yourself for the outside world?

22       **INMATE FERNANDEZ:**  I think I'm fine to get out.

23       **DEPUTY DISTRICT ATTORNEY RICO:**  And the last thing I

24   have, did I understand that one of those letters was from

25   Mr. Fernandez's wife who appears to have some serious

26   medical issues.  Is that accurate?

27       **INMATE FERNANDEZ:**  Yes.

41

1    DEPUTY DISTRICT ATTORNEY RICO:  Does Mr. Fernandez

2    think that if he goes back into that situation caring for

3    his wife that there are going to be significant stress

4    factors there that may tempt him to take a drink?

5    INMATE FERNANDEZ:  No.  Never.

6    DEPUTY DISTRICT ATTORNEY RICO:  I really have

7    nothing further.

8    PRESIDING COMMISSIONER DAVIS:  All right, thank you.

9    Mr. Sparks?

10    ATTORNEY SPARKS:  Is there anybody out there that

11    wants to kill you from your family or the other side's

12    family because of the crime that you did?

13    INMATE FERNANDEZ:  No.

14    ATTORNEY SPARKS:  Do you think that if something

15    happened to one of your family members that you would

16    take the law into your own hands again?

17    INMATE FERNANDEZ:  No, never.  No.

18    ATTORNEY SPARKS:  Do you think that the philosophy

19    that you had at the time, that you could take the law

20    into your hands, was an appropriate philosophy?

21    INTERPRETER UGALVE:  Can you repeat that, please?

22    ATTORNEY SPARKS:  Do you think that the philosophy

23    that you had at the time, that you could take the law

24    into your own hands, was an appropriate philosophy?

25    INMATE FERNANDEZ:  No.

26    ATTORNEY SPARKS:  What was it about the way that you

27    lived that made you believe that you could take the law

42

1    into your own hands?

2        INMATE FERNANDEZ:  I don't know what happened to me

3    that moment.  I never thought it (inaudible).

4        ATTORNEY SPARKS:  What (inaudible) that you took the

5    law into your own hands?

6        INMATE FERNANDEZ:  Yes, but I don't know why I --

7    how I did it.

8        ATTORNEY SPARKS:  But it was revenge, right?

9        INMATE FERNANDEZ: Yes.

10        ATTORNEY SPARKS:  An eye for an eye, a tooth for a

11    tooth?

12        INMATE FERNANDEZ:  I feel for them very much that

13    that happened.

14        ATTORNEY SPARKS:  But that was pretty much the

15    reality, right?

16        INMATE FERNANDEZ:  Yes.

17        ATTORNEY SPARKS:  All right.  So what makes you

18    think that you would handle things differently now?

19    Who's responsible for enforcing the law then?

20        INMATE FERNANDEZ:  I feel that I'm a different

21    person.

22        ATTORNEY SPARKS:  Okay, but who's responsible for

23    enforcing the law if, in fact, somebody gets killed for

24    your family members, who's the responsible authority for

25    taking care of that then?

26        INMATE FERNANDEZ:  God.

27        ATTORNEY SPARKS:  Okay.  But if there was some kind

43

1    of enforcement of the law, who would that be besides God?

2        INMATE FERNANDEZ:  The government.

3        ATTORNEY SPARKS:  Do you see how you took the

4    responsibility that would otherwise be the police's

5    authority?

6        INMATE FERNANDEZ:  Yes, but as I told you, I didn't

7    know what I was doing.

8        ATTORNEY SPARKS:  No, it doesn't matter.  You still

9    did it.  It's not whether you didn't know what you were

10   doing; you did it.  I mean, today you have to agree that

11   you did it and you're responsible for it, right?

12       INMATE FERNANDEZ:  I realize that I was not

13   (inaudible).

14       ATTORNEY SPARKS:  Nobody said you premeditated it.

15   That would be first degree murder.  But you intentionally

16   did it because that was second degree murder.  Okay.  I'm

17   just trying to understand whether or not you understand

18   the severity of the crime.  Not -- not in the sense that

19   you took his life.  But in the sense that you -- you

20   understand that you're attempting to held -- you're --

21   you're held responsible for this as a second degree

22   murder.  And that there was some other authority that

23   should've taken care of the situation rather than you.

24       INMATE FERNANDEZ:  Yes.

25       ATTORNEY SPARKS:  As long as you understand all

26   that.

27       INMATE FERNANDEZ:  I know I recognize all that.

44

1     **ATTORNEY SPARKS:**  Okay.  And the question is

2  slightly different in the sense that even if you don't

3  remember because your memory's clouded by alcohol that,

4  in fact, somebody else should've stepped up to take care

5  of this if -- if your brother-in-law had killed your

6  brother that should've been left up to other authorities

7  to take care of it.  Not just you.

8     **INMATE FERNANDEZ:**  You.

9     **ATTORNEY SPARKS:**  Would you agree with all that?

10    **INMATE FERNANDEZ:**  Yes, I'm agreeing with that.

11    **ATTORNEY SPARKS:**  So revenge isn't something that

12  you get to do?  That's God or other authorities to take

13  care of that, right?

14    **INMATE FERNANDEZ:**  Yeah, that's very correct.

15    **ATTORNEY SPARKS:**  Can't lead you through it any more

16  than that, Mr. Fernandez.  That's enough questions for

17  me.

18    **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

19  Closing?

20    **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

21  Commissioner.  Well, this -- I find a little bit

22  difficult to put these in the proper perspective.  But we

23  have a situation where Mr. Fernandez, when he was 35

24  years of age, and -- and I think that's an important

25  factor.  That's not -- this is some type of a -- an

26  impulse or an indiscretion of youth.  He was 35 at the

27  time that this crime took place.  And I believe that his

45

1    record involved four misdemeanors and one felony which
2    included carrying a loaded firearm in a public place and
3    shooting into an occupied dwelling.  Alcohol has been a
4    problem for him, historically.  I'm troubled by the
5    circumstances of the discharge of the firearm into the
6    occupied dwelling.  There seems to be -- there was no
7    true motive to do that.  He was he says drunk at the time
8    and others were doing it, so he just kind of went along
9    with and -- and fired into the dwelling where a woman was
10   inside.  It was an extreme risk potential for loss of
11   life.  Then there's this circumstance where he shoots his
12   brother-in-law.  The husband of own sister.  The father
13   of his nephew and nieces.  Because he believes that the
14   victim killed his own brother some seven years before.  I
15   think it's still equivocal as to when he got that
16   information.  He seems to indicate on the day of, but
17   then seems to be somewhat inconsistent with what's in the
18   packet.  Again, alcohol is involved and he says he knew
19   for sure that the victim had done it because they told
20   him that he had.  Now, today he indicates -- and today
21   he's 59-years-old of age at this time.  He's been in for
22   a significant period of time.  He has taken AA.  Been
23   involved in AA.  I think there are some unresolved
24   issues.  The family situation, I would feel more
25   comfortable if there were some letters documenting
26   certain things in terms of support letters from members
27   of the family.  I hope that this is not a Hatfield and

46

1    McCoy situation where we have the inmate killing his

2    brother-in-law, who he believes to have killed his own

3    brother, leaving alive a nephew and nieces and his own

4    sister in a situation that may still involve possibility

5    (inaudible) in the family.  I -- I don't know.  And I

6    don't know -- I don't have in my packet significant

7    letters of support.  I -- I heard what I thought was an

8    inconsistency when he indicated first of all that he

9    hadn't talked to his sister about this and then he said

10   that he had made amends and that she wasn't upset.  It

11   would be nice to have some letter documenting that.  The

12   parole plans, he wants to go back and live with his wife

13   who has serious medical issues.  And I submit that it's a

14   matter of common sense that's going to be a very

15   difficult situation for him to step back into.  The

16   question is whether his wife can even physically relocate

17   to Mexico, whether or not she would want to because of

18   the medical conditions.  I think there's unresolved

19   issues there that -- that need to clarified.  I'm a bit

20   troubled by the fact and -- and it may be difficult to do

21   for Mr. Fernandez to find out what resources there are to

22   keep him on the straight and narrow if he is really

23   deported to Mexico.  But I thought I heard him say that

24   he hadn't inquired into the resources there, but if he

25   were paroled and went to Mexico he would look into it,

26   and I think that's kind of putting the cart well back of

27   the horse so to speak and I think that's something that

47

1    he needs to explore before he's given a release date,

2    because the most current psych assessment, which I have

3    some issues with, does state that attendance in Alcohol -

4    - Alcoholic's Anonymous has been a benefit to him.  The

5    author of that report indicates that he appears to be a

6    low-risk for violence in the free community and that goes

7    on the condition that saying that,

8         "however, this statement is dependent on his

9         avoiding alcohol and drug use in the future to

10        ensure this state of affairs, that it's

11        important that he continue to Alcoholic's

12        Anonymous if he is to be released.  This is an

13        important source of understanding and support

14        for the alcoholic.  Moreover, he must be

15        monitored regularly to ensure he is not

16        using."

