1

# P R O C E E D I N G S

1

2       **DEPUTY COMMISSIONER BLONIEN:** Okay. We're on

3  record.

4       **PRESIDING COMMISSIONER DAVIS:** This is a Subsequent

5  Parole Consideration Hearing for Guadalupe Fernandez, CDC

6  number C-72642. Today's date is August 17th, 2006.

7  We're located at the Correctional Training Facility in

8  Soledad. The inmate was received on September 13th,

9  1983, from Santa Clara County. The life term began on

10  September 13th, 1983, with a minimum eligible parole date

11  of November 29th, 1993. The controlling offense for

12  which the inmate's been committed is Murder Second with

13  use of a Firearm. Case number SCL-89523, Count One,

14  Penal Code section 187/12022.5. The inmate received a

15  term of 15 years to Life, plus two. This hearing is

16  being tape-recorded and, for the purposes of voice

17  identification, we will each state our first and last

18  name, spelling the last name. When it reaches you, Mr.

19  Fernandez, if you will also give us your CDC number,

20  please, sir. So I will start and move to my left. I'm

21  James Davis, D-A-V-I-S, Commissioner.

22       **DEPUTY COMMISSIONER BLONIEN:** I'm Noreen Blonien, B-

23  L-O-N-I-E-N. I'm a Deputy Commissioner.

24       **ATTORNEY SPARKS:** Patrick Sparks, S-P-A-R-K-S,

25  attorney for Mr. Fernandez.

26       **INMATE FERNANDEZ:** Guadalupe Fernandez.

27       **ATTORNEY SPARKS:** You can spell it in Spanish if you

2

1    want.

2          **INMATE FERNANDEZ:**  F-E-R-N-A-N-D-E-Z.

3          **PRESIDING COMMISSIONER DAVIS:**  All right, and your

4    CDC number, please, sir.

5          **INMATE FERNANDEZ:**  C-72642.

6          **PRESIDING COMMISSIONER DAVIS:**  Very well, thank you.

7          **INTERPRETER UGALVE:**  David Ugalve, U-G-A-L-V-E, from

8    Monterey County, Interpreter.

9          **COMMISSIONER MARTINEZ:**  Ed Martinez, M-A-R-T-I-N-E-

10   Z, Commissioner/Observer.

11         **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico, R-I-C-

12   O, Deputy District Attorney of Santa Clara County by

13   video conference.

14         **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

15   And let the record also reflect we're joined by two

16   correctional officers who are here today for security

17   purposes only and will not be actively participating in

18   this hearing.  Before we actually do anything else, Mr.

19   Ugalve, I'll go ahead and swear you in.  Do you solemnly

20   swear to interpret to the best of your ability accurately

21   from English to Spanish and Spanish to English?

22         **INTERPRETER UGALVE:**  Yes.

23         **PRESIDING COMMISSIONER DAVIS:**  Thank you.  All

24   right, if you will, in front of you is the Americans with

25   Disabilities Act Statement.  Would you please read that

26   for Mr. Fernandez?

27         [Thereupon, the ADA Statement was read to the inmate

3

1    in Spanish.]

2        INTERPRETER UGALVE:  Okay, it's fine.

3        PRESIDING COMMISSIONER DAVIS:  All right, sir, and

4    our records indicate that on April 10th of 2006, together

5    with staff from the institution, that you reviewed and

6    signed the BPT Form 1073 indicating that you do not have

7    any disabilities that would qualify under the Americans

8    with Disabilities Act, but that you do need language

9    interpretation which is, of course, what our interpreter

10   is here for today.  So is all that accurate, sir?

11       INMATE FERNANDEZ:  Yes.

12       PRESIDING COMMISSIONER DAVIS:  All right.  Has

13   anything changed since that time?

14       INMATE FERNANDEZ:  No.  Only my eyes.  I cannot see

15   very well.

16       PRESIDING COMMISSIONER DAVIS:  All right, do you

17   have glasses that you wear normally?

18       INMATE FERNANDEZ:  Yes.

19       PRESIDING COMMISSIONER DAVIS:  All right, and you

20   brought those with you today?

21       INMATE FERNANDEZ:  Yes.

22       PRESIDING COMMISSIONER DAVIS:  And they work all

23   right for you?

24       INMATE FERNANDEZ:  Yes.

25       PRESIDING COMMISSIONER DAVIS:  Now, are you able to

26   read in English?

27       INMATE FERNANDEZ:  No.

4

1       **PRESIDING COMMISSIONER DAVIS:**  Now, are you able

2   to -- when you reviewed your -- you waived your -- your

3   right to review your Central File.  Is that correct, sir?

4   We're getting a little -- excuse me just one second.

5   We're getting a little feedback from your end.  Not feed

6   back, but just more of you on the phone.

7       **DEPUTY DISTRICT ATTORNEY RICO:**  I'm -- I'm sorry

8   about that.  Perhaps we should state for the record that

9   there's been a little bit of a glitch in the video

10   conference hook-up, so we have both an audio line as well

11   the video line, and my technician is trying to work on

12   that.

13       **PRESIDING COMMISSIONER DAVIS:**  Right, and -- and

14   that is -- that is absolutely correct and we are -- we're

15   trying to -- to bridge the technical difficulties here to

16   make sure we proceed appropriately.  But we do have -- we

17   do have video, that there is some delay from the actual

18   audio which is by telephone line and they are doing some

19   work on -- on I think both of our ends trying to figure

20   out exactly what the problems are and get those resolved.

21   But until then we're -- we're making the best of it.

22       **DEPUTY DISTRICT ATTORNEY RICO:**  I apologize for the

23   oversight on my part for getting the -- the open line

24   while I was trying to resolve that.  But if you could

25   step back and ask the inmate that question again so the

26   audio picks up the answer.

27       **PRESIDING COMMISSIONER DAVIS:**  You bet.  We're --

5

1   we're discussing the -- the C-File review, that you

2   reviewed your right to review your C-File?  Did you

3   decide you didn't want to -- to review your C-File?

4        INMATE FERNANDEZ:  Yes.

5        PRESIDING COMMISSIONER DAVIS:  Okay, and why was --

6        INMATE FERNANDEZ:  I don't have nothing to review.

7        PRESIDING COMMISSIONER DAVIS:  It wasn't for lack of

8   interpreter or anything.  It was just because you chose

9   not to review it?

10        INMATE FERNANDEZ:  Yeah, because I didn't want to.

11        PRESIDING COMMISSIONER DAVIS:  All right, very well.

12   So you have your glasses.  You can hear me all right?

13        INMATE FERNANDEZ:  Yes.

14        DEPUTY COMMISSIONER BLONIEN:  We've lost the

15   (inaudible).

16        PRESIDING COMMISSIONER DAVIS:  Okay, hang on just a

17   second.  I -- I apologize for this.  We're having some

18   technical difficulties so just bear with us.  It -- it

19   has nothing to do with you.  Are you with us?

20        DEPUTY DISTRICT ATTORNEY RICO:  I'm still live on

21   the line.

22        PRESIDING COMMISSIONER DAVIS:  Okay.

23        DEPUTY DISTRICT ATTORNEY RICO:  Did you lose the

24   video connection?

25        PRESIDING COMMISSIONER DAVIS:  Did we?  I -- I

26   didn't notice.

27        DEPUTY COMMISSIONER BLONIEN:  Yeah, but it came

6

1    back.  You went off for about 30 seconds and you came

2    back.

3          DEPUTY DISTRICT ATTORNEY RICO:  So I do have a live

4    landline here.  I can copy everything you're saying and

5    for purposes of the hearing.  I -- I see no difficulty

6    with that.  If we lose video connection, I can still hear

7    you.

8          PRESIDING COMMISSIONER DAVIS:  All right, and -- and

9    if for some reason again that we've lost you and you

10    can't hear us any longer, I don't know, waive or

11    something and we'll -- it'll attract our attention.

12          DEPUTY DISTRICT ATTORNEY RICO:  Thank you,

13    Commissioner.

14          PRESIDING COMMISSIONER DAVIS:  All right.  All

15    right, Mr. Fernandez, again I apologize for the

16    interruptions here, but we'll -- we'll do our best to

17    proceed forward.  So --

18          INMATE FERNANDEZ:  It's okay.

19          PRESIDING COMMISSIONER DAVIS:  -- Counsel, you're

20    satisfied that your client is -- is ready and -- and

21    healthy and -- and able to proceed today?

22          ATTORNEY SPARKS:  Yes.

23          PRESIDING COMMISSIONER DAVIS:  And Mr. Fernandez, do

24    you agree with that?  Your -- nothing that you can see

25    that would interfere with your ability to actively

26    participate in this hearing today?

27          INMATE FERNANDEZ:  Yes.

7

1    **PRESIDING COMMISSIONER DAVIS:**  All right, very well.

2    Now, this hearing is being conducted pursuant to Penal

3    Code Sections 3041 and 3042 and the rules and regulations

4    of the Board of Prison Terms governing parole

5    consideration hearings for life inmates.  The purpose of

6    today's hearing is to once again consider the number and

7    nature of the crimes for which you were committed, your

8    prior criminal and social history, and your behavior and

9    programming since your commitment.  We've had the

10    opportunity to review your Central File and your prior

11    transcripts, and you will be given the opportunity to

12    correct or clarify the record as we proceed.  Now, we

13    will reach a decision today and inform you whether or not

14    we find you suitable for parole and the reason for our

15    decision.  If you are found suitable for parole the

16    length of your confinement will be explained to you.

17    Nothing that happens in today's hearing will change the

18    findings of the court.  The Panel is not here to retry

19    your case.  The Panel is here for the sole purpose of

20    determining your suitability for parole.  You understand

21    that, sir?

22    **INMATE FERNANDEZ:**  Yes.

23    **PRESIDING COMMISSIONER DAVIS:**  This hearing will be

24    conducted in two phases.  First, I will discuss with you

25    the crime for which you were committed, as well as your

26    prior criminal and social history.  Following that,

27    Commissioner Blonien will discuss with you your

8

```
 1    counselor's report, your progress since your commitment,
 2    and your psychological evaluation, as well as your parole
 3    plans and any letters of support or opposition as they
 4    may exist.  Once that's concluded, the Commissioners, the
 5    District Attorney, and then your attorney will have an
 6    opportunity to ask you questions.  Questions that come
 7    from the District Attorney will be asked through the
 8    Chair and you will respond back to the Panel with your
 9    answer.  Following that, the District Attorney and then
10    your attorney will make closing statements, followed by
11    your closing statement, which should focus specifically
12    on your suitability for parole.  The California Code of
13    Regulations states that regardless of time served an
14    inmate shall be found unsuitable for and denied parole
15    if, in the judgment of the panel, the inmate would pose
16    an unreasonable risk of danger to society if released
17    from prison.  You have certain rights.  Those rights
18    include the right to a timely notice of this hearing, the
19    right to review your Central File and the right to
20    present relevant documents.  Counselor, are you satisfied
21    that your client's rights have been met to date?
22         ATTORNEY SPARKS:  Yes.
23         PRESIDING COMMISSIONER DAVIS:  You have an
24    additional right and that is to be heard by an impartial
25    panel.  Now, you've heard your Commissioners introduce
26    our -- ourselves today.  Is there any reason to believe
27    that you would -- that we would not be impartial?
```

9

1          INMATE FERNANDEZ:  No.

2          PRESIDING COMMISSIONER DAVIS:  All right, thank you.

3    You will receive a written copy of our tentative decision

4    today.  That decision becomes effective within 120 days.