17   And, quite frankly, I'm at a loss as to how that could be

18   done if he were to be deported to Mexico without there

19   being some inquiry on his part or inquiry on someone's

20   part, maybe family members, who could look into that and

21   see what resources are available and how to ensure that

22   he's not released and, in spite of his good intentions,

23   in spite of his word that he's a different person, that

24   he would never drink again.  I think there needs to be a

25   little bit more solidification of that rather than just

26   the good intentions, because I'm not hearing sufficient

27   indication that Mr. Fernandez is strong enough in that

48

1    area to be able to do that without some assist.  Now, the
2    part of what makes this problematic is the language issue
3    where Mr. Fernandez's English is not his -- his native
4    tongue and I would hope that these inferences that seem
5    to be raising troublesome concern are not just because of
6    the language.  I would feel much more comfortable if
7    there were a stronger psych assessment and somehow I
8    could hear a little bit more (inaudible) as to what's
9    going on in Mr. Fernandez's head, because what I've heard
10   today, I'm hearing the word, I'm hearing him say I'm a
11   different person now, I'll never drink again, but I'm not
12   seeing the independent verification on the outside that
13   there is a support network in place that would allow him
14   to function within a non-controlled environment in a safe
15   fashion that would not -- that would not allow him to be
16   a risk to others.  And with those comments, I have to say
17   that based on everything that I see here, he is not ready
18   for release.  There are other issues that need to be
19   addressed in terms of the parole plans and in terms of
20   perhaps some insight.  I heard him say today quite often
21   that he didn't really remember too much about the crime.
22   It was the alcohol.  And he seems to blaming the alcohol.
23   And I'm not sure that this is entirely alcohol-related
24   because of his history with not only alcohol, but his
25   history with some fascination of guns that in spite of
26   him running afoul of law and carrying a loaded firearm in
27   a public place and then picking up the felony conviction

49

1    of carrying a gun and shooting it through an occupied

2    dwelling.  Then on the date of the life crime, he's back

3    to carrying a gun again.  He doesn't seem to learn from

4    society's efforts to correct his behavior and I think

5    that goes beyond just a problem with alcohol.  It's got

6    to do something with a willingness, inability to conform

7    to the law and the fascination with firearms that doesn't

8    seem to be addressed, at least that aspect, in the -- the

9    most current psych eval.  So with all those comments, I

10   have to submit that I believe that the evidence before

11   the Panel shows that he still constitutes a significant

12   risk and an unacceptable -- an unacceptable risk if he

13   were to be released at this time and there is still work

14   that he needs to do, although he should be commended for

15   the efforts that he has been making in that direction.

16   Thank you.

17        **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

18   Mr. Sparks?

19        **ATTORNEY SPARKS:**  T       his is where I think the

20   Deputy DA's not served by appearing personally at these

21   hearings to be able to make observations in a direct way

22   about who Mr. Fernandez is.  Not that Rico doesn't have

23   experience in witnessing in where life prisoners and

24   their progress.  I certainly think that Mr. Rico

25   understands well where potential falls -- faults are of

26   some unsuitability for parole as he does have that kind

27   of experience he's not aware.  It's not that in this

50

1    particular situation, if he'd seen Mr. Fernandez in

2    person, he would be able to see that the changes that

3    he's made are genuine and that concerns that he has are

4    more of the nature of whether or not -- well, I mean if

5    you're a -- a pro-baseball player and you hit 365, you're

6    going into the whole thing.  But if you're an inmate and

7    you hit 365, you're not getting out of prison.  You know,

8    that's just kind of the way it is.  And so the question

9    is where is the standard for an inmate to be found

10   suitable for parole.  In the Board parole hearings it's -

11   - it's clearly concern about the citizens in the

12   community being harmed by someone like Mr. Fernandez

13   again and that's an appropriate concern.  I don't

14   disagree with that.  And I don't even necessarily

15   disagree with the notion that someone like Mr. Fernandez

16   has to change from his inner core to somebody that took

17   into his own hands revenge.  Which was totally

18   inappropriate and he has to understand that as a basic

19   realization about why he came into prison.  I certainly

20   think that that's appropriate and that alcohol was a

21   precipitating factor.  That this attitude that he had

22   about the wild west and begin able to do things his way

23   by retaliation for his brother's death is inappropriate

24   and he grasped that although it took a lot of leading

25   questions on my part to actually get him to realize that

26   this is really what the issue was to why he's been

27   incarcerated.  It would be much easier if Mr. Fernandez

51

1   just came in and told the Parole Board, you know, what I

2   did was clearly inappropriate. I took matters into my

3   own hands. And that -- the question

4   that -- that Mr. Rico's ask -- asking in the sense is

5   will this revenge be an ongoing -- be in his family.

6   Whether or not the bygones be bygones and the resolution

7   has been made in his family. Does anybody have any

8   bitterness towards him and doesn't he have to be fearful

9   in the community or is he still causing fear in the

10   community. It's sort of an issue. You know. So yeah,

11   it would be nice to know, I mean, 1,000 percent it would

12   be nice to have a perfect hitting record relative to this

13   sort of hearing, but 23 years later, I mean, if things

14   aren't resolved you would think that the victim's next of

15   kin or somebody would be writing, you know, we're just

16   not comfortable with Mr. Fernandez being returned to the

17   community. You would think somebody would say something.

18   And so to say well, we're going to speculate that

19   somebody's still uncomfortable with Mr. Fernandez, I

20   don't think that that's necessarily fair. Somebody would

21   show up and say that if they were feeling that. The DA's

22   office has affirmative duty to continue to let the

23   victim's next of kin know that these hearings are -- are

24   taking place and Mr. Fernandez himself is connected with

25   the family so they're aware of when he's coming up for

26   these parole consideration hearings. The fact that his

27   family continues to support him and that he's provided

52

1    opportunities here today for his return to the community

2    is some evidence that bygones are bygones.  It's not

3    1,000 percent, but it's some evidence.  The psychological

4    report reports a low risk of violence if released to the

5    community and that's, again, some evidence that he's

6    suitable for parole and that he's changed, that he's

7    matured and grown.  I really think Mr. (inaudible)'s own

8    subjective analysis here today in terms of what the Panel

9    sees is the necessary statement to show that he's no

10    longer dangerous to the community.  That he's done his 12

11    Steps work and written it out shows that he has in place

12    the AA program of living and that finding that in the

13    community won't be that difficult.  In fact, in Mexico,

14    it's my understanding that Alcoholics Anonymous is -- is

15    something rather than a stigma the way oftentimes it's

16    perceived in the United States, that the people in Mexico

17    look at it more as heroes in a sense that they're taking

18    care of themselves now rather than pariahs in their

19    community.  And then I know that in the United States

20    that's ultimately changing.  You wouldn't look at

21    somebody that has leukemia as a pariah.  You would look

22    at him as somebody that has a disease and -- and,

23    accordingly, if they're taking care of it by chemotherapy

24    or whatever you would think, well, they're taking care of

25    themselves.  Whereas in alcohol the same; you would look

26    at them as a sick person.  If you saw them as a sick

27    person, you wouldn't necessarily say well, you know,

53

1    they're not taking care of themselves.  So to Mr.
2    Fernandez's credit, he hasn't shown that he's willing
3    relapse in the institutional setting and that -- I think
4    that's a certainly good indication of his return to good
5    citizenship and that he's willing to live a day at a time
6    without alcohol in his life in the institution somehow
7    will reflect that same commitment in the community since
8    he does have a 12 Step methodology in place and knows
9    that he needs to return to that same methodology in the
10   community to abstain from alcohol use.  I would like to
11   see, as has been pointed out by the Panel, that where his
12   parole plans you're going to live here and you're going
13   to work here be somehow syncopated, but I'm not willing
14   to say that since he has a job offer and he's purporting
15   that he has family members in Mexico that they could be a
16   simple confirmation by way of during the gap if the
17   Parole Board gave him a release date, it's pretty obvious
18   it -- whoever's investigating where he's going to go and
19   where he's going to live is going to check those things
20   anyways and that that's not necessarily something that we
21   should deny him parole here for today as he didn't hit
22   1,000 again, you know, I think it's sufficient.  Not
23   perfect, but it's sufficient.  I'll submit on that.
24       **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.
25   Mr. Fernandez, now is your opportunity to address the
26   Panel directly and tell us why you believe that you're
27   suitable for parole.