5    A copy of the decision and a copy of the transcript will

6    be sent to you.  The -- the Board has eliminated its

7    appeal process.  If you disagree with anything in today's

8    hearing, you have the right to go directly to court with

9    your complaint.  You are not required to admit your

10   offense or discuss your offense.  However, the Panel does

11   accept the findings of the court to be true.  Do you

12   understand that, sir?

13         INMATE FERNANDEZ:  Yes.

14         PRESIDING COMMISSIONER DAVIS:  All right.

15   Commissioner, are we going to be dealing with anything

16   from a confidential file today?

17         DEPUTY COMMISSIONER BLONIEN:  No, there's no

18   confidential information.

19         PRESIDING COMMISSIONER DAVIS:  All right.  Thank

20   you.  I'm going to be passing a checklist of documents to

21   defense counsel in the room.  It's dated 7/26/06.  And

22   I'm assuming that you have a similar list on your -- on

23   your end?

24         DEPUTY DISTRICT ATTORNEY RICO:  Commissioner Davis,

25   I have a checklist dated 7/26/06 lower right-hand corner.

26   I have all of those documents and I'm prepared to

27   proceed.

10

1      **PRESIDING COMMISSIONER DAVIS:**  Very well, thank you.

2      **ATTORNEY SPARKS:**  I have those documents, thank you.

3      **PRESIDING COMMISSIONER DAVIS:**  Very well.  We'll

4    mark that Exhibit 1 then.  Any additional documents you'd

5    like to submit?

6      **ATTORNEY SPARKS:**  No, thank you.

7      **PRESIDING COMMISSIONER DAVIS:**  Any preliminary

8    objections?

9      **ATTORNEY SPARKS:**  No.

10      **PRESIDING COMMISSIONER DAVIS:**  Okay.

11      **ATTORNEY SPARKS:**  Oh, actually, I do.  This report

12    from San Jose Police Department just came in today.  It's

13    dated July 21st, 2006.  We just object to it.  We didn't

14    receive it until today.  The ten-day processing of these

15    documents --

16      **PRESIDING COMMISSIONER DAVIS:**  Are you able to hear

17    Mr. Sparks all right on your end?

18      **DEPUTY DISTRICT ATTORNEY RICO:**  Perhaps if he could

19    speak up a little louder.  I copied July 21st (inaudible)

20    the San Jose Police Department letter in opposition.

21      **PRESIDING COMMISSIONER DAVIS:**  Yes, it was just

22    received in today's -- as -- as we all arrived today, we

23    got this today.  This is that continuing problem of

24    trying to get documents appropriately distributed.

25      **DEPUTY DISTRICT ATTORNEY RICO:**  The only thing I

26    would ask is that it would appear San Jose Police

27    Department sent it out in timely fashion and it seems to

11

1    be a problem within the institution distributions

2    thereof.  If -- if the Panel were to consider this --

3    this timeliness problem, perhaps the file could be

4    reviewed to see if there's been prior opposition.

5        **PRESIDING COMMISSIONER DAVIS:**  All right, we can --

6    well, we have -- we have two issues then on the table.

7    The first one is the timeliness issue and that is that

8    this letter was received -- although written in a timely

9    manner not -- not received by defense counsel in a timely

10    manner and, therefore, I'll sustain that objection.  The

11    other request is that we look and see if there are other

12    letters of objection in the existing file perhaps from

13    the last hearing and we can certainly do that.

14        **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you, and one

15    other matter.  I will just tell you my technician called

16    and indicated that he has the telephone companies looking

17    into the matter.  They're calling back in about 30

18    minutes if you have any problem on the line.

19        **PRESIDING COMMISSIONER DAVIS:**  Good.  Well, perhaps

20    we can get this resolved before our next hearing today

21    then that will good news.  All right, any other

22    objections, Counsel?

23        **ATTORNEY SPARKS:**  No, thank you.

24        **PRESIDING COMMISSIONER DAVIS:**  And will your client

25    be speaking with us today?

26        **ATTORNEY SPARKS:**  Yes.

27        **PRESIDING COMMISSIONER DAVIS:**  All right, then if

12

1    you'll raise your right hand then, Mr. Fernandez.  Do you

2    solemnly swear or affirm that the testimony you will give

3    at this hearing will be the truth and nothing but the

4    truth?

5        **INMATE FERNANDEZ:**  Yes.

6        **PRESIDING COMMISSIONER DAVIS:**  Thank you.  All

7    right, for a review of the crime I'm going to refer to

8    the Court of Appeals document starting on Page 2 where it

9    states,

10        "On July 9th, 1983, at approximately 8:55

11        p.m., Mr. Fernandez went to 236 North 20th

12        Street, San Jose, where Eduardo Fernandez was

13        talking to a Mr. Winstead, W-I-N-S-T-E-A-D.

14        Got out of his car, walked up to Eduardo

15        Fernandez, and shot him several times with a

16        .45 caliber automatic.  The defendant left the

17        area after the shooting.  Police arrived and

18        the victim was taken to the San Jose Hospital

19        where he was pronounced dead.  Witnesses

20        identified the defendant and most knew him as

21        he was related to the victim.  The defendant

22        was arrested on the same date and it was

23        learned that he had killed the victim because

24        the victim had killed the defendant's brother

25        in a bar fight in Mexico seven years prior.

26        Analysis of a blood sample obtained from

27        defendant revealed that the blood alcohol

13

1          content was a .21.  The .45 caliber automatic

2          weapon was located in the rear bedroom of 326

3          North 20th Street where Jesus Frausto, F-R-A-

4          U-S-T-O, had placed the weapon after he

5          knocked it out of the defendant's hand."

6    So Mr. Fernandez, did you commit this crime?

7          INMATE FERNANDEZ:  Yes.

8          PRESIDING COMMISSIONER DAVIS:  Okay.  And why did

9    you do this?

10          INMATE FERNANDEZ:  The reason is that because he had

11    killed one of my brothers.  And I was flat-out drunk.

12          PRESIDING COMMISSIONER DAVIS:  And how did you know

13    that he was the person responsible for killing your

14    brother?

15          INMATE FERNANDEZ:  How did I know?

16          PRESIDING COMMISSIONER DAVIS:  Yes, how did you know

17    that this -- that the victim was the one responsible for

18    killing your brother?

19          INMATE FERNANDEZ:  He was the one because he

20    belonged to the same family.

21          DEPUTY DISTRICT ATTORNEY RICO:  Commissioner Davis?

22          PRESIDING COMMISSIONER DAVIS:  Yes?

23          DEPUTY DISTRICT ATTORNEY RICO:  We may have lost the

24    video connection, but we still have the audio.  You may

25    inadvertently refer to the Court of Appeal document as

26    the (inaudible) the Statement of Facts.  I think it's

27    actually the probation report.  It's just that --

14

1      PRESIDING COMMISSIONER DAVIS:  Oh.

2      DEPUTY DISTRICT ATTORNEY RICO:  -- clear.

3   (inaudible) Court of Appeals.

4      PRESIDING COMMISSIONER DAVIS:  No, you are right.

5   There is -- I had looked at the title originally and

6   thought it was Court of Appeal, but it is a probation

7   document.  Thank you for the correction.  So getting back

8   to -- how did -- how did you know that this was the man

9   responsible?

10      INMATE FERNANDEZ:  He was my brother-in-law.

11      PRESIDING COMMISSIONER DAVIS:  But how did you know

12   that he was responsible for the death?

13      INMATE FERNANDEZ:  I was here.  They call me on the

14   phone that he was the one that killed my brother.

15      PRESIDING COMMISSIONER DAVIS:  So someone called you

16   and told you that?

17      INMATE FERNANDEZ:  Yes.

18      PRESIDING COMMISSIONER DAVIS:  And how long -- how

19   long before the -- the incident offense did that happen?

20      INMATE FERNANDEZ:  When I killed him.

21      PRESIDING COMMISSIONER DAVIS:  So it was that day

22   that you learned that he had killed your brother?

23      INMATE FERNANDEZ:  Yeah, the same moment.

24      PRESIDING COMMISSIONER DAVIS:  So, as I understand

25   your -- your testimony is that you got a phone call just

26   prior to the murder?

27      INMATE FERNANDEZ:  Yes.

15

1       PRESIDING COMMISSIONER DAVIS:  And -- but this --

2   this -- the death of your brother had occurred some seven

3   years prior.  Is that correct?

4       INMATE FERNANDEZ:  Yes.

5       PRESIDING COMMISSIONER DAVIS:  And -- and why -- why

6   that day?  How did -- how did -- what had happened that

7   they learned or that you had just learned that the --

8   that this was the person responsible for your brother's

9   death?

10      INMATE FERNANDEZ:  That -- that day I was drinking,

11  I was drunk and that is when I remembered the couple.

12      PRESIDING COMMISSIONER DAVIS:  And so it wasn't a

13  matter that you got a phone call that day.  You just

14  remembered that day.  Is that accurate?

15      INMATE FERNANDEZ:  Yes.

16      PRESIDING COMMISSIONER DAVIS:  Okay.  Do you -- as

17  you sit here today, do you think you have a fairly good

18  recollection of the events of that day?

19      INMATE FERNANDEZ:  No, I don't remember all --

20      PRESIDING COMMISSIONER DAVIS:  Okay.  Just let me --

21  from that same report -- let me read your statements from

22  that statement report.  "The defendant does not speak

23  English and at the defendant's request and with his

24  approval, inmate interpreter Carlos Paniagua, P-A-N-I-A-

25  G-U-A, was used as an interpreter."  And from that same

26  report on Page 2, it states that,

27      "In a verbal statement the defendant admitted

16

1      that he killed Eduardo Fernandez.  Indicated

2      that Eduardo had killed his brother seven

3      years ago.  He also indicated that he was very

4      drunk at the time and believes that if he had

5      not been so drunk he would not have killed

6      Eduardo.  He had purchased the .45 caliber

7      automatic approximately five months earlier

8      for the purpose of protecting his home."

9  And that's -- that's pretty much all you had to say on

10  this particular topic.  So the -- the gun was one that

11  you had purchased?

12      INMATE FERNANDEZ:  No, I had it.  I didn't buy it.

13      PRESIDING COMMISSIONER DAVIS:  Where did you get the

14  gun?