54

1    **INMATE FERNANDEZ:** We all have a second opportunity.

2  My family needs me. The family is very important and

3  they need me outside.

4    **PRESIDING COMMISSIONER DAVIS:** Anything else, sir?

5    **INMATE FERNANDEZ:** That's all.

6    **PRESIDING COMMISSIONER DAVIS:** All right, thank you

7  very much. We'll now recess for deliberation.

8               **R E C E S S**

9                --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

55

1      CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3      DEPUTY COMMISSIONER BLONIEN:  We're on record.

4      PRESIDING COMMISSIONER DAVIS:  All right, let the

5   record reflect that all those previously identified as

6   being in the room have returned including -- by actually

7   just instead of video conference, now we just have a

8   phone connection of Mr. Rico.  So -- but everyone has

9   returned and this is in the matter of Guadalupe Fernandez

10  CDC number C-72642.  The Panel reviewed all information

11  received from the public and relied on the following

12  circumstances in concluding that the prisoner is not

13  suitable for parole and would pose an unreasonable risk

14  of danger to society or a threat to public safety if

15  released from prison.  We come to this conclusion first

16  by the commitment itself.  It -- the offense was carried

17  out in an especially callous manner.  The motive or the

18  offense was carried out in a dispassionate manner.  These

19  conclusions are drawn from the statement of facts wherein

20  the prisoner after years of reflection believes he killed

21  the victim more because of alcohol intoxication than out

22  of anger over the death of his brother.  He chose to

23  shoot the victim several times and left him to die.  With

24  regard to a previous record, we find that there is a

25  record of assaultive behaviors.  Specifically, firing

26  into an inhabited dwelling and a criminal conduct which

27  G. FERNANDEZ  C-72642  DECISION PAGE 1   8/17/06

56

1   consists primarily of alcohol and firearms violations for

2   which he received probation.  We find that he has failed

3   a previous grant of probation and failed to profit from

4   society's previous attempts to correct criminality.

5   Specifically, adult probation.  With regard to

6   institutional behavior, we find that he does have three

7   128(a)s, the last of which was in 10 of '95, and six

8   serious 115 disciplinary reports, the last of which was

9   in July of 1990.  So, effectively, since 1990 you have

10  been free of -- of discipline so that is a record to

11  be -- to be proud of and something that you could

12  certainly -- that you guard jealously and continue to

13  build upon.  The psychological report dated November 2003

14  by Dr. Talbot is not supportive of release.  And I'll

15  quote from the report itself where it states under

16  Assessment of Dangerousness,

17      "He likely will be a -- a low-risk for violence

18      in the free community, as well.  However, this

19      last statement is dependent on his alcohol and

20      drugs in the future.  To ensure this state of

21      affairs, it is important that he continue to

22      attend Alcoholic's Anonymous if he is to be

23      released since this is an important source of

24      understanding and support for the alcoholic.

25      Moreover, he must be monitored regularly to

26      ensure he is not using alcohol or other

27  G. FERNANDEZ  C-72642  DECISION PAGE 2  8/17/06

57

1   So I think that goes, Mr. Fernandez, to our original

2   suggestions that you work on identifying locations where

3   you can continue your AA work should you -- should you --

4   when you -- when you receive a date. We note that in

5   response to -- I'm sorry, with regard to parole plans,

6   your parole plans are taking shape, but they need to be

7   refined.  Job offers would be best on the company

8   letterhead and signed by the person who has the authority

9   to hire you.  Also, residential plans need to be clear

10  and with some relation to the place of employment.  We

11  note that in response to the 3042 notices, the District

12  Attorney from Santa Clara County is -- has joined us by

13  video conferencing and telephone and does oppose parole.

14  The San Jose Police Department had sent previous letters

15  of opposition in all of the prior hearings.  However, the

16  last letter for this hearing was not able to be

17  introduced due to the -- the -- the time in which it was

18  received by defense counsel.  Nevertheless, we do want to

19  commend you for several things.  First of all, your

20  consistent history of -- of AA, as well as your

21  independent work in AA during the lockdowns because

22  that's often something or reason or excuse we hear is

23  that well, we -- I haven't been able to participate in AA

24  because of a lockdown.  But you chose the more assertive

25  route and did some independent study and, in fact,

26  produced that -- that very good document that you allowed

27  **G. FERNANDEZ  C-72642  DECISION PAGE 3  8/17/06**

58

1    the Panel to read not only identifying the Steps, but

2    also writing an explanation of what the Steps meant to

3    you personally.  So I think that was a good thing that

4    you did on your part.  You have participated in the

5    Impact program and your -- you consistently work.  Your

6    most current work in the Kitchen, you received excellent

7    work reports.  This is a -- however, these aspects of

8    behavior or positive behavior do not outweigh the factors

9    of unsuitability.  This is a one-year denial.  The Panel

10   recommends that you remain disciplinary-free, that you

11   continue to participate in -- in self-help, that you earn

12   positive chrono's, and that you continue to refine your

13   parole plans.  And I would even go so far as to say that

14   you want to encourage family support letters.  I think

15   given the illness that your wife is facing that should

16   you receive a date and you're out there trying to help

17   her, you -- you're going to find that you're going to

18   need a lot of help to help her.  Probably in the way of

19   transportation.  Many, many things.  So the more that you

20   can begin to rally the family around you and identify

21   some of the -- their willingness to -- to help and --

22   and, as your counsel said, let bygones be bygones, I

23   think that will bode well for you also.  Commissioner, do

24   you have anything else you'd like to add?

25            DEPUTY COMMISSIONER BLONIEN:  No.  Good luck to

26   you.

27   G. FERNANDEZ  C-72642  DECISION PAGE 4  8/17/06

59

1          **PRESIDING COMMISSIONER DAVIS:** All right, Mr.

2     Fernandez, we wish you the best of luck.  You have a lot

3     of work to do in -- in -- in one year.  It's a very short

4     period of time, so start today.  All right, good luck to

5     you, sir.  We are adjourned.

6                              --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     PAROLE DENIED ONE YEAR

24     THIS DECISION WILL BE FINAL ON: _____
                                        DEC 1 5 2006

25     YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26     DATE, THE DECISION IS MODIFIED.

27     G. FERNANDEZ  C-72642  DECISION PAGE 5   8/17/06

60

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Tracy Richardson, a duly designated transcriber, VINE MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 59, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GUADALUPE FERNANDEZ, CDC No. C-72642, on AUGUST 17, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated NOVEMBER 7, 2006, at Sacramento County, California.

_T Rch_

TRACY RICHARDSON
Transcriber
**VINE MCKINNON & HALL**

# EXHIBIT 2

IN THE SUPERIOR COURT OF THE

STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                          PLAINTIFF,   )
                                       )          REPORT OF
                  vs.                  )          PROBATION OFFICER
                                       )          No. 89523
                                       )          September 8, 1983
GUADALUPE FERNANDEZ        DEFENDANT,  )          D. Shearer, D.A.
                                       )          N. Gonzales, P.D.
                                       )
                                       )

COURT DATA

SENTENCING COURT:  Honorable John R. Kennedy

COURT OF CONVICTION:  Honorable John R. Kennedy

CHARGE:  Section 187 of the Penal Code (Murder), Second Degree
         With Use of a Firearm Allegation, Admitted within the
         meaning of Section 12022.5 and Section 1203.06 of the
         Penal Code

DATE OF OFFENSE:  July 9, 1983

DATE OF ARREST:  July 9, 1983 (SJPD)

CONVICTION:  Pled guilty on August 11, 1983 pursuant to Sec. 859(a) PC.