15      INMATE FERNANDEZ:  It belonged to a nephew of mine.

16      PRESIDING COMMISSIONER DAVIS:  And when had you

17  borrowed it?

18      INMATE FERNANDEZ:  It was there at my home.

19      PRESIDING COMMISSIONER DAVIS:  Okay.  So how well

20  did you know the victim in this case?

21      INMATE FERNANDEZ:  From Mexico.

22      PRESIDING COMMISSIONER DAVIS:  How many years?

23      INMATE FERNANDEZ:  All the life.

24      PRESIDING COMMISSIONER DAVIS:  All your life.  Had

25  you had any other arguments with him or any other

26  disagreements?

27      INMATE FERNANDEZ:  No.

17

1    PRESIDING COMMISSIONER DAVIS:  You know why he was

2    the one that was accused of killing your brother?

3    INMATE FERNANDEZ:  Oh, because he was drunk and my

4    brother wanted to drive him home.

5    PRESIDING COMMISSIONER DAVIS:  Do you -- do you

6    think -- because alcohol clearly seems to be a

7    significant part of this and you said even in the

8    original probation officer's statement that if you

9    weren't drunk you might not have done this.  Do you think

10   it was more the anger over the death of your brother or

11   the alcohol that caused this to happen?

12   INMATE FERNANDEZ:  I was drunk.  I never wanted to

13   do to him anything.

14   PRESIDING COMMISSIONER DAVIS:  So it was really more

15   -- more the alcohol than the anger, do you think?

16   INMATE FERNANDEZ:  Yes.

17   PRESIDING COMMISSIONER DAVIS:  Okay.  In that

18   regard, it says that you, in the same probation officer's

19   report, denied any illegal use of drugs or narcotics, but

20   that you did at that time consume about ten beers a week

21   on average.

22   INMATE FERNANDEZ:  Yes.

23   PRESIDING COMMISSIONER DAVIS:  So about -- that

24   would be about an average amount of alcohol that you

25   would consume on average?  About ten beers a week?

26   INMATE FERNANDEZ:  Yes.

27   PRESIDING COMMISSIONER DAVIS:  And would it be more

18

1   on weekends?

2       INMATE FERNANDEZ:  Once in a while.

3       PRESIDING COMMISSIONER DAVIS:  On the particular --

4   on the day of the -- of the murder was there a reason why

5   you had been drinking perhaps more than you normally do?

6       INMATE FERNANDEZ:  No.

7       PRESIDING COMMISSIONER DAVIS:  Again, the same

8   report it indicates that on September 16th -- and this is

9   in terms of your prior record, September 16th, 1977, you

10  were granted two years probation after being convicted of

11  carrying a loaded firearm in a public place.  And then on

12  January 19th, 1978, you received another grant of two

13  years probation for shooting in an occupied dwelling.

14  What was the -- the association with firearms here?  How

15  come you were -- how come you were associated with so

16  many firearm incidents?

17      INMATE FERNANDEZ:  I liked firearms but not to

18  damage anybody.

19      PRESIDING COMMISSIONER DAVIS:  What was the shooting

20  into the inhabited dwelling that you were arrested for?

21      INMATE FERNANDEZ:  The same owner told me let's see

22  if you can shoot up and we were all drunk.

23      PRESIDING COMMISSIONER DAVIS:  So that -- that

24  incidence also happened when you -- had a firearm and you

25  were -- and you'd been drinking?

26      INMATE FERNANDEZ:  Yes.

27      PRESIDING COMMISSIONER DAVIS:  Had you ever received

19

1    any -- any treatment for your use of alcohol?

2        INMATE FERNANDEZ:  No.

3        PRESIDING COMMISSIONER DAVIS:  According to the

4    somewhat limited information we have in terms of your

5    personal history is that you received three years of

6    formal education while living in Mexico.

7        INMATE FERNANDEZ:  Yes.

8        PRESIDING COMMISSIONER DAVIS:  Not really much in

9    here about your family except -- do you have brothers and

10   sisters?

11       INMATE FERNANDEZ:  Yes.

12       PRESIDING COMMISSIONER DAVIS:  How many?

13       INMATE FERNANDEZ:  Six brothers and six -- two

14   sisters.

15       PRESIDING COMMISSIONER DAVIS:  Okay.  And you keep

16   in contact with them?

17       INMATE FERNANDEZ:  Yes.

18       PRESIDING COMMISSIONER DAVIS:  Are your parents

19   still living?

20       INMATE FERNANDEZ:  Only my mother.

21       PRESIDING COMMISSIONER DAVIS:  And your contact with

22   your siblings is that letters or cards or telephone calls

23   or --

24       INMATE FERNANDEZ:  Letters and phone.

25       PRESIDING COMMISSIONER DAVIS:  Are they living in

26   the United States or in Mexico?

27       INMATE FERNANDEZ:  They're in Texas.

20

1        PRESIDING COMMISSIONER DAVIS:  Texas.

2        INMATE FERNANDEZ:  All my children are in San Jose.

3        PRESIDING COMMISSIONER DAVIS:  So you were married?

4        INMATE FERNANDEZ:  Yes.

5        PRESIDING COMMISSIONER DAVIS:  And how many children

6   do you have?

7        INMATE FERNANDEZ:  Three.

8        PRESIDING COMMISSIONER DAVIS:  And you keep in

9   contact with them?

10       INMATE FERNANDEZ:  Yes.

11       PRESIDING COMMISSIONER DAVIS:  What kind of work did

12   you do before the -- before the incident offense?

13       INMATE FERNANDEZ:  Oh, I was at (inaudible)

14   Electronics.

15       PRESIDING COMMISSIONER DAVIS:  As an assembler I

16   think I recall?

17       INMATE FERNANDEZ:  Assembler.

18       PRESIDING COMMISSIONER DAVIS:  And you -- you

19   received your citizenship in 1975, but -- and it also

20   indicates that you --

21       INMATE FERNANDEZ:  Yes.

22       PRESIDING COMMISSIONER DAVIS:  -- did graduate or

23   you completed the 11th grade?

24       INMATE FERNANDEZ:  Yes.

25       PRESIDING COMMISSIONER DAVIS:  In the United States?

26       INMATE FERNANDEZ:  No.

27       PRESIDING COMMISSIONER DAVIS:  No?  Okay.  Did you

21

1    receive any more education than the three years of

2    education that you got in Mexico?

3        INMATE FERNANDEZ:  No.

4        PRESIDING COMMISSIONER DAVIS:  You were in the --

5    were you in the Mexican Army?

6        INMATE FERNANDEZ:  I did my military service.

7        PRESIDING COMMISSIONER DAVIS:  And you were --

8    received an honorable discharge?

9        INMATE FERNANDEZ:  Yes.

10        PRESIDING COMMISSIONER DAVIS:  And what did you do

11    in the Army?

12        INMATE FERNANDEZ:  Just do the exercises and the

13    (inaudible).

14        PRESIDING COMMISSIONER DAVIS:  No particular skills

15    or trades that you learned in the Army?

16        INMATE FERNANDEZ:  No.  Oh, just to get my

17    education.

18        PRESIDING COMMISSIONER DAVIS:  Just to get -- okay,

19    but no skills?  No --

20        INMATE FERNANDEZ:  No.

21        PRESIDING COMMISSIONER DAVIS:  All right, is there

22    anything that we haven't talked about or covered in

23    your -- your family history, your -- the crime itself,

24    any details that you would like the Panel to know more

25    about?  Your education?  Anything that -- prior to the

26    incident offense that you feel it's important for the

27    Panel to understand today before we make any decisions?

22

1        INMATE FERNANDEZ:  No, it's fine.

2        PRESIDING COMMISSIONER DAVIS:  All right.  Do you

3    have any questions, Commissioner?

4        DEPUTY COMMISSIONER BLONIEN:  I do.  How many people

5    were there when you shot your brother-in-law?

6        INMATE FERNANDEZ:  There were like six but they were

7    running inside.

8        DEPUTY COMMISSIONER BLONIEN:  And what did you do

9    after you shot him?

10       INMATE FERNANDEZ:  I left from there.

11       DEPUTY COMMISSIONER BLONIEN:  Who called for help?

12       INMATE FERNANDEZ:  I don't know.

13       DEPUTY COMMISSIONER BLONIEN:  You never asked?

14       INMATE FERNANDEZ:  No.

15       DEPUTY COMMISSIONER BLONIEN:  That's all I have.

16       PRESIDING COMMISSIONER DAVIS:  All right, thank you.

17   I'll ask you to turn your attention to Commissioner

18   Blonien for her part in this.

19       DEPUTY COMMISSIONER BLONIEN:  Mr. Fernandez, this is

20   your fifth subsequent hearing and your last appearance

21   before the Board was August 18th, of '04 and the panel on

22   a two-year denial.  And they were very specific when they

23   talked to you about what they wanted you to do before the

24   next hearing.  And -- and I'm just going to read that

25   into the -- into the record because they took a lot of

26   time talking to you.

27          "First, that you remain disciplinary-free and

23

1    you have.  That when available to you, you

2    participate in self-help, specifically

3    alcohol-abuse-related programs such as AA,

4    which you do.  But you've got to do more than

5    just attend.  You've got to -- you don't have

6    to pass a test here.  You don't have to tell

7    us the 12 Steps.  But we need to believe that

8    you are able to understand what AA is all

9    about and that you make it part of your daily

10   operation.  And in your own words you'll be

11   able to tell the Panel how you will keep sober

12   if released into the community.  We recommend

13   that you continue to upgrade educationally and

14   vocationally and that your parole plans -- it

15   would be very helpful if you could get

16   something official indicating that you do have

17   property or residence in Mexico and when your

18   wife writes her next letter, she should also

19   be able to say that she's willing to go to

20   Mexico with you.  And if you have anyone in

21   Mexico who will give you a job, that would be

22   helpful as well.  You have to assume that

23   you're going to be deported based on that INS

24   hold."

25 So your custody level is Medium-A.  Your classification

26 score is 19.  I have that.

27   **ATTORNEY SPARKS:**  Okay.  And then we have two

24

1    others.

2    **DEPUTY COMMISSIONER BLONIEN:**  Okay, that's good.

3    **ATTORNEY SPARKS:**  Then in Spanish.

4    **DEPUTY COMMISSIONER BLONIEN:**  The psych report by

5    Dr. Talbot is dated November 24th of '03 and I've read

6    that.  I've read your current counselor's report by

7    Counselor Studebaker, S-T-U-D-E-B-A-K-E-R, dated May 24th,

8    '06.  I've read your whole C-File, the whole Board

9    report.  And you've already talked to the Commissioner

10    about declining to review your C-File.  So in your

11    history you've had six 115s.  The last one was in 1990.