CONDITIONS:  Sec. 187 PC stipulated to be in the Second Degree.

REMAINING CHARGES:  None

DAYS IN CUSTODY:  62 actual days, 31 days - 4019 PC, 93 total
                  days; presently in custody.

AGE & DATE OF BIRTH:  36; August 22, 1947; Mexico

CODEFENDANTS & STATUS:  None

SUMMARY OF OFFENSE:

The source of this summary is an Investigation Report prepared by
the San Jose Police Department, #83-190-1208.

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.:  89523

September 8, 1983

On July 9, 1983, at approximately 8:55 p.m., ~~the defendant~~ FERNANDEZ went to 236 North 20th Street, San Jose, where Edwardo Fernandez was talking to a Mr. Winstead, got out of his car, walked up to Edwardo Fernandez and shot him several times with a .45 Caliber Automatic. The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead.

Witnesses identified the defendant and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he had killed the victim because the victim had killed the defendant's brother in a bar fight in Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed that his blood alcohol content was 0.21%. The .45 Caliber Automatic weapon was located in the rear bedroom of 326 North 20th Street where Jesus Frausto had placed the weapon after he had knocked it out of the defendant's hand.

The defendant was booked into the County Jail.

## VICTIM'S STATEMENT:

Contact was made with the victim's daughter Anna Fernandez, 20 years old. ~~She~~ indicated that her mother, the victim's wife does not speak English. Total funeral expenses came to $2,400.80. Anna believes that the defendant should be sentenced to a lot of years in Prison and indicated that if he gets out to soon that her brother will be after him.

The victim's daughter was advised of her right to be present at this Hearing and to be heard and she indicated that she, her sister, Alicia, and her brother will be present.

## DEFENDANT'S STATEMENT:

The defendant does not speak English. At the defendant's request and his approval inmate interpreter, Carlos Paniagua was used as an interpreter.

In a verbal statement, the defendant admitted that he killed Edwardo Fernandez. He indicated that Edwardo had killed his brother seven years ago. He also indicated he was very drunk at the time and believes that if he had not been so drunk he would not have killed Edwardo. He had purchased the .45 Caliber Automatic approximately five months earlier for the purpose of protecting his home.

-2-

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

As to disposition, the defendant does not believe 17 years of State Prison is fair.  He believes this is too many years for this particular type of situation.

The defendant was last employed for Atari in Sunnyvale from 1980 until 1983 until he was laid off.  He was working as an assembler making $7 an hour.

The defendant denies any use of illegal drugs or narcotics.  As to alcohol usage, the defendant indicates he consumes approximately 10 beers per week on the average.

INTERESTED PARTIES:

The defendant's probation file indicates that he has been supervised by the Probation Department on two separate grants. On September 16, 1977, he was granted two years probation by the San Jose Municipal Court after being convicted of Carrying a Loaded Firearm in a Public Place.  On January 19, 1978, he was granted two years probation by the Superior Court for Section 246 of the Penal Code (Shooting in an Occupied Dwelling).  The probation file indicates that the defendant successfully completed probation on January 19, 1980.

Notes in the probation file prepared by the defendant's past supervising officer Lorenzo Arroyo, indicate that the defendant did comply with all conditions of probation.

DISCUSSION:

Judicial Council Rules 414, 421 & 423:  (Attached)

Enhancements:  (None)

Case Evaluation:

Appearing before the Court is 36-year-old Guadalupe Fernandez, who has pled guilty to Murder in the Second Degree.

The defendant's criminal record consists of four misdemeanor convictions and one felony conviction.  The defendant has been granted probation on two previous occasions, once for Carrying a Loaded Firearm in a Public Place and another for Shooting into an Occupied Dwelling.  His misdemeanor convictions were mostly alcohol related.

In the present offense, the defendant shot and killed Edwardo Fernandez, a relative of the defendant, who allegedly seven years

-3-

In the Case of:   GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

prior had killed the defendant's brother in a bar fight in Mexico. The defendant was highly intoxicated at the time as indicated by an analysis of his blood which indicated a 0.21% blood alcohol content. The defendant indicates that if he had not been drunk, he does not believe he would have shot Edwardo Fernandez. However, it is noted that witnesses indicated that he had drove by the victim's location earlier prior to coming back and shooting the victim, indicating possible premeditation. The defendant demonstrates absolutely no remorse for this offense and believes that a 17 year State Prison sentence would not be fair considering this situation.

Reviewing the defendant's criminal record, two facts are outstanding:  One, the defendant has an obsession with firearms; Two, he has an alcohol problem.  Perhaps the California Department of Corrections can assist him with these two problems. It is recommended the defendant be committed to State Prison for 17 years to life.  The defendant is absolutely ineligible for probation pursuant to Section 1203.06 of the Penal Code.

SUGGESTED TERM:

| CRIME | MIT | AGG | RANGE | ENHANCEMENT | TOTAL TERM |
|-------|-----|-----|-------|-------------|------------|
| 187 PC, Second Degree | No | No | 15 Yrs to Life | 2 Years (12022.5 PC) | 17 Yrs to Life |

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

RECOMMENDATION:

1.  Probation be denied.

2.  State Prison for 17 years to Life.

3.  Five years parole.

Respectfully submitted,

ROBERT M. WEIGLE
Chief Probation Officer

Lee R. Casey, Deputy
Probation Officer

LRC/lms
Attachments

Reviewed by:

C. John Wardle
Supervising Probation
Officer   Ext. 3621

The above report has been read and considered by the Court.

JOHN R. KENNEDY
Judge of the Superior Court.
Santa Clara County, California

-5-

# EXHIBIT 3

# FILED

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

MAR 12 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

In re                                    )    No.: 89523
                                         )
    GUADALUPE FERNANDEZ,                 )    ORDER
                                         )
On Habeas Corpus                         )
_____)

The California Supreme Court, in *In re Dannenberg* (2005) 34 Cal.4th 1061, finding that the Parole Board's procedures are lawful because they are constrained by a framework within which to exercise discretion, stated: "the regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole." (*Dannenberg* at p. 1080. See also page 1096, footnote 16: "the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds.") In this case the crime itself, and Petitioner's prior gun convictions, appear to show unsuitability under the standards. Accordingly the habeas petition is DENIED

DATED: **12 Mar**, 2007

_____
PAUL BERNAL
JUDGE OF THE SUPERIOR COURT

cc:  Petitioner
     Attorney General
     Research(1-10A)
     CJIC

1

IN THE SUPERIOR COURT OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

Plaintiff/Petitioner
Guadalupe Fernandez

In re: People vs. Fernandez

**PROOF OF SERVICE OF: Order in re: Habeas Corpus**

Case Number:
89523

**FILED**

MAR 12 2007

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this cause and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on 3/12/07. I declare under penalty of perjury that the foregoing is true and correct.