12    You've only had three 128s and the last one was in 1995.

13    You work in the Kitchen and you're very dependable.  And

14    you get -- your supervisor says you're satisfactory to

15    excellent.  You've worked in Waste Management in the

16    Recycling in '02.  You've had other jobs in Culinary and

17    Yard Crew.  You were in Vocational Auto Body Fender, but

18    I don't think you got a certificate, did you?

19    **INMATE FERNANDEZ:**  Yeah, they gave it but I didn't

20    finish it.

21    **DEPUTY COMMISSIONER BLONIEN:**  Right.  You weren't

22    able to complete the course.  Were -- were you

23    transferred before you could complete it?

24    **INMATE FERNANDEZ:**  Yes.

25    **DEPUTY COMMISSIONER BLONIEN:**  You've worked a long

26    time in the -- in the area of English as a Second

27    Language and I think the highest TABE test I saw was a

25

1   6.0 with a 2.0 overall.  Is the education very difficult

2   for you?

3       INMATE FERNANDEZ:  Yes.  Yeah, they took me off

4   because I wasn't able to learn.

5       DEPUTY COMMISSIONER BLONIEN:  You -- there's a

6   chrono in there that you reached a plateau on March 12th,

7   1998, and they felt --

8       INMATE FERNANDEZ:  Yes.

9       DEPUTY COMMISSIONER BLONIEN:  -- and in the chrono,

10  I wasn't sure if it was because of lack of motivation on

11  your part or you were trying really hard and that was the

12  best you could do.

13      INMATE FERNANDEZ:  I wasn't able to learn more.

14      DEPUTY COMMISSIONER BLONIEN:  You -- and were you

15  trying really hard?

16      INMATE FERNANDEZ:  Yes.  My head hurt.

17      DEPUTY COMMISSIONER BLONIEN:  You have been in AA

18  '89, '91, '94, '96, '97, '98, '99, 2000, 2003, -4 and -5.

19  So a long time.

20      INMATE FERNANDEZ:  Yes.

21      DEPUTY COMMISSIONER BLONIEN:  And the -- and the

22  last Panel asked you if you've worked through all the

23  Steps.

24      INMATE FERNANDEZ:  Yes, but I have -- we have almost

25  a year that we don't go to AA.  But I study from my book.

26      DEPUTY COMMISSIONER BLONIEN:  And when you study --

27  from your book, have you worked through the Steps?

26

1        INMATE FERNANDEZ:  Yes.

2        DEPUTY COMMISSIONER BLONIEN:  And how do you plan to

3    use those Steps to help you not to drink if you're

4    released?

5        INMATE FERNANDEZ:  If they ever granted me freedom

6    to Mexico continue with AA.

7        DEPUTY COMMISSIONER BLONIEN:  And -- and does he use

8    the Steps not to drink?

9        INMATE FERNANDEZ:  Studying all the time, going to

10    AA.

11        DEPUTY COMMISSIONER BLONIEN:  Have you made a list

12    of people that you need to make amends to?

13        INMATE FERNANDEZ:  Yes.  I wrote something.  I have

14    something.

15        ATTORNEY SPARKS:  He wrote out the Steps and applied

16    them accordingly to what he understands.  He could

17    probably just read you something off of here.

18        DEPUTY COMMISSIONER BLONIEN:  Yeah, if he -- if he

19    could give me -- tell me an example.  Well, it's good

20    that the wrote it down.  He can look at it.

21        ATTORNEY SPARKS:  Yeah, this is Step 9.  Right?  So

22    you want to tell that or use the interpreter for that

23    purpose?

24        INMATE FERNANDEZ:  Which Step do you want?

25        DEPUTY COMMISSIONER BLONIEN:  I want the one that's

26    most important to him.

27        INMATE FERNANDEZ:  Number 12.  The number 12 says

27

1  gaining a spiritual awakening -- awakening as a result of

2  the Steps to try to take the message to the alcoholics

3  and practice these principles in all our dealings.  After

4  gaining all these 12 Steps, our happiness and willingness

5  of (inaudible) the last Step.  To share with another

6  alcoholic our experience in our lives for the rest of our

7  lives.

8         DEPUTY COMMISSIONER BLONIEN:  And did you write

9  that?

10        INMATE FERNANDEZ:  Yes.  Right here are the 12.

11        DEPUTY COMMISSIONER BLONIEN:  When I finish our

12  discussion, I'd like to see that cause -- because I can

13  read Spanish.

14        INMATE FERNANDEZ:  Yes.

15        DEPUTY COMMISSIONER BLONIEN:  Okay?

16        INMATE FERNANDEZ:  Okay.

17        DEPUTY COMMISSIONER BLONIEN:  You've also completed

18  the Impact Program.

19        INMATE FERNANDEZ:  Oh, yeah.

20        DEPUTY COMMISSIONER BLONIEN:  How did -- how did --

21  was it in Spanish?

22        INMATE FERNANDEZ:  Yes.

23        DEPUTY COMMISSIONER BLONIEN:  And what did you think

24  about that program?

25        INMATE FERNANDEZ:  Very well for me.

26        DEPUTY COMMISSIONER BLONIEN:  Tell me -- tell me

27  about it.

28

1       INMATE FERNANDEZ:  I can't explain.  I forget.  But

2   really good.

3       DEPUTY COMMISSIONER BLONIEN:  In the program they

4   talk about the impact your action had on the victim's

5   family and the victim's family --

6       INMATE FERNANDEZ:  Yeah.

7       DEPUTY COMMISSIONER BLONIEN:  -- is your family.

8   How did -- how did that feel?

9       INMATE FERNANDEZ:  Very bad.  I was -- I felt very

10  bad.

11      DEPUTY COMMISSIONER BLONIEN:  Do you think about

12  your brother-in-law?

13      INMATE FERNANDEZ:  Of course, yes.

14      DEPUTY COMMISSIONER BLONIEN:  Tell me about your

15  feelings.

16      INMATE FERNANDEZ:  Very bad because he was my

17  brother.  I don't want to talk about that.  I feel bad.

18      DEPUTY COMMISSIONER BLONIEN:  Well, tell Mr.

19  Fernandez that this is a good time to talk about that.

20      INMATE FERNANDEZ:  He was my brother.  I didn't want

21  to do that.

22      DEPUTY COMMISSIONER BLONIEN:  So in the institution

23  he goes to work in the Kitchen.

24      INMATE FERNANDEZ:  Yes.

25      DEPUTY COMMISSIONER BLONIEN:  AA on lockdown.  So

26  what does he do all day?

27      INMATE FERNANDEZ:  When?

29

1      DEPUTY COMMISSIONER BLONIEN:  All day.  After -- you

2   go to work --

3      INMATE FERNANDEZ:  After work, I -- I study the book

4   about alcoholics.  I go to church.

5      DEPUTY COMMISSIONER BLONIEN:  What church do you go

6   to?

7      INMATE FERNANDEZ:  The brothers of -- Jehovah's

8   Witnesses.

9      DEPUTY COMMISSIONER BLONIEN:  So you go to church.

10     INMATE FERNANDEZ:  Yes.

11     DEPUTY COMMISSIONER BLONIEN:  You study your AA

12  Steps.

13     INMATE FERNANDEZ:  Yes.

14     DEPUTY COMMISSIONER BLONIEN:  What else?

15     INMATE FERNANDEZ:  Not much.

16     DEPUTY COMMISSIONER BLONIEN:  Watch TV?

17     INMATE FERNANDEZ:  Yes.

18     DEPUTY COMMISSIONER BLONIEN:  Read books?

19     INMATE FERNANDEZ:  Yes.

20     DEPUTY COMMISSIONER BLONIEN:  What -- what -- what

21  do -- what are you read?

22     INMATE FERNANDEZ:  Stories in Spanish.

23     DEPUTY COMMISSIONER BLONIEN:  Like things that help

24  him with his life or novels?

25     INMATE FERNANDEZ:  Yes.  Things that you learn --

26  things that you learn more.

27     DEPUTY COMMISSIONER BLONIEN:  So what is he learning

30

1  more?

2        INMATE FERNANDEZ:  Every book that you read you

3  learn something out of it.  You learn a lot when you

4  read.

5        DEPUTY COMMISSIONER BLONIEN:  Are you a different

6  person, Mr. Fernandez, than the person who did --

7        INMATE FERNANDEZ:  Of course.  I have changed a lot.

8        DEPUTY COMMISSIONER BLONIEN:  I saw, just looking

9  back over past reports, that when you first came in your

10  counselor said that "his relationship with staff and

11  other inmates is barely mentioned in progress reports.

12  He is reported as shy, self-conscious individual who

13  demonstrates a lack of self-confidence." And that was

14  1992.  Then in 1994, two years later, comments were that

15  "Fernandez took an active role and had an excellent

16  attitude toward staff."  So you found yourself changing

17  as a person.

18        INMATE FERNANDEZ:  I have noticed that I have

19  changed.  I'm not the same person.  Many years passed by.

20        DEPUTY COMMISSIONER BLONIEN:  And when your family

21  comes to visit you, have they told you that you've made

22  big changes?

23        INMATE FERNANDEZ:  Yes.

24        DEPUTY COMMISSIONER BLONIEN:  And your parole plans,

25  I know you have two letters there.  I don't who they're

26  from.  Says you plan to live with your wife.

27        INMATE FERNANDEZ:  Yes.

31

1          DEPUTY COMMISSIONER BLONIEN:  In San Jose?

2          INMATE FERNANDEZ:  She's going to go with me to

3   Mexico.

4          DEPUTY COMMISSIONER BLONIEN:  And that you have

5   property in Mexico.

6          INMATE FERNANDEZ:  Not myself.  But my brothers do.

7          DEPUTY COMMISSIONER BLONIEN:  And where in Mexico?

8          INMATE FERNANDEZ:  Vera Cruz.

9          DEPUTY COMMISSIONER BLONIEN:  All right.  And so --

10  and -- and I see the confusion here because you -- you do

11  have citizenship papers, but you do also have a U.S. INS

12  hold.  So if you live in San Jose, your wife will stay in

13  San Jose and she has an address and an apartment.  And if

14  not, you will go to your brother's in Vera Cruz and your

15  wife will go with you.

16         INMATE FERNANDEZ:  My wife goes with me.

17         DEPUTY COMMISSIONER BLONIEN:  And then I have a

18  letter dated 6/26 from Guadalupe Fernandez who is your

19  son?

20         INMATE FERNANDEZ:  Yes.

21         DEPUTY COMMISSIONER BLONIEN:  Who says that -- that

22  he will have a job -- that you will have a job waiting

23  for you the day of your release.  The name of the company

24  is V & A Painting.  "We will always need help in some

25  area.  Example, touch-up, prepare, clean-up."  And then

26  it gives the telephone number of V & A Painting.  Does

27  your son own the -- own V & A Painting?

32

1          **INMATE FERNANDEZ:**  No, no.  It's another

2     (inaudible).