DATED: 3/12/07

Kiri Torre, Chief Executive Officer

BY: Catherine Guerra, Deputy Clerk

| Guadalupe Fernandez<br>CDC# C-72642<br>CTF North<br>Soledad, CA 93960-0705 | Research Attorney Criminal Division<br>190 W. Hedding Street<br>San Jose, CA 95110<br>*Placed in Research Attorney pick up box at HOJ |
|---|---|
| | Attorney General of the State of California<br>455 Golden Gate Ave., Suite 11000<br>San Francisco, CA 94102 |
| | CJIC |
| | |

Proof of service
Clerk's Certificate of Service

Guadalupe Fernandez, C-72642
P.O. Box 705/ND-70-L,
CTF North Facility
Soledad, CA.93960-0705

TO:  OFFICE OF THE ATTORNEY GENERAL
455 GOLDEN AVE., SUITE 11000
SAN FRANCISCO, CA.94102



UNITED STATES POSTAGE
PITNEY BOWES
$ 04.20°
02 1M
0004230086    MAR 16 2007
MAILED FROM ZIP CODE 93960

Name   Guadalupe Fernandez                                    MC-275

Address   P.O. Box 705/ND-70-L

CTF North Facility

Soledad,CA.93960-0705

CDC or ID Number   C-72642

## SUPERIOR COURT OF CALIFORNIA

## FOR THE COUNTY OF SANTA CLARA
(Court)

Guadalupe Fernandez                    PETITION FOR WRIT OF HABEAS CORPUS

Petitioner

vs.                                    No. _____

Ben Curry; et., al;                         (To be supplied by the Clerk of the Court)

Respondent

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | | | |
|---|---|---|---|
| ☐ A conviction | | ☒ Parole | |
| ☐ A sentence | | ☐ Credits | |
| ☐ Jail or prison conditions | | ☐ Prison discipline | |
| ☐ Other *(specify):* _____ | | | |

1. Your name: Guadalupe Fernandez

2. Where are you incarcerated? Correctional Training Facility, Soledad, California

3. Why are you in custody?  ☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Murder 2nd / With use F'arm

   b. Penal or other code sections: P.C. 187 (a) / 12022.5

   c. Name and location of sentencing or committing court: Santa Clara County Superior Court

   191 N. First Street., San Jose,CA.95113-1090

   d. Case number: 89523

   e. Date convicted or committed: September 8,1983

   f. Date sentenced: September 8,1983

   g. Length of sentence: 15 years to life

   h. When do you expect to be released? Unknown

   i. Were you represented by counsel in the trial court?  ☒ Yes.    ☐ No.  If yes, state the attorney's name and address:

   Mr. Nazario Gonzales Public Defender 70 W. Hedding St. San Jose,CA. 95110

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty    ☒ Guilty    ☐ Nolo Contendere    ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury    ☒ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PETITION

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PETITION

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PETITION

7. **Ground 2** or **Ground** _____ (*if applicable*):

SEE ATTACHED PETITION

a. Supporting facts:

SEE ATTACHED PETITION

b. Supporting cases, rules, or other authority:

SEE ATTACHED PETITION

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☒ No.   If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result: _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

           (2) _____

           (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known: _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☒ No.   If yes, give the following information:

   a. Result: _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

           (2) _____

           (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    _____
    _____

11. Administrative Review:
    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
       N/A
       _____
       _____
       _____
       _____
       _____
       _____
       _____

    b. Did you seek the highest level of administrative review available? ☐ Yes. ☒ No.
       *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. January 1, 1999]                    **PETITION FOR WRIT OF HABEAS CORPUS**                    Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    No Delays

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    This Court has original jurisdiction

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 1-5-07                           ▶ _Guadalupe Fernandez_
                                  (SIGNATURE OF PETITIONER)

1  Guadalupe Fernandez, C-72642
   P.O. Box 705/ND-70-L
2  CTF North Facility
   Soledad,CA.93960-0705

3

4  In Propria Persona

5

6

7

8           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               IN AND FOR THE COUNTY OF SANTA CLARA

10

11  IN RE: GUADALUPE FERNANDEZ          CASE NO. _____

12                                      PETITION FOR WRIT OF HABEAS
           PETITIONER                   CORPUS AND MEMORANDUM OF
13                                      POINTS AND AUTHORITIES IN
                                        SUPPORT THEREOF.
14  ON HABEAS CORPUS
                               /
15

16

17

18

19

20

21          TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

22              IN AND FOR THE COUNTY OF SANTA CLARA

23

24

25

26

27

28

                                1.

1  Guadalupe Fernandez,C-72642
   P.O. Box 705/ND-70-L
2  CTF North Facility
   Soledad,CA.93960-0705

3

4  In propria Persona

5

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF SANTA CLARA

10

11 IN RE: GUADALUPE FERNANDEZ          CASE NO. _____

12                                     PETITION FOR WRIT OF HABEAS
             PETITIONER                CORPUS AND MEMORANDUM OF
13                                     POINTS AND AUTHORITIES IN
                                       SUPPORT THEREOF.
14 ON HABEAS CORPUS
   _____/

15

16

17                                 1.

18              PETITION FOR WRIT OF HABEAS CORPUS

19 TO: THE HONORABLE JUDGE OF THE SUPERIOR COURT OF THE STATE OF CALIF-
20 ORNIA IN AND FOR THE COUNTY OF SANTA CLARA.

21     Comes Now Guadalupe Fernandez (hereafter petitioner) In Propria

22 Persona. Petitioner is unlawfully restrained of his liberty. This

23 petition is intended to give meaning to Guadalupe Fernandez's sentence

24 of 15 years to life for second degree murder - by seeking to overturn

25 the Board of Parole Hearings "Illegal And Unconstitutional" decision

26 refusing to grant him parole for the (6th) time since becoming elig-

27 ible for parole on December 9, 1993.

28

1    Under the parole ststute (penal code section 3041, amended 1976,c.
2    1139), parole is now the norm rather than the exception. (penal code
3    section 3041 (a), the board "shall." normally set a parole release date
4    at the initial hearing". A life prisoner must have a release date set
5    when his release would not pose a danger to the public. (penal code
6    section 3041 (b). That determination must be based on criteria set
7    forth in the Penal Code. The Board is given latitude to formulate
8    criteria implementing the statutory mandate. (Penal Code Section
9    5076.2). However, this criteria is limited to the parameters estab-
10   lished by statute and legislative intent. (Terhune v. Superior Court,
11   65 cal. App. 4th 864, 872-873 (1998).

12       In the case of this petitioner, there is "No Evidence" in the
13   record to support the Board's denial of parole at his (6th) parole
14   hearing. The court is asked to issue a formal "Order To Show Cause"
15   and require the respondent to present to the court justification for
16   the Board's decision in this case. The court is asked to find the
17   decision violated due process of law and order the Board to set
18   this petitioner's parole release date. The court is also asked to
19   declare the rights of the parties under the Due Process and Equal
20   Protection Clauses, in regards to the Board's interpretation of
21   Section 3041, Penal Code, and to issue habeas relief accordingly.

22       Generally, Petitioner asserts that he is being subjected to an
23   unconstitutional condition in the determination of his parole appli-
24   cations because the Board of Parole Hearings has been operating out-
25   side the law pursuant to a policy against granting paroles, such that
26   the parole statute has been and currently is misinterpreted to the
27   extent that petitioner has been deprived all substantive due process
28   protections of the law including his federally protected liberty in-

3.

1  terest to parole. Petitioner asserts, within this context, that the
2  Board has been found to be operating pursuant to a "No" parole policy
3  which reduces parole hearings to pro forma sham hearings where parole
4  commissioners are precluded by this policy (and their own abiding an-
5  imus) from being fair or impartial, which violates substantive due
6  process of law.

7

8                                  11.

9                                PARTIES

10

11  PETITIONER, Guadalupe Fernandez, CDC#C-72642 is a prisoner of the
    state of California, incarcerated at the Correctional Training Facility
12  Soledad, California.
13  RESPONDENT, Ben Curry, is the Warden of the Correctional Training Fac-
14  ility, Soledad, California and is the legal custodian of petitioner.

15

16

17                                 111.

18                          STATEMENT OF THE CASE

19

20      Preliminary formalities (HT 1). 1/ (Exhibit 1, transcript of
21  parole hearing conducted on August 17, 2006).

22      Guadalupe Fernandez (hereafter petitioner) was received by the
23  California Department of Corrections & Rehabilitations (CDCR) on Sept-
24  ember 13, 1983, from Santa Clara County for the offense of Murder 2nd
25  with use of a firearm. He is sentenced to an indeterminate term of 17
26  years to life. Case number SCL-89523. His minimum eligible parole date
27  (MEPD) is set for November 29th, 1993.

    ──────────────────────────────────────────────────────
    1.  References to the parole hearing transcripts will be indicated by
28      HT followed by page number, i.e., (HT 0).

                                   4.

## COMMITMENT OFFENSE

The following are statements taken from the petitioner's September 8th, 1983 probation officer's report and provided to the court as petitioner's exhibit number 2 at p. 2.

On July 9, 1983, at approximately 8:55 p.m., Fernandez went to 236 North 20th Street, San Jose, where the victim Edwardo Fernandes was talking to a Mr. Winstead, got out of his car, walked up to Edwardo Fernandez and shot him several times with a .45 Caliber Automatic. The defendant left the area after the shooting. Police arrived and the victim was taken to the San Jose Hospital where he was pronounced dead.