3          **DEPUTY COMMISSIONER BLONIEN:**  Okay.  Oh, another.

4          **INMATE FERNANDEZ:**  He's not my son.

5          **DEPUTY COMMISSIONER BLONIEN:**  Not your son.  And

6     it's notarized.  He had the letter notarized.  And Mr.

7     Ugalve, if you could summarize the -- the letters that he

8     has in -- in Spanish and then when you're done, if you

9     could pass them to me along with his AA --

10          **INTERPRETER UGALVE:**  Okay, sounds good.

11          "I am Mrs. Glafida Fernandez, wife of

12          Guadalupe Fernandez, write this letter to let

13          you know how much I need my husband.  I'm a

14          person -- sick, sick person.  I suffer from

15          cholesterol and diabetes, depression,

16          arthritis.  I have many years that I'm

17          suffering this sickness and to this point I

18          cannot even walk for -- by directions of the

19          doctor.  I am disabled.  My feet get swollen.

20          My hands get swollen.  I cannot even walk.

21          They found me a tumor in my brain and the

22          doctors don't know yet what to do with this

23          problem.  I need the help of my husband since

24          I live by myself and I cannot do very much by

25          -- for myself.  He knows my (inaudible) my

26          condition.  He wants to help me and I don't

27          want to be alone.  I need him very much."

33

1   And that's -- this is from Glafida (phonetic) Fernandez,

2   my wife.

3       **DEPUTY COMMISSIONER BLONIEN:**  Who's the first one

4   from?

5       **INTERPRETER UGALVE:**  That was Glafida Fernandez.

6       **DEPUTY COMMISSIONER BLONIEN:**  His wife.

7       **INTERPRETER UGALVE:**  His wife.

8       **DEPUTY COMMISSIONER BLONIEN:**  Okay.

9       **INTERPRETER UGALVE:**  And the next is from Mrs.

10   Guadalupe -- oh, Mr. Guadalupe Fernandez.

11      "Through this letter me, Jorge Fernandez

12      (inaudible), let you know that I know Mr.

13      Guadalupe Fernandez for a long -- from a long

14      time ago and he's a hard-working person for

15      whom I promise to provide work in my company

16      with the address, Jose Maria Morales

17      (phonetic) number 197 between the 2nd and the

18      3rd (inaudible) Ensenada, Baja, California.

19      At this moment, Mr. Guadalupe Fernandez -- oh,

20      the moment that he resides in this city of

21      Ensenada, Baja, California."

22   **DEPUTY COMMISSIONER BLONIEN:**  How far is Vera Cruz

23   from Ensenada?

24   **INMATE FERNANDEZ:**  About eight hours.

25   **DEPUTY COMMISSIONER BLONIEN:**  That's what I thought.

26   It'd be a long commute.  Living in Vera Cruz and --

27   **INMATE FERNANDEZ:**  Oh, I'm going to live in Ensenada

34

1    because I have a brother who lives there.

2        DEPUTY COMMISSIONER BLONIEN:  Do you see how this

3    can be confusing for the Panel when you don't have

4    letters saying I'm going to live here, work here?  And --

5    and I'll note that you passed me the work that you're

6    doing on your AA and he's written down every Step and

7    then he has written down how that Step is important to

8    him and how it applies to him and how it -- how he's

9    going to use it to remain sober.  Are you ever going to

10   drink again?

11       INMATE FERNANDEZ:  No, never.

12       DEPUTY COMMISSIONER BLONIEN:  And he's gone through

13   and explains that in Spanish.  We also sent out 3042

14   notices and the District Attorney of Santa Clara is here

15   today, audio and sometimes video, and at the appropriate

16   time he'll be given the opportunity to speak.  So I'm

17   going to return to the Chair.

18       PRESIDING COMMISSIONER DAVIS:  Thank you.  Mr.

19   Fernandez, have you made some plans in your parole

20   preparation for continuing with AA?

21       INMATE FERNANDEZ:  I haven't done yet, but if I go

22   to Mexico down there.

23       PRESIDING COMMISSIONER DAVIS:  Do you consider this

24   a life-long commitment?

25       INMATE FERNANDEZ:  Yes.

26       PRESIDING COMMISSIONER DAVIS:  How would you go

27   about finding an AA sponsor?  Have you -- have you

35

1   written anyone or done anything in preparation for that?

2       INMATE FERNANDEZ:   That's easy because in Mexico

3   there's a lot of them.

4       PRESIDING COMMISSIONER DAVIS:   What about San Jose?

5   Is there any preparation for your potential parole to San

6   Jose?

7       INMATE FERNANDEZ:   No, I haven't done anything

8   because I have -- going to be deported to Mexico.

9       PRESIDING COMMISSIONER DAVIS:   What would be your

10  preference?   I mean, given the best of all words, would

11  you rather go to Mexico or stay in the United States?

12  Where do you think you can be most successful?

13      INMATE FERNANDEZ:   In Mexico.

14      PRESIDING COMMISSIONER DAVIS:   Mexico.   Do you have

15  any other questions?

16      DEPUTY COMMISSIONER BLONIEN:   I don't.

17      PRESIDING COMMISSIONER DAVIS:   District Attorney

18  have questions?

19      DEPUTY DISTRICT ATTORNEY RICO:   Just very briefly,

20  Commissioner.   The prior conviction for shooting into an

21  occupied dwelling.   Did Mr. Fernandez indicate whose

22  dwelling that was or why he did that?

23      PRESIDING COMMISSIONER DAVIS:   Can you give us some

24  additional details, Mr. Fernandez, on whose dwelling you

25  were shooting at and why that was occurring?

26      INMATE FERNANDEZ:   It was -- I was with some friends

27  of the owner of the residence.

36

1          PRESIDING COMMISSIONER DAVIS:  And why were they --

2     they were shooting at the owner's residence?  Who's

3     residence were they shooting at?

4          INMATE FERNANDEZ:  The apartment.

5          PRESIDING COMMISSIONER DAVIS:  And why were they

6     shooting at the apartment?

7          INMATE FERNANDEZ:  They were -- we were all drunk

8     drinking.

9          PRESIDING COMMISSIONER DAVIS:  Was there anyone

10    inside the apartment?

11         INMATE FERNANDEZ:  Oh, the owner's wife.

12         PRESIDING COMMISSIONER DAVIS:  Was inside the

13    apartment?

14         INMATE FERNANDEZ:  Yes.  She was there.

15         PRESIDING COMMISSIONER DAVIS:  Was the owner

16    actively participating in the shooting?

17         INMATE FERNANDEZ:  Yes.

18         PRESIDING COMMISSIONER DAVIS:  And why was that?

19         INMATE FERNANDEZ:  Cause he was drunk also.

20         DEPUTY DISTRICT ATTORNEY RICO:  Did Mr. Fernandez do

21    any of the shooting himself?

22         INMATE FERNANDEZ:  Yes.

23         DEPUTY DISTRICT ATTORNEY RICO:  And why did he do

24    that?

25         INMATE FERNANDEZ:  I didn't know what I was doing.

26    I was drunk.

27         DEPUTY DISTRICT ATTORNEY RICO:  I -- I understand to

37

1    some extent what Mr. Fernandez has said about why he shot

2    the victim, but what I don't understand -- did Mr.

3    Fernandez know it to be true that the victim had killed

4    his brother or did Mr. Fernandez do this just because

5    someone said the victim had killed his brother?  Does he

6    understand that?

7         **INMATE FERNANDEZ:**  I was sure of that.

8         **DEPUTY DISTRICT ATTORNEY RICO:**  And how was he so

9    sure of that?

10        **INMATE FERNANDEZ:**  Because they called me from

11   Mexico saying that he had killed my brother.

12        **DEPUTY DISTRICT ATTORNEY RICO:**  And why did Mr.

13   Fernandez think it was necessary -- let -- let me

14   withdraw that.  As I understand it the victim in this

15   case, Eduardo Fernandez, was married to the inmate's

16   sister.  Is that correct?

17        **INMATE FERNANDEZ:**  I was marred to his sister.  He

18   was married to my sister.

19        **DEPUTY DISTRICT ATTORNEY RICO:**  So the victim's wife

20   is Anna Maria and that's the inmate's sister?  Is that

21   correct?

22        **INMATE FERNANDEZ:**  Yes.

23        **DEPUTY DISTRICT ATTORNEY RICO:**  Do we -- do we have

24   a connection?

25        **PRESIDING COMMISSIONER DAVIS:**  Oh, yeah.  The answer

26   was yes.

27        **DEPUTY DISTRICT ATTORNEY RICO:**  I'm sorry, okay.

38

1  And the victim and the inmate's sister had some children

2  at the time, did they not?

3      INMATE FERNANDEZ:  Yes.

4      DEPUTY DISTRICT ATTORNEY RICO:  There was a Jorge,

5  J-O-R-G-E, who was the victim's son.  Is that correct?

6      INMATE FERNANDEZ:  Yes.

7      DEPUTY DISTRICT ATTORNEY RICO:  And he would  be the

8  inmate's nephew?

9      INMATE FERNANDEZ:  Yes.

10     DEPUTY DISTRICT ATTORNEY RICO:  And there was a

11 Maria who was the victim's daughter?

12     INMATE FERNANDEZ:  Yes.

13     DEPUTY DISTRICT ATTORNEY RICO:  And Alesia is maybe

14 A-L-E-S-I-A, who was the victim's daughter.  Is that

15 right?

16     INMATE FERNANDEZ:  Yes.

17     PRESIDING COMMISSIONER DAVIS:  Yes.

18     DEPUTY DISTRICT ATTORNEY RICO:  So those would've

19 been the inmate's nieces?

20     INMATE FERNANDEZ:  Yes.

21     DEPUTY DISTRICT ATTORNEY RICO:  Did Mr. Fernandez

22 give any thought to his own sister and his nephew and his

23 nieces in pulling the trigger on the victim?

24     INMATE FERNANDEZ:  No, at that moment.  I was bad.

25 Feeling bad.

26     DEPUTY DISTRICT ATTORNEY RICO:  Does Mr. Fernandez's

27 sister, who's the widow, as well as his nephew and his

39

1    nieces, do they live in Mexico or the United States?

2         **INMATE FERNANDEZ:**  Here in San Jose.

3         **DEPUTY DISTRICT ATTORNEY RICO:**  And what is Mr.

4    Fernandez's current relationship to that part of his

5    family?

6         **INMATE FERNANDEZ:**  Haven't spoke to them, but with

7    my sister, yes.

8         **DEPUTY DISTRICT ATTORNEY RICO:**  Now, I know there's

9    been some discussion about Mr. Fernandez's involvement in

10   AA.  Has Mr. Fernandez taken any steps or made any effort

11   to contact any of the family members who have been harmed

12   by his actions to make amends with them?

13        **INMATE FERNANDEZ:**  Yes.

14        **DEPUTY DISTRICT ATTORNEY RICO:**  Would that include

15   his sister, his nephew and his nieces?