Witnesses identified the defendant Guadalupe Fernandez and most knew him as he was related to the victim. The defendant was arrested on the same date and it was learned that he killed the victim because victim killed the defendamt's brother in a bar in Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed that his blood alcohol content was 0.21%. The .45 Caliber Automatic weapon was located in the rear bedroom of 326 North 20-th Street where Jesus Frausto had placed the weapon after he had knocked it out of the defendant's hand.

## BOARD FINDINGS

In the matter of Guadalupe Fernandez, CDC # C-72642. The panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prision.

5.

1   The offense was carried out in an especially especially
    callous manner. The motive or the offense was carried
2   out in a dispassionate manner. We find that there is a
    record of assaultive behavior. Specifically, firing into
3   an inhabited dwelling and a criminal conduct which con-
    sist primarily of alcohol and firearms violations for
4   which he received probation. With regard to institutional
    behavior, we find that he does have three 128 (A)s, the
5   last of which was in october of 1995, and six serious
    115 disciplinary reports, The last of which was in July
6   of 1990.

7   Assessment of Dangerousness, he likely will be a low-
    risk for violence in the free community, This is depend-
8   ent on his alcohol and drugs in the future. (HT 55-56).

9

10                              IV.

11          EXHAUSTION OF ADMINISTRATIVE REMEDIES

12

13       Petitioner filed this petition in the superior Court in

14  the first instance in asmuch as the Board of Parole Hearings no

15  longer provides for administrative appeals.

16

17                              V.

                          VERIFICATION
18

19       I am the petitioner in this action. All facts in the above

20  documents, not otherwise supported by citation to the record, ex-

21  hibits, of other documents, are true of my own personal knowledge.

22  I declare under penalty of perjury that the foregoing is true and

23  correct and that this declaration was executed on this date

24  _1-5-07_____, at the Correctional Training Facility at

25  Soledad, California.

26

27                              _Guadalupe Fernandez_
                                Guadalupe Fernandez
28

# VII.

## CRITERIA FOR PAROLE

The "unreasonable risk" requirement is the standard required by statute (3041,subd,[b]), and by the Board regulations in order to justify a denial of parole. (CCR 15. 2402,subd [a]), Section 3041,(a), Penal Code requires, in pertinent part:

One year prior to the inmates minimum eligible parole date a panel consisting of at least two commissioners of the Board Of Parole Hearings shall again meet with the inmate and normally set a parole release date as provided in section 3041.5. The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to public.... Subd. [b] of section 3041 provides in pertinent part, that: the panel or board shall set a release date unless it dteermines that the gravity of the current convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration of this individual, and that a parole date, therefore, cannot be fixed at this meeting.

## TITLE 15, DIVISION 2, BOARD REGULATIONS

## 2402. DETERMINATION OF SUITABILITY.

(a) General.—The panel shall first determin whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. (emphasis added).

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before and after the crime; past and present attitude toward the crime; any conditions of treatment or controle, including the use of special conditions under which the prisoner may safely be releaseed to the community;

**7.**

and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending To Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as guidelines; the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitabiliyt include:

(1) Commitment Offense: The prisoner committed the offense in an especially heinous, atrocious or cruel manner. the factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record Of Violence. The prisoner on previous occasions inflicted or attempted to inflect serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unsuitable Social History. The prisoner has a history of unsutable or tumultous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending To Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines;the importance attached to any circumstances or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juenile Record. The prisoner does not have a record assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.The prisoner has experienced reasonably stable relationships with others.

(3) Signs Of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation For Crime. The prisoner commited his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Sydrome. (Not quoted here as inapplicable).

(6) Lack Of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be be put to use upon release.

(9) Institutional Behavior. Institutional activities and enhanced ability to function within the law upon release.

9.

# VIII.

## PRAYER FOR RELIEF

Guadalupe Fernandez states that he has no other plain or speedy remedy save habeas corpus: therefore, he prays this Honorable Court:

1. Issue an order to show cause;

2. appoint counsel to represent petitioner in any and all proceedings in this matter.

3. Conduct an evidentiary hearing;

4. Order respondents to provide petitioner with reasonable discovery;

5. Declare the rights of the petitioner;

6. Grant any other further relief the court deems proper and just.

Date: 1-5-07                     Respectfully, submitted

_Guadalupe Fernandez_
Guadalupe Fernandez

10.

IX.

MEMORANDUM OF POINTS AND AUTHORITIES

THE LAW ON PAROLE

Penal Code section 3041, subdivision (a) requires that at a suitability hearing the board "shall normally set a parole release date...Subdivision (b) provides that a release date "shall" be set "unless" the Board determins that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of public safety requires a more lengthy period of incarceration for this individual...See, e.g, In re Rosenkrantz, 29 Cal.App. 4th 616, at 653, (2002), citing to In re Ramirez, 94 Cal. App. 4th 549, at 565. The parole board regulations make this criterion more specific. The panel can deny only if the prisoner would pose an unreasonable risk of danger to society if released from prison. (Cal. Code Regs., tit 15, 2402, subd (a). The regulations set forth specific criteria to determine whether under the standard a prisoner is suitable for parole.

Under the rule created by the United States Supreme court in Greenholtz v. Inmates of Nebraska Penal (1979) 442 U.S. 1,12, and Board of Pardons v. Allen (1987) 482 U.S. 369, 377-378, a state's statutory parole scheme which used mandatory language "creates a presumption that parole will be granted" when or unless certain designated findings are made, and therefore gives rise to a constitutional liberty interest. The California parole scheme uses mandatory language which is parallel to the parole scheme found in Greenholtz and Allen

11.

1  to give rise to a protected liberty interest in parole. Accordingly,

2  the California parole scheme gives rise to a cognizable liberty in-

3  terest in release on parole. See also, McQuillion v. Duncan, 306 F.3d

4  895, 902 (9th Cir. Cal.2002); and Biggs v. Terhune, 334 F.3d 910

5  (9th Cir. Cal. 2003), affirming these propositions in California's

6  section 3041, penal code. Following on the heels of McQuillion, supra,

7  the siminal case of In er Rosenkrantz held that the satutory parole

8  scheme creats a liberty interest under California due process of law.

9  Id., at 29 Cal. 4th at 668, fn.12. The court then applied the clearly

10  established federal due process test to review a gubernatorial dec-

11  ision to deny parole. It recognized that a gubernatorial decision is

12  subject to judicial review to determine whether there is "some evid-

13  ence" to support the decision. In this case, the decision by the Board

14  to find petitioner unsuitable for parole is also subject to review to

15  determine if there is some evidence to support the decision, the ev-

16  idence must bear some indicis of reliability, Cato v, Rushen, 824 F.

17  2d 703, 705 (9th Cir. Cal. 1987); also, Jancsek v. Oregon Board of

18  Parole. 833 F. 2d 1389, 1390. (9th Cir. 1987). The evidence must be

19  relevant and material to the decision. (Cal. Code Regs., 15. 2000 (b)

20  (50) Good Cause; (63) Material Evidence, (90) Relevant Evidence (Ibid.

21  (50) Good Cause: A finding by the board based upon a preponderance of

22  the evidence that there is a factual basis and good reason for the

23  decision made. Evidence which tends to prove or disprove an issue or

24  facts in dispute.In re Caswell, 92 Cal. App. 4th 1017, 1030;McQuillion

25  supra, 306F.3d at 906,910.

26
27      A.  THE DECISION TO FIND PETITIONER UNSUITABLE FOR
      PAROLE IS AN ABUSE OF DISCRETION AND VIOLATES DUE
      PROCESS; PETITIONER MUST BE GRANTED A PAROLE DATE.
28

12.

1    1.   THE DECISION IS NOT SUPPORTED BY ANY RELEVANT OR
         MATERIAL EVIDENCE.
2

3    Proceeding under the presumption that the evidence must be rel-

4    evant and material, there was no relevant or material evidence to ba-

5    se denial of parole to petitioner. Under federal due process analysis,

6    after finding a liberty interest, it must be determined what process

7    is due. Morrissey v. Brewer (1972) 408 U.S. 471,481. In this context,

8    the United States Supreme Court has held that there must be "some ev-

9    idence" Superintendent v. Hill (1985) 472 U.S. 445,456, where it sta-

10   tes that "the fundamental fairness guarnteed by the due process clause

11   does not require courts to set aside decisions of prison administra-

12   tors that have some basic fact."