16        **INMATE FERNANDEZ:**  Yes.

17        **DEPUTY DISTRICT ATTORNEY RICO:**  I thought he said a

18   moment ago he hadn't spoken to his sister about this.

19        **INMATE FERNANDEZ:**  She's not upset.

20        **DEPUTY DISTRICT ATTORNEY RICO:**  She is upset, is

21   that what he said?

22        **INTERPRETER UGALVE:**  She's not upset.

23        **DEPUTY DISTRICT ATTORNEY RICO:**  She's not upset.

24   Now, this a little harder question to ask.  I will try

25   to -- to do it.  If Mr. Fernandez was upset at the victim

26   for killing his -- Mr. Fernandez's brother, if Mr. 

27   Fernandez killed his brother-in-law, are there any

40

1    hostilities on the part of the widow and nephew or the

2    nieces that Mr. Fernandez should be concerned about here?

3    Does he understand that?

4        INMATE FERNANDEZ:  Yes.

5        DEPUTY DISTRICT ATTORNEY RICO:  Could he comment on

6    that?

7        INMATE FERNANDEZ:  I cannot say.  I feel very bad

8    for all this had happened.

9        DEPUTY DISTRICT ATTORNEY RICO:  Does Mr. Fernandez

10   think that he needs to do anything else while he is

11   incarcerated to prepare himself for a life on the outside

12   where there may be stresses awaiting him?

13       INMATE FERNANDEZ:  Yes, I'm a different person.  I

14   have changed a lot.

15       DEPUTY DISTRICT ATTORNEY RICO:  That -- that wasn't

16   really my question.  Perhaps, Commissioner?

17       PRESIDING COMMISSIONER DAVIS:  Yeah, I -- is there

18   anything else that you think that you need to do to

19   prepare yourself to get -- other than what you've already

20   done, is there anything else that you think that you need

21   to prepare yourself for the outside world?

22       INMATE FERNANDEZ:  I think I'm fine to get out.

23       DEPUTY DISTRICT ATTORNEY RICO:  And the last thing I

24   have, did I understand that one of those letters was from

25   Mr. Fernandez's wife who appears to have some serious

26   medical issues.  Is that accurate?

27       INMATE FERNANDEZ:  Yes.

41

1        DEPUTY DISTRICT ATTORNEY RICO:  Does Mr. Fernandez

2   think that if he goes back into that situation caring for

3   his wife that there are going to be significant stress

4   factors there that may tempt him to take a drink?

5        INMATE FERNANDEZ:  No.  Never.

6        DEPUTY DISTRICT ATTORNEY RICO:  I really have

7   nothing further.

8        PRESIDING COMMISSIONER DAVIS:  All right, thank you.

9   Mr. Sparks?

10       ATTORNEY SPARKS:  Is there anybody out there that

11   wants to kill you from your family or the other side's

12   family because of the crime that you did?

13       INMATE FERNANDEZ:  No.

14       ATTORNEY SPARKS:  Do you think that if something

15   happened to one of your family members that you would

16   take the law into your own hands again?

17       INMATE FERNANDEZ:  No, never.  No.

18       ATTORNEY SPARKS:  Do you think that the philosophy

19   that you had at the time, that you could take the law

20   into your hands, was an appropriate philosophy?

21       INTERPRETER UGALVE:  Can you repeat that, please?

22       ATTORNEY SPARKS:  Do you think that the philosophy

23   that you had at the time, that you could take the law

24   into your own hands, was an appropriate philosophy?

25       INMATE FERNANDEZ:  No.

26       ATTORNEY SPARKS:  What was it about the way that you

27   lived that made you believe that you could take the law

42

1  into your own hands?

2      INMATE FERNANDEZ:  I don't know what happened to me

3  that moment.  I never thought it (inaudible).

4      ATTORNEY SPARKS:  What (inaudible) that you took the

5  law into your own hands?

6      INMATE FERNANDEZ:  Yes, but I don't know why I --

7  how I did it.

8      ATTORNEY SPARKS:  But it was revenge, right?

9      INMATE FERNANDEZ:  Yes.

10      ATTORNEY SPARKS:  An eye for an eye, a tooth for a

11  tooth?

12      INMATE FERNANDEZ:  I feel for them very much that

13  that happened.

14      ATTORNEY SPARKS:  But that was pretty much the

15  reality, right?

16      INMATE FERNANDEZ:  Yes.

17      ATTORNEY SPARKS:  All right.  So what makes you

18  think that you would handle things differently now?

19  Who's responsible for enforcing the law then?

20      INMATE FERNANDEZ:  I feel that I'm a different

21  person.

22      ATTORNEY SPARKS:  Okay, but who's responsible for

23  enforcing the law if, in fact, somebody gets killed for

24  your family members, who's the responsible authority for

25  taking care of that then?

26      INMATE FERNANDEZ:  God.

27      ATTORNEY SPARKS:  Okay.  But if there was some kind

43

1   of enforcement of the law, who would that be besides God?

2       INMATE FERNANDEZ:  The government.

3       ATTORNEY SPARKS:  Do you see how you took the

4   responsibility that would otherwise be the police's

5   authority?

6       INMATE FERNANDEZ:  Yes, but as I told you, I didn't

7   know what I was doing.

8       ATTORNEY SPARKS:  No, it doesn't matter.  You still

9   did it.  It's not whether you didn't know what you were

10  doing; you did it.  I mean, today you have to agree that

11  you did it and you're responsible for it, right?

12      INMATE FERNANDEZ:  I realize that I was not

13  (inaudible).

14      ATTORNEY SPARKS:  Nobody said you premeditated it.

15  That would be first degree murder.  But you intentionally

16  did it because that was second degree murder.  Okay.  I'm

17  just trying to understand whether or not you understand

18  the severity of the crime.  Not -- not in the sense that

19  you took his life.  But in the sense that you -- you

20  understand that you're attempting to held -- you're --

21  you're held responsible for this as a second degree

22  murder.  And that there was some other authority that

23  should've taken care of the situation rather than you.

24      INMATE FERNANDEZ:  Yes.

25      ATTORNEY SPARKS:  As long as you understand all

26  that.

27      INMATE FERNANDEZ:  I know I recognize all that.

44

1        **ATTORNEY SPARKS:**  Okay.  And the question is

2    slightly different in the sense that even if you don't

3    remember because your memory's clouded by alcohol that,

4    in fact, somebody else should've stepped up to take care

5    of this if -- if your brother-in-law had killed your

6    brother that should've been left up to other authorities

7    to take care of it.  Not just you.

8        **INMATE FERNANDEZ:**  You.

9        **ATTORNEY SPARKS:**  Would you agree with all that?

10       **INMATE FERNANDEZ:**  Yes, I'm agreeing with that.

11       **ATTORNEY SPARKS:**   So revenge isn't something that

12    you get to do?  That's God or other authorities to take

13    care of that, right?

14       **INMATE FERNANDEZ:**  Yeah, that's very correct.

15       **ATTORNEY SPARKS:**  Can't lead you through it any more

16    than that, Mr. Fernandez.  That's enough questions for

17    me.

18       **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

19    Closing?

20       **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

21    Commissioner.  Well, this -- I find a little bit

22    difficult to put these in the proper perspective.  But we

23    have a situation where Mr. Fernandez, when he was 35

24    years of age, and -- and I think that's an important

25    factor.  That's not -- this is some type of a -- an

26    impulse or an indiscretion of youth.  He was 35 at the

27    time that this crime took place.  And I believe that his

45

1   record involved four misdemeanors and one felony which
2   included carrying a loaded firearm in a public place and
3   shooting into an occupied dwelling.  Alcohol has been a
4   problem for him, historically.  I'm troubled by the
5   circumstances of the discharge of the firearm into the
6   occupied dwelling.  There seems to be -- there was no
7   true motive to do that.  He was he says drunk at the time
8   and others were doing it, so he just kind of went along
9   with and -- and fired into the dwelling where a woman was
10  inside.  It was an extreme risk potential for loss of
11  life.  Then there's this circumstance where he shoots his
12  brother-in-law.  The husband of own sister.  The father
13  of his nephew and nieces.  Because he believes that the
14  victim killed his own brother some seven years before.  I
15  think it's still equivocal as to when he got that
16  information.  He seems to indicate on the day of, but
17  then seems to be somewhat inconsistent with what's in the
18  packet.  Again, alcohol is involved and he says he knew
19  for sure that the victim had done it because they told
20  him that he had.  Now, today he indicates -- and today
21  he's 59-years-old of age at this time.  He's been in for
22  a significant period of time.  He has taken AA.  Been
23  involved in AA.  I think there are some unresolved
24  issues.  The family situation, I would feel more
25  comfortable if there were some letters documenting
26  certain things in terms of support letters from members
27  of the family.  I hope that this is not a Hatfield and

46

1    McCoy situation where we have the inmate killing his

2    brother-in-law, who he believes to have killed his own

3    brother, leaving alive a nephew and nieces and his own

4    sister in a situation that may still involve possibility

5    (inaudible) in the family.  I -- I don't know.  And I

6    don't know -- I don't have in my packet significant

7    letters of support.  I -- I heard what I thought was an

8    inconsistency when he indicated first of all that he

9    hadn't talked to his sister about this and then he said

10    that he had made amends and that she wasn't upset.  It

11    would be nice to have some letter documenting that.  The

12    parole plans, he wants to go back and live with his wife

13    who has serious medical issues.  And I submit that it's a

14    matter of common sense that's going to be a very

15    difficult situation for him to step back into.  The

16    question is whether his wife can even physically relocate

17    to Mexico, whether or not she would want to because of

18    the medical conditions.  I think there's unresolved

19    issues there that -- that need to clarified.  I'm a bit

20    troubled by the fact and -- and it may be difficult to do

21    for Mr. Fernandez to find out what resources there are to

22    keep him on the straight and narrow if he is really

23    deported to Mexico.  But I thought I heard him say that

24    he hadn't inquired into the resources there, but if he

25    were paroled and went to Mexico he would look into it,

26    and I think that's kind of putting the cart well back of

27    the horse so to speak and I think that's something that

47

1    he needs to explore before he's given a release date,

2    because the most current psych-assessment, which I have

3    some issues with, does state that attendance in Alcohol –

4    – Alcoholic's Anonymous has been a benefit to him.  The

5    author of that report indicates that he appears to be a

6    low-risk for violence in the free community and that goes

7    on the condition that saying that,

8        "however, this statement is dependent on his

9        avoiding alcohol and drug use in the future to

10        ensure this state of affairs, that it's

11        important that he continue to Alcoholic's

12        Anonymous if he is to be released.  This is an

13        important source of understanding and support

14        for the alcoholic.  Moreover, he must be

15        monitored regularly to ensure he is not

16        using."