13   Additionally, the evidence underlying the Board's decision must

14   have some indicia of reliability. Jancsek, supra 833 F. 2d at 1390.

15   In this case, petitioner contends that the Board of Parole Hearings

16   erroneously concluded there is some evidence to justify the finding

17   that he is suitable for parole.

18

19   (a).   THE COMMITMENT OFFENSE DOES NOT CONSTITUTE "SOME
         EVIDENCE" FOR DENIAL OF PAROLE IN THIS CASE.
20

21   In finding petitioner unsuitable for parole the panel stated

22   that the commitment offense was carried out in an especially vicious

23   and brutal manner. Additionally, the motive of this crime was inexpl-

24   icable and trivial in relationship to the offense. Moreover, the off-

25   ense was carried out in a manner which demonstrates exceptional insen-

26   sitive disregard for human suffering.Such a finding is contrary to the

27   facts of the case, where the record indicates petitioner would pose a

28

1  low degree of risk to society if he were released from prison at this
2  time. It could be argued that any and all murders are carried out in
3  a vicious, brutal manner without regard to human suffering. and in
4  fact is what second degree murder is. But used as a regulation for
5  unsuitability would have to denote something greater than an ordinary
6  or typical killing. Nonetheless, as the psychological evaluation re-
7  port clearly demonstrates, petitioner has made substantial and signif-
8  icant progress in growth and maturation while incarcerated. The record
9  is replete with his achieving the correctional objectives of reforming
10  his life, and it would be a disservice to the professionalism and pro-
11  grams of the Department to devalue petitioner's officially-recognized
12  progress and deny him parole because he committed the offense. Despite
13  this offense, he was sentenced to a parolable sentence. Certainly, his
14  case falls within the meaning expressed in Ramirez,supra, that any
15  murder is parolable under the statute. Yet, the panel made no effort
16  to distinguish his offense as containing circumstances which are be-
17  yond the minimum necessary to sustain a conviction for the crime of
18  second degree murder.

19       2.   THE BOARD"S BOILERPLATE RELIANCE ON STATIC HISTORY
20            FACOTORS VIOLATES FUNDAMENTAL DUE PROCESS.

21
22       The Ninth Circuit has expressed concern about the use of the
    commitment offense to repeatedly deny parole. As the circuit in Biggs
23  v. Terhune (9th Cir. 2003) 334 F. 3d 910,916, recently acknowledge:
24  "Due process is not a mechanical instrument. It is a process. It is
25  a delicate process of adjustment inescapably involving the exercise of
26  judgment by those whom the Constitution has entrusted with the unfold-
27  ing of the process. "Lankford v. Idaho 500 U.S. 110,121 (1991 (quoting
28

1  Joint Anti-Fascist Refugee Comm. v.McGrath,341 U.S. 123, 163 (1951)

2  (Frankfuter, J., Concurring). A continued reliance in the future on an

3  unchanging factor, the circumstances of the crime... runs contrary to

4  the rehabilitative goals espoused by the prison system and could re-

5  sult in a due process violation. See also, In re Rosenkrantz, supra,

6  29 Cal. 4th at 689 (Moreno, J., concurring). (Emphasis added).Biggs

7  was denied at his first initial parole hearing. The Circuit allowed

8  that the commitment offense could be used at that initial hearing as

9  a legitimate cause for denial of parole, but questioned whether it

10  could be used as a factor to continue denying parole at subsequent

11  hearings. At first blush, the use of the offense in the petitioner's

12  case at his initial hearing might have been upheld as "some evidence".

13  but the hearing challenged here is his (6th) subsequent hearing. The

14  Biggs court gave clear indication that had it been Biggs subsequent

15  hearing, the court may have found against the Board on using the off-

16  ense to again base parole denial on.

17      When considering the offense as circumstances for unsuitability

18  the Board must be and should be mindful that the circumstances of the

19  offense are static and unchangeable. The most important aspect of this

20  case is the dynamic changes that years of imprisonment and exposuer to

21  positive, behavioral programs has made in this petitioner. The record

22  shows that he has achieved the objective of corrections, i.e., to co-

23  rrect behavior, and the record shows official and professional recog-

24  nition that he does not pose an unreasonable risk to public safety if

25  paroled. Thus, since there is no evidence whatsoever of unreasonable

26  risk, which is the standard by which the Board's decision legally hi-

27  nges, the Board's decision denying petitioner parole must be reversed.

28  The statutory default must be enforced in this case.

15.

3.    THE BOARD'S STATEMENT OF REASON WAS INADEQUATE.

The Board's statement of reasons were inadequate and inappropriate. In In re Strum (1974) 11 Cal. 3d 258, 113 Cal. Rptr. 361, 521. P. 2d 97. The California Supreme Court held that in order to comply with a prisoner's due process rights, the Board must "support all its denials of parole with a written definitive statement of its reasons therefore and to communicate such statements to the inmate concerned". (Id., at P. 273.) The Strum court articulated three rationales as to why the Board must provide a written statement of reasons granting parole: (1) to promote carefule decision making; (2) to allow inmates to make an informed application for relief if parole is denied; and (3) to permit meaningful judicial review. (Id., at P. 270.) Other courts have taken similar positions where judges have failed to adequately articulate their findings. See People v. Martin (1986) 42 Cal. 3d 905, 913-915, and cases cited. In Martin the court said, citing several cases, such as In re Podesto (1976) 15 Cal. 3d 921, that

> "we emphasized that a requirement of articulated reasons to support a given decision serves a number of interests; it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring that the judge himself analyzes the problem and recognizes the grounds for his decision-making process by helping to persuade the parties and the public that the decision-making is careful, reasoned and equitable". (Ibid.)

Here, the Board's statement of reasons is crtptic at best. It merely recites the commitment offense as the primary basis upon which it denied parole and list pro forma boilerplate terminology from its Parole Denial Worksheet/Fm. 1000A. It dose not explain what it is about the commitment offense and its inclusive aggravvting circumstances that make the petitioner an "unreasonable risk of danger to society if

1 released". (see section 2402, subd. (a).) or how the commitment offe-

2 nse was "particularly egergious". It did not explain how all the evi-

3 dence supporting petitioner's suitability for parole, including all

4 the psychological clearances, and lack of any violent criminal history

5 did not outweigh under the ordinary rules of the "perponderance of

6 evidence" standard employed by the Board's regulations (see section

7 2000 (b), (50) - the static history of the commitment offense. There-

8 fore, the Board's abused its discretion in violation of procedural due

9 process by failing to properly apply its own burden of proof.

10     The Court is not here asked to substitute its judgment for that

11 of the Board, nor is ti asked to weigh or reweigh the evidence. Rather

12 the court is asked to review de novo the pre-decisional process of the

13 hearing, including the evidence submitted, determined the legal sign-

14 icance of that evidence as relevant or irrelevant, and then determine

15 if the Board met its own standard of proof in weighing and balancing

16 process.

17     4.   THE DECISION TO DENY PETITIONER PAROLE WAS ARBITRARY
            AND AN ABUSE OF DISCRETION, UNSUPPORTED BY "SOME EVID-
18          ENCE," VIOLATING HIS RIGHT TO DUE PROCESS GUARANTEED
            BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTIT-
19          UTION OF THE UNITED STATES.