17    And, quite frankly, I'm at a loss as to how that could be

18    done if he were to be deported to Mexico without there

19    being some inquiry on his part or inquiry on someone's

20    part, maybe family members, who could look into that and

21    see what resources are available and how to ensure that

22    he's not released and, in spite of his good intentions,

23    in spite of his word that he's a different person, that

24    he would never drink again.  I think there needs to be a

25    little bit more solidification of that rather than just

26    the good intentions, because I'm not hearing sufficient

27    indication that Mr. Fernandez is strong enough in that

48

1    area to be able to do that without some assist.  Now, the

2    part of what makes this problematic is the language issue

3    where Mr. Fernandez's English is not his -- his native

4    tongue and I would hope that these inferences that seem

5    to be raising troublesome concern are not just because of

6    the language.  I would feel much more comfortable if

7    there were a stronger psych assessment and somehow I

8    could hear a little bit more (inaudible) as to what's

9    going on in Mr. Fernandez's head, because what I've heard

10    today, I'm hearing the word, I'm hearing him say I'm a

11    different person now, I'll never drink again, but I'm not

12    seeing the independent verification on the outside that

13    there is a support network in place that would allow him

14    to function within a non-controlled environment in a safe

15    fashion that would not -- that would not allow him to be

16    a risk to others.  And with those comments, I have to say

17    that based on everything that I see here, he is not ready

18    for release.  There are other issues that need to be

19    addressed in terms of the parole plans and in terms of

20    perhaps some insight.  I heard him say today quite often

21    that he didn't really remember too much about the crime.

22    It was the alcohol.  And he seems to blaming the alcohol.

23    And I'm not sure that this is entirely alcohol-related

24    because of his history with not only alcohol, but his

25    history with some fascination of guns that in spite of

26    him running afoul of law and carrying a loaded firearm in

27    a public place and then picking up the felony conviction

49

1    of carrying a gun and shooting it through an occupied

2    dwelling.  Then on the date of the life crime, he's back

3    to carrying a gun again.  He doesn't seem to learn from

4    society's efforts to correct his behavior and I think

5    that goes beyond just a problem with alcohol.  It's got

6    to do something with a willingness, inability to conform

7    to the law and the fascination with firearms that doesn't

8    seem to be addressed, at least that aspect, in the -- the

9    most current psych eval.  So with all those comments, I

10   have to submit that I believe that the evidence before

11   the Panel shows that he still constitutes a significant

12   risk and an unacceptable -- an unacceptable risk if he

13   were to be released at this time and there is still work

14   that he needs to do, although he should be commended for

15   the efforts that he has been making in that direction.

16   Thank you.

17        **PRESIDING COMMISSIONER DAVIS:**  All right, thank you.

18   Mr. Sparks?

19        **ATTORNEY SPARKS:**  T     his is where I think the

20   Deputy DA's not served by appearing personally at these

21   hearings to be able to make observations in a direct way

22   about who Mr. Fernandez is.  Not that Rico doesn't have

23   experience in witnessing in where life prisoners and

24   their progress.  I certainly think that Mr. Rico

25   understands well where potential falls -- faults are of

26   some unsuitability for parole as he does have that kind

27   of experience he's not aware.  It's not that in this

50

1    particular situation, if he'd seen Mr. Fernandez in

2    person, he would be able to see that the changes that

3    he's made are genuine and that concerns that he has are

4    more of the nature of whether or not -- well, I mean if

5    you're a -- a pro-baseball player and you hit 365, you're

6    going into the whole thing.  But if you're an inmate and

7    you hit 365, you're not getting out of prison.  You know,

8    that's just kind of the way it is.  And so the question

9    is where is the standard for an inmate to be found

10    suitable for parole.  In the Board parole hearings it's -

11    - it's clearly concern about the citizens in the

12    community being harmed by someone like Mr. Fernandez

13    again and that's an appropriate concern.  I don't

14    disagree with that.  And I don't even necessarily

15    disagree with the notion that someone like Mr. Fernandez

16    has to change from his inner core to somebody that took

17    into his own hands revenge.  Which was totally

18    inappropriate and he has to understand that as a basic

19    realization about why he came into prison.  I certainly

20    think that that's appropriate and that alcohol was a

21    precipitating factor.  That this attitude that he had

22    about the wild west and begin able to do things his way

23    by retaliation for his brother's death is inappropriate

24    and he grasped that although it took a lot of leading

25    questions on my part to actually get him to realize that

26    this is really what the issue as to why he's

27    incarcerated.  It would be much easier if Mr. Fernandez

51

1    just came in and told the Parole Board, you know, what I

2    did was clearly inappropriate.  I took matters into my

3    own hands.  And that -- the question

4    that -- that Mr. Rico's ask -- asking in the sense is

5    will this revenge be an ongoing -- be in his family.

6    Whether or not the bygones be bygones and the resolution

7    has been made in his family.  Does anybody have any

8    bitterness towards him and doesn't he have to be fearful

9    in the community or is he still causing fear in the

10   community.  It's sort of an issue.  You know.  So yeah,

11   it would be nice to know, I mean, 1,000 percent it would

12   be nice to have a perfect hitting record relative to this

13   sort of hearing, but 23 years later, I mean, if things

14   aren't resolved you would think that the victim's next of

15   kin or somebody would be writing, you know, we're just

16   not comfortable with Mr. Fernandez being returned to the

17   community.  You would think somebody would say something.

18   And so to say well, we're going to speculate that

19   somebody's still uncomfortable with Mr. Fernandez, I

20   don't think that that's necessarily fair.  Somebody would

21   show up and say that if they were feeling that.  The DA's

22   office has affirmative duty to continue to let the

23   victim's next of kin know that these hearings are -- are

24   taking place and Mr. Fernandez himself is connected with

25   the family so they're aware of when he's coming up for

26   these parole consideration hearings.  The fact that his

27   family continues to support him and that he's provided

52

1    opportunities here today for his return to the community
2    is some evidence that bygones are bygones.  It's not
3    1,000 percent, but it's some evidence.  The psychological
4    report reports a low risk of violence if released to the
5    community and that's, again, some evidence that he's
6    suitable for parole and that he's changed, that he's
7    matured and grown.  I really think Mr. (inaudible)'s own
8    subjective analysis here today in terms of what the Panel
9    sees is the necessary statement to show that he's no
10   longer dangerous to the community.  That he's done his 12
11   Steps work and written it out shows that he has in place
12   the AA program of living and that finding that in the
13   community won't be that difficult.  In fact, in Mexico,
14   it's my understanding that Alcoholics Anonymous is -- is
15   something rather than a stigma the way oftentimes it's
16   perceived in the United States, that the people in Mexico
17   look at it more as heroes in a sense that they're taking
18   care of themselves now rather than pariahs in their
19   community.  And then I know that in the United States --
20   that's ultimately changing.  You wouldn't look at
21   somebody that has leukemia as a pariah.  You would look
22   at him as somebody that has a disease and -- and,
23   accordingly, if they're taking care of it by chemotherapy
24   or whatever you would think, well, they're taking care of
25   themselves.  Whereas in alcohol the same; you would look
26   at them as a sick person.  If you saw them as a sick
27   person, you wouldn't necessarily say well, you know,

53

1    they're not taking care of themselves.  So to Mr.

2    Fernandez's credit, he hasn't shown that he's willing

3    relapse in the institutional setting and that -- I think

4    that's a certainly good indication of his return to good

5    citizenship and that he's willing to live a day at a time

6    without alcohol in his life in the institution somehow

7    will reflect that same commitment in the community since

8    he does have a 12 Step methodology in place and knows

9    that he needs to return to that same methodology in the

10   community to abstain from alcohol use.  I would like to

11   see, as has been pointed out by the Panel, that where his

12   parole plans you're going to live here and you're going

13   to work here be somehow syncopated, but I'm not willing

14   to say that since he has a job offer and he's purporting

15   that he has family members in Mexico that they could be a

16   simple confirmation by way of during the gap if the

17   Parole Board gave him a release date, it's pretty obvious

18   it -- whoever's investigating where he's going to go and

19   where he's going to live is going to check those things

20   anyways and that that's not necessarily something that we

21   should deny him parole here for today as he didn't hit

22   1,000 again, you know, I think it's sufficient.  Not

23   perfect, but it's sufficient.  I'll submit on that.

24          PRESIDING COMMISSIONER DAVIS:  All right, thank you.

25   Mr. Fernandez, now is your opportunity to address the

26   Panel directly and tell us why you believe that you're

27   suitable for parole.

54

1          **INMATE FERNANDEZ:**  We all have a second opportunity.

2     My family needs me.  The family is very important and

3     they need me outside.

4          **PRESIDING COMMISSIONER DAVIS:**  Anything else, sir?

5          **INMATE FERNANDEZ:**  That's all.

6          **PRESIDING COMMISSIONER DAVIS:**  All right, thank you

7     very much.  We'll now recess for deliberation.

8                         **R E C E S S**

9                          --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

55

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER BLONIEN:**  We're on record.

4    **PRESIDING COMMISSIONER DAVIS:**  All right, let the

5    record reflect that all those previously identified as

6    being in the room have returned including -- by actually

7    just instead of video conference, now we just have a

8    phone connection of Mr. Rico.  So -- but everyone has

9    returned and this is in the matter of Guadalupe Fernandez

10   CDC number C-72642.  The Panel reviewed all information

11   received from the public and relied on the following

12   circumstances in concluding that the prisoner is not

13   suitable for parole and would pose an unreasonable risk

14   of danger to society or a threat to public safety if

15   released from prison.  We come to this conclusion first

16   by the commitment itself.  It -- the offense was carried

17   out in an especially callous manner.  The motive or the

18   offense was carried out in a dispassionate manner.  These

19   conclusions are drawn from the statement of facts wherein

20   the prisoner after years of reflection believes he killed

21   the victim more because of alcohol intoxication than out

22   of anger over the death of his brother.  He chose to

23   shoot the victim several times and left him to die.  With

24   regard to a previous record, we find that there is a

25   record of assaultive behaviors.  Specifically, firing

26   into an inhabited dwelling and a criminal conduct which

27   G. FERNANDEZ  C-72642  DECISION PAGE 1  8/17/06

56

1  consists primarily of alcohol and firearms violations for

2  which he received probation.  We find that he has failed

3  a previous grant of probation and failed to profit from

4  society's previous attempts to correct criminality.

5  Specifically, adult probation.  With regard to

6  institutional behavior, we find that he does have three

7  128(a)s, the last of which was in 10 of '95, and six

8  serious 115 disciplinary reports, the last of which was

9  in July of 1990.  So, effectively, since 1990 you have

10 been free of -- of discipline so that is a record to

11 be -- to be proud of and something that you could

12 certainly -- that you guard jealously and continue to

13 build upon.  The psychological report dated November 2003

14 by Dr. Talbot is not supportive of release.  And I'll

15 quote from the report itself where it states under

16 Assessment of Dangerousness,

17      "He likely will be a -- a low-risk for violence

18      in the free community, as well.  However, this

19      last statement is dependent on his alcohol and

20      drugs in the future.  To ensure this state of

21      affairs, it is important that he continue to

22      attend Alcoholic's Anonymous if he is to be

23      released since this is an important source of

24      understanding and support for the alcoholic.