20

21     Although the Board of parole Hearings (hereafter Board) dis-

22 cretion in parole matters has been described as "broad", it is not

23 "absolute" (In re Powell (1988) 45 Cal. 3d 894,940), as its discretion

24 is "cabined" by criteria, in petitioner's case, listed in the Calif-

25 ornia Code of Regulations, title 15 § 2402 McQuillion v. Duncan (9th

26 Cir. 2003) 306 F.3d 895, 912). Petitioner has not only a "liberty

27 interest" in parole (In re Rosencrantz (2002) 29 Cal. 4th 616,652) but

28

an "expectation that [he] will be granted parole unless the Board

1 finds in the exercise of its discretion that [the prisoner is]

2 unsuitable <u>for parole in light of the circumstances specified by</u>

3 <u>statute and by regulations</u>" (<u>Ibid</u>. at 654, emphasis added). Pet-

4 itioner's liberty interest in and "expectation" of parole, dose ← does

5 not attach upon being found suitable for parole, but upon entrance

6 of prison gates (<u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910,

7 915). A decision of unsuitability for parole must be supported

8 by some evidence having some indicia of reliability (<u>Ibid</u>., cita-

9 tion). There must also be a rational connection between the evi-

10 dence and the decision made; if not the decision is arbitrary and

11 an abuse of discretion, violating the due process clause (Guido-

12 tti v. County of Yolo (1989) 214 Cal. App. 3d 1552, 1561; <u>Oregon</u>

13 <u>Resource Council v Lowe</u> (9th Cir. 1997) 109 F.3d 521, 526).

14     As will be demonstrated, the decision to deny petitioner

15 parole for the sixth time, is not supported by "some evidence"

16 and is therefore an abuse of discretion, violating his right to

17 due process. (<u>Rosenkrantz v. Marshall</u>, 444 F. Supp. 2d 1063. C.D.

18 Cal. (2006) U.S. Dist. Lexis 79358; (<u>Martin v. Marshall</u>, 431 F.

19 Supp. 2d 1038 (N.D. Cal. 2006).

20

21                          AEGUMENTS

22     a.  <u>THE COMMITMENT OFFENSE, FOR THE SIXTH TIME, IS NOT</u>
         <u>"SOME EVIDENCE" UPON WHICH PAROLE CAN BE DENIED.</u>
23

24     Petitioner's sixth parole hearing was held on August 17,

25 2006. Presiding Commissioner, Mr. James Davis states: This hearing

26 is being conducted pursuant to Penal Code Section 3041 and 3042

27 and the rules and regulations of the Board of Prison Terms gover-

28 ning parole consideration hearings for life inmates. (HT 7).

1   In closing, the panel states: In the matter of Guadalupe Fernandez
2   CDC number C-72642. The panel reviewed all information received
3   from the public and relied on the following circumstances in con-
4   cluding that the prisoner is not suitable for parole and would
5   pose an unreasonable risk of danger to society or a threat to
6   public safety if released from prison. For the sixth time the
7   Board relied on the unchanging factors of petitioner's case to
8   deny him parole. The Board finds the offense was carried out in
9   an especially callous manner. The motive or the offense was car-
10  ried out in a dispassionate manner. (HT 55).

11        The relevant evidence does not merely fail to support but
12                              refutes the conclusion that the petitioner
13  committed his offense in a dispassionate manner (In re Scott 119
14  Cal. App. 4th 889). This is petitioner's sixth suitability hear-
15  ing. It has been 22-years since petitioner committed his offense.
16  Under these circumstances, the nature of the offense has lost any
17  predictive value and the continued reliance on it to find petitio-
18  ner unsuitable violated due process. (Bair v. Folsom State Prison
19  2005 U.S. Dist. Lexis 29952 (E.D. Cal. 2005). The Biggs court
20  held, in relevant part:

21        [The] parole board's sole supportable reliance on the
22        gravity of the offense and conduct prior to imprisonment
          to justify denial of parole can be initially justified
          as fulfilling the requirements set forth by the state.
23        Over time, however, should Biggs continue to demonstrate
          exemplary behavior and evidence of rehabilitation, deny-
24        ing him a parole date simply because of the nature of
          Biggs offense and prior conduct would raise serious qu-
25        estions involving his liberty interest in parole. A con-
          tinued reliance in the future on an unchanging factor,
26        the circumstances of the offense and conduct prior to im-
          prisonment runs contrary to the rehabilitative goals es-
27        poused by the prison system. (Biggs v. Terhune, supra, 334
          F.3d at 916-917).
28

                              19.

b.  **THE OFFENSE WAS NOT PARTICULARLY EGREGIOUS.**

One year prior to a prisoner's minimum eligible parole release date, the Board "shall normaly set a parole release date" (penal Code§ 3041 (a)). The only statutory expecption to "shall normally set a parole release date" is the gravity of the current or past convicted offenses, or timing and gravity of the current or past convicted offense or offenses (penal code § 3041 (b)). This has been interpreted to mean : The character of the offense alone may justify a denial of parole if the offense involves "particularly egregious acts beyond the minimum necessary to sustain a conviction for second degree murder" (In re Rosenkrantz, supra, 29 Cal. 4th at 683). However, we must be mindful that [t]he Board's authority to make a exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted (Ibid., quoting with approval In re Ramirez (2001) 94 Cal. App. 4th 549, at 570).

This was clearly a senseless and unjustified crime. It was not however, particularly egregious when compared to other murders. Indeed, the crime falls squarely within the middle of the Board's matrix given the nature and behavior of both the victim snd the petitioner. The facts of this case show that the petitioner shot a man to death in the heat of passion.

As held by Ramirez court:

The circumstances of any past offense, even any murder, not necessarily a sufficient ground for the Board to refuse to set a parole date.... And the Legislature has clearly expressed its intent that when murders--who are the great majority of inmates serving indeterminate sen-

20.

tences--approach their minimum eligible parole date,
the Board shall normally set a parole release date
(Pen. Code § 3041, subd. (a)). (In re Ramirez, 94 Cal.
App. 4th at 569-570).

Petitioner could have been denied parole, at least at his
initial parole hearing, if his offense was "particularly egreg-
ious."

In some circumstances, a denial of parole based upon
the nature of the offense alone might rise to the level
of a due process violation--for example where no circum-
stances of the offense reasonably could be considered
more aggravated or violent than the minimum necessary to
sustain a conviction for that offense....[P] Therefore,
a life term offense or any other offense underlying an
indeterminate sentence must be particularly egregious to
justify the denial of a parole date (In re Rosenkrantz,
supra, 29 Cal. 4th at 683, citation).

## CONCLUSION

When the court applies the some evidence standard as pro-
perly understood to the circumstances of Guadalupe Fernandez, the
court will find that the Board's decision was not based on some
relevant reliable evidence that reasonable suggest that he poses
a current, unreasonable threat to public safety. For these reas-
ons, the petitioner respectfully request that this court vacate
the Board's determination of unsuitability and direct yhe Board
to set a parole date for Guadalupe Fernandez.

Date: *1-5-07*                          Respectfully, submitted

                                        Guadalupe Fernandez

21.

DECLARATION OF GUADALUPE FERNANDEZ

I declare as follows:

I am the petitioner in this case. I am over the age of eighteen years. I am aparty to the attached action. I am a resident of the Correctional Training Facility in Soledad, California. My address is Post Office Box 705 / ND- 70-L, CTF North Facility, Soledad, California. 93960-0705. I served the attached document entitled "<u>WRIT OF HABEAS CORPUS</u>" on the persons/parties specified below by placing a true copy of said document into a sealed envelope with the appropriate postage affixed thereto and surrendering said envelope to the following:

OFFICE OF THE ATTORNEY GENERAL
300 S. SPRING STREET.
LOS ANGELES, CA.90013

I declare under penalty of purjury under the laws of the United States that the foregoing is true and correct. Executed this 5 Th day of January , 2007 at the Correctional Training Facility in Soledad, California.

Guadalupe Fernandez
Declarant

22.

# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life    )
Term Parole Consideration    )        CDC Number C-72642
Hearing of:                  )
                             )
GUADALUPE FERNANDEZ          )
_____)


CALIFORNIA TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 17, 2006


PANEL PRESENT:

Mr. James Davis, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Guadalupe Fernandez, Inmate
Mr. Patrick Sparks, Attorney for Inmate
Mr. David Ugalve, Interpreter
Mr. Ed Martinez, Commissioner/Observer
Mr. Ronald Rico, Deputy District Attorney (via
videoconference)
Correctional Officers, Unidentified

**INMATE
COPY**


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum


Tracy Richardson          Vine, McKinnon & Hall

ii

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 18 |
| Post-Commitment Factors | 22 |
| Parole Plans | 30 |
| Closing Statements | 44 |
| Recess | 54 |
| Decision | 55 |
| Adjournment | 59 |
| Transcriber Certification | 60 |

--oOo--