25      Moreover, he must be monitored regularly to

26      ensure he is not using alcohol.

27  G. FERNANDEZ   C-72642   DECISION PAGE 2  8/17/06

57

1    So I think that goes, Mr. Fernandez, to our original

2    suggestions that you work on identifying locations where

3    you can continue your AA work should you -- should you --

4    when you -- when you receive a date.  We note that in

5    response to -- I'm sorry, with regard to parole plans,

6    your parole plans are taking shape, but they need to be

7    refined.  Job offers would be best on the company

8    letterhead and signed by the person who has the authority

9    to hire you.  Also, residential plans need to be clear

10    and with some relation to the place of employment.  We

11    note that in response to the 3042 notices, the District

12    Attorney from Santa Clara County is -- has joined us by

13    video conferencing and telephone and does oppose parole.

14    The San Jose Police Department had sent previous letters

15    of opposition in all of the prior hearings.  However, the

16    last letter for this hearing was not able to be

17    introduced due to the -- the -- the time in which it was

18    received by defense counsel.  Nevertheless, we do want to

19    commend you for several things.  First of all, your

20    consistent history of -- of AA, as well as your

21    independent work in AA during the lockdowns because

22    that's often something or reason or excuse we hear is

23    that well, we -- I haven't been able to participate in AA

24    because of a lockdown.  But you chose the more assertive

25    route and did some independent study and, in fact,

26    produced that -- that very good document that you allowed

27    G. FERNANDEZ   C-72642   DECISION PAGE 3   8/17/06

58

1    the Panel to read not only identifying the Steps, but

2    also writing an explanation of what the Steps meant to

3    you personally.  So I think that was a good thing that

4    you did on your part.  You have participated in the

5    Impact program and your -- you consistently work.  Your

6    most current work in the Kitchen, you received excellent

7    work reports.  This is a -- however, these aspects of

8    behavior or positive behavior do not outweigh the factors

9    of unsuitability.  This is a one-year denial.  The Panel

10   recommends that you remain disciplinary-free, that you

11   continue to participate in -- in self-help, that you earn

12   positive chrono's, and that you continue to refine your

13   parole plans.  And I would even go so far as to say that

14   you want to encourage family support letters.  I think

15   given the illness that your wife is facing that should

16   you receive a date and you're out there trying to help

17   her, you -- you're going to find that you're going to

18   need a lot of help to help her.  Probably in the way of

19   transportation.  Many, many things.  So the more that you

20   can begin to rally the family around you and identify

21   some of the -- their willingness to -- to help and --

22   and, as your counsel said, let bygones be bygones, I

23   think that will bode well for you also.  Commissioner, do

24   you have anything else you'd like to add?

25          **DEPUTY COMMISSIONER BLONIEN:**  No.  Good luck to

26   you.

27   **G. FERNANDEZ  C-72642  DECISION PAGE 4  8/17/06**

59

1    **PRESIDING COMMISSIONER DAVIS:** All right, Mr.

2    Fernandez, we wish you the best of luck. You have a lot

3    of work to do in -- in -- in one year. It's a very short

4    period of time, so start today. All right, good luck to

5    you, sir. We are adjourned.

6                         --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON: _____DEC 1 5 2006_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   G. FERNANDEZ  C-72642  DECISION PAGE 5    8/17/06

60

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Tracy Richardson, a duly designated transcriber, VINE MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 59, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GUADALUPE FERNANDEZ, CDC No. C-72642, on AUGUST 17, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated NOVEMBER 7, 2006, at Sacramento County, California.

_T Rich_

_____
TRACY RICHARDSON
Transcriber
**VINE MCKINNON & HALL**

# EXHIBIT 2

IN THE SUPERIOR COURT OF THE

STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| ) | |
| PLAINTIFF, ) | REPORT OF |
| ) | PROBATION OFFICER |
| vs. ) | No. 89523 |
| ) | September 8, 1983 |
| GUADALUPE FERNANDEZ        DEFENDANT, ) | D. Shearer, D.A. |
| ) | N. Gonzales, P.D. |
| ) | |
| ) | |

## COURT DATA

SENTENCING COURT:  Honorable John R. Kennedy

COURT OF CONVICTION:  Honorable John R. Kennedy

CHARGE:  Section 187 of the Penal Code (Murder), Second Degree
With Use of a Firearm Allegation, Admitted within the
meaning of Section 12022.5 and Section 1203.06 of the
Penal Code

DATE OF OFFENSE:  July 9, 1983

DATE OF ARREST:   July 9, 1983 (SJPD)

CONVICTION:  Pled guilty on August 11, 1983 pursuant to Sec. 859(a) PC.

CONDITIONS:  Sec. 187 PC stipulated to be in the Second Degree.

REMAINING CHARGES:  None

DAYS IN CUSTODY:  62 actual days, 31 days - 4019 PC, 93 total
days; presently in custody.

AGE & DATE OF BIRTH:  36; August 22, 1947; Mexico

CODEFENDANTS & STATUS:  None

SUMMARY OF OFFENSE:

The source of this summary is an Investigation Report prepared by
the San Jose Police Department, #83-190-1208.

MICROFILMED AT CDC

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

On July 9, 1983, at approximately 8:55 p.m., ~~the defendant~~ FERNANDEZ went
to 236 North 20th Street, San Jose, where Edwardo Fernandez was
talking to a Mr. Winstead, got out of his car, walked up to
Edwardo Fernandez and shot him several times with a .45 Caliber
Automatic. The defendant left the area after the shooting.
Police arrived and the victim was taken to the San Jose Hospital
where he was pronounced dead.

Witnesses identified the defendant and most knew him as he was
related to the victim.  The defendant was arrested on the same
date and it was learned that he had killed the victim because the
victim had killed the defendant's brother in a bar fight in
Mexico seven years prior.

Analysis of a blood sample obtained from the defendant revealed
that his blood alcohol content was 0.21%.  The .45 Caliber
Automatic weapon was located in the rear bedroom of 326 North
20th Street where Jesus Frausto had placed the weapon after he
had knocked it out of the defendant's hand.

The defendant was booked into the County Jail.

VICTIM'S STATEMENT:

Contact was made with the victim's daughter Anna Fernandez, 20
years old.  She indicated that her mother, the victim's wife does
not speak English.  Total funeral expenses came to $2,400.80.
Anna believes that the defendant should be sentenced to a lot of
years in Prison and indicated that if he gets out too soon that
her brother will be after him.

The victim's daughter was advised of her right to be present at
this Hearing and to be heard and she indicated that she, her
sister, Alicia, and her brother will be present.

DEFENDANT'S STATEMENT:

The defendant does not speak English.  At the defendant's request
and his approval inmate interpreter, Carlos Paniagua was used as
an interpreter.

In a verbal statement, the defendant admitted that he killed
Edwardo Fernandez.  He indicated that Edwardo had killed his
brother seven years ago.  He also indicated he was very drunk at
the time and believes that if he had not been so drunk he would
not have killed Edwardo.  He had purchased the .45 Caliber
Automatic approximately five months earlier for the purpose of
protecting his home.

-2-

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

As to disposition, the defendant does not believe 17 years of
State Prison is fair.  He believes this is too many years for this
particular type of situation.

The defendant was last employed for Atari in Sunnyvale from 1980
until 1983 until he was laid off.  He was working as an assembler
making $7 an hour.

The defendant denies any use of illegal drugs or narcotics.  As
to alcohol usage, the defendant indicates he consumes
approximately 10 beers per week on the average.

INTERESTED PARTIES:

The defendant's probation file indicates that he has been
supervised by the Probation Department on two separate grants.
On September 16, 1977, he was granted two years probation by the
San Jose Municipal Court after being convicted of Carrying a
Loaded Firearm in a Public Place.  On January 19, 1978, he was
granted two years probation by the Superior Court for Section 246
of the Penal Code (Shooting in an Occupied Dwelling).  The
probation file indicates that the defendant successfully
completed probation on January 19, 1980.

Notes in the probation file prepared by the defendant's past
supervising officer Lorenzo Arroyo, indicate that the defendant
did comply with all conditions of probation.

DISCUSSION:

Judicial Council Rules 414, 421 & 423:  (Attached)

Enhancements:  (None)

Case Evaluation:

Appearing before the Court is 36-year-old Guadalupe Fernandez,
who has pled guilty to Murder in the Second Degree.

The defendant's criminal record consists of four misdemeanor
convictions and one felony conviction.  The defendant has been
granted probation on two previous occasions, once for Carrying a
Loaded Firearm in a Public Place and another for Shooting into an
Occupied Dwelling.  His misdemeanor convictions were mostly
alcohol related.

In the present offense, the defendant shot and killed Edwardo
Fernandez, a relative of the defendant, who allegedly seven years

-3-

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523

September 8, 1983

prior had killed the defendant's brother in a bar fight in Mexico. The defendant was highly intoxicated at the time as indicated by an analysis of his blood which indicated a 0.21% blood alcohol content. The defendant indicates that if he had not been drunk, he does not believe he would have shot Edwardo Fernandez. However, it is noted that witnesses indicated that he had drove by the victim's location earlier prior to coming back and shooting the victim, indicating possible premeditation. The defendant demonstrates absolutely no remorse for this offense and believes that a 17 year State Prison sentence would not be fair considering this situation.

Reviewing the defendant's criminal record, two facts are outstanding: One, the defendant has an obsession with firearms; Two, he has an alcohol problem. Perhaps the California Department of Corrections can assist him with these two problems. It is recommended the defendant be committed to State Prison for 17 years to life. The defendant is absolutely ineligible for probation pursuant to Section 1203.06 of the Penal Code.

SUGGESTED TERM:

| CRIME | MIT | AGG | RANGE | ENHANCEMENT | TOTAL TERM |
|---|---|---|---|---|---|
| 187 PC, Second Degree | No | No | 15 Yrs to Life | 2 Years (12022.5 PC) | 17 Yrs to Life |

In the Case of:  GUADALUPE FERNANDEZ
Charge:  187 PC
Info. No.: 89523                                    September 8, 1983

RECOMMENDATION:

1.   Probation be denied.

2.   State Prison for 17 years to Life.

3.   Five years parole.

Respectfully submitted,

ROBERT M. WEIGLE
Chief Probation Officer

Lee R. Casey, Deputy
Probation Officer

LRC/lms
Attachments

Reviewed by:

C. John Wardle
Supervising Probation
Officer, Ext. 3621

The above report has been read and considered by the Court.

JOHN R. KENNEDY
Judge of the Superior Court
Santa Clara County, California

-5